**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA  DIVISION**

| | |
|---|---|
| Jesika Brodiski and Peter Hayward, on behalf of themselves and all others similarly situated,<br><br>               Plaintiff(s),<br><br>   v.<br><br>Capital One Financial Corporation, Wikibuy LLC, and Wikibuy Holdings LLC,<br><br>               Defendant(s). | Case No.:  1:25-cv-23<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.      INTRODUCTION

1.      Coupon browser extensions are widely used by online shoppers to identify coupons and discounts on products and services they have already added to their online shopping cart.

2.      According to Defendant, the Capital One Shopping browser extension is a free tool that automatically looks for coupons, offers users a price comparison tools, and incorporates a built-in rewards point system wherein points can be redeemed for gift cards.

3.      Because of this, the Capital One Shopping browser extension is appealing to consumers looking for a discount on a product or service they're already interested in purchasing and have already added to their online shopping cart.

4.      Capital One Shopping can be used on desktop and laptop computers, and it can also be used on mobile devices (phones and tablets) by downloading the Capital One Shopping browser extension from the Apple App Store or Google Play Store.

5.      An estimated 10 million people in the United States use the Capital One Shopping browser extension.

6.      Capital One's Shopping browser extension, however, is designed to steal commissions from online marketers, including but not limited to website operators, online publications, YouTubers, influencers, and other content creators.

7.      Online marketers earn money by directing their followers and viewers to specific products and services, which are linked on their respective platforms and social media channels. When their followers and viewers purchase the products and services they are promoting via these affiliate links, they get credit for the referrals and purchases and earn sales commissions.

8.      Online retailers work with these online marketers through affiliate marketing programs, which rely on tracking tags and affiliate marketing cookies in order to determine who gets credit for online referrals and product sales.

9.      The online marketer is given a specific web link to share with their followers and audience, and if someone clicks on that link, the online marketer's unique affiliate marketing cookie populates and credits the online marketer with the sale.

10.     However, the Capital One Shopping browser extension cheats these online marketers out of commissions they are entitled to during the checkout process.

11.     As described in more detail throughout this complaint, Capital One programmed the Capital One Shopping browser extension to systematically appropriate commissions that belong to influencers like Plaintiffs and Class members. It does so by substituting its own affiliate marketing cookie in place of the online marketer's affiliate marketing cookie, and this happens even though the customer used the online marketer's specific affiliate web link to purchase a product or service.

12.     Plaintiffs are online marketers whose commission payments Capital One has wrongfully misappropriated. Plaintiffs bring this case on their own behalf and on behalf of all others

similarly situated to recover the damages they have sustained and enjoin Capital One's wrongful conduct going forward.

## II. JURISDICTION

13. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Capital One, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

14. This Court has personal jurisdiction over Capital One because Capital One has its principal headquarters in McLean, Virginia, does business in Virginia, directly or through agents, and has sufficient minimum contacts with Virginia such that it has intentionally availed itself of the laws of the United States and Virginia.

15. Venue is proper under 28 U.S.C. § 1391(a) through (d) because Capital One's headquarters and principal place of business are located in this District, Capital One resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Capital One's governance and management personnel.

## IV. PARTIES

### A. Plaintiffs

16. Jesika Brodiski is a resident of Renton, Washington.

17. Peter Hayward is a resident of Los Angeles, California.

### B. Defendants

18. Capital One Financial Corporation is a corporation organized and existing under the laws of Delaware.

19. On information and belief, Capital One Financial Corporation holds all assets and liabilities of Wikibuy, LLC and Wikibuy Holdings, LLC, two subsidiary corporations organized and

existing under the laws of Delaware that originally developed the Capital One Shopping browser extension.

20.     Capital One Financial Corporation, Wikibuy LLC, and Wikibuy Holdings, LLC are collectively referred to here as "Capital One."

21.     Capital One transacts business and is headquartered within this judicial district, specifically at 1680 Capital One Dr. in McLean, Virginia.

## V.     RELEVANT FACTS

### A.     Background

#### 1.     The Capital One Shopping Browser Extension

22.     Capital One acquired a cashback rewards startup and browser extension called "Wikibuy" for an undisclosed amount in 2018.

23.     Since then, the tool has been rebranded and now operates under the name Capital One Shopping, which is controlled by Capital One.

24.     Capital One entices users to download the Capital One Shopping browser extension by promising to search the internet for coupons that can be applied to items that are already in the user's online shopping cart.

25.     The browser extension works by employing near-instantaneous web scraping to search for and test coupon codes that may be applicable to the relevant purchase.

26.     Capital One also entices users to download and implement the Capital One Shopping browser extension by offering price-comparison tools and shopping rewards where cashback is earned on purchases.

27.     Importantly, the Capital One Shopping browser extension is not limited to its base of credit card account holders and other account holders. Rather, it is widely advertised by Capital One, which lists Capital One Shopping as one of its sources of non-interest income.

28.     According to Capital One's Annual Report for 2023, the company earned $7.5 billion in non-interest income, include income from Capital One Shopping.[1]

### 2.     Online Marketers and the Commission System

29.     With the rise of e-commerce, social media and increasing popularity of platforms like YouTube, Instagram, and TikTok, several retailers have turned to online marketers to promote and market their products to consumers.

30.     Online marketers make commissions by directing their readers and/or followers to affiliate links that they share on their various platforms and social media channels.

31.     Affiliate links are web-based hyperlinks that direct consumers to a website where they can purchase the product or service being promoted by a website, or online marketer.

32.     Online vendors use tracking tags to determine whether a consumer landed on the webpage for their product or service and made a purchase after clicking an affiliate link. Vendors can then attribute the sale to the influencer responsible for the affiliate link and provide a commission.

### 3.     Capital One's Misappropriation of Online Marketer Commissions

33.     Unbeknownst to Plaintiffs and other online marketers, Capital One uses the Capital One Shopping browser extension to manipulate online shoppers' website traffic and network traffic transmissions, namely by altering the tracking tags that are transmitted during the checkout process.

34.     This allows Capital One to surreptitiously take credit for sales commissions it did not earn.

35.     Capital One Shopping displaces tracking tags that point to influencers as the source of the referral, substitutes Capital One's own tracking tags, and holds Capital One out as the referrer of the specific products and/or services.

---

[1] *See* Capital One's Annual Report for 2023, pp. 57 (https://ir-capitalone.gcs-web.com/static-files/3381e479-cf44-4a85-a0f6-b7d8d30c2a31)(last accessed Jan. 2, 2025).

36.     The Capital One Shopping browser extension does this even if the sale in question emanated from a content creator's specific affiliate marketing link.

37.     Analysis of network traffic on websites where the Capital One Shopping browser extension is running reveals electronic transmissions and communications between an online shopper's web browser, the given website, and other third parties.

38.     Importantly, network traffic is typically invisible to ordinary website users.

39.     However, reviewing network traffic demonstrates that, when an online shopper has downloaded Capital One Shopping, the browser extension silently and invisibly removes affiliate cookies and tracking tags that would otherwise credit the rightful salesperson—the influencer—with the sale of that particular product or service.

40.     The images below illustrate what happens when an online shopper wants to purchase a product or service a specific influencer is promoting by clicking on that influencer's affiliate link and proceeding to the merchant's website to complete the checkout. Importantly, whether the influencer will be credited with the referral and  commission ultimately depends on whether the online shopper has activated the Capital One Shopping browser extension.



Figure 1. The screenshot was taken during the checkout process at greenmangaming.com after having navigated to the website from the online marketer's affiliate marketing link.

CLASS ACTION COMPLAINT

41.    Figure 1 shows the online merchant's website markup (left), which is what ordinary website visitors see, and the inspection panel (right) provides a glimpse into what is happening behind the scenes prior to activating the Capital One Shopping browser extension.

42.    In Figure 1, the user navigated to greenmangaming.com, which was being promoted by an influencer known as "Linus Tech Tips," and they arrived there by clicking on the influencer's affiliate marketing link. Next, they added an item to their cart and proceeded to the checkout page.

43.    The extensions tab shows that the Capital One Shopping browser extension has been installed but has not yet been activated on the particular page. At this point, the _entry cookie correctly attributes the referral to "Linus Tech Tips," which is shown in Figure 2.



Figure 2. The image above is a zoomed in version of Figure 1, which shows the affiliate marketing cookie value being displayed as "Linus Tech Tips," and thereby properly crediting him for the referral.

44.    In this scenario, the influencer gets credit for the referral and should receive a commission from the online merchant if the shopper completes their purchase.

45.    However, as demonstrated in the images below, once the Capital One Shopping browser extension is activated, the _entry cookie—which would otherwise credit "Linus Tech Tips" with the sale and affiliate commission—is removed and replaced with Capital One's own affiliate marketing cookie.



Figure 3. Capital One creates a pop-up banner on the shoppers web browser even though it did not identify any coupons for the purchaser to use.

46.    Capital One Shopping alters the checkout, and Linus Tech Tips' affiliate marketing cookie is removed and replaced with Capital One's own affiliate marketing cookie.



Figure 4. Screenshot take after Capital One Shopping is activated.

47.    In this scenario, Capital One gets credit for the referral and ultimate purchase of the product even though it did not help the online shopper identify the product, nor did it provide the online shopper with any additional discount for the product.

**B.    The Exploitation of Last-Click Attribution and Affiliate Marketing Links.**

48.    When an online shopper clicks on a content creator's affiliate marketing link, a tracking tag is generated that allows the online merchant to know who to credit with the referral and commission for the sale.

49.    The tracking tag is saved on the online shopper's browser in the form of a cookie that will expire some time in the future, commonly between 2-30 days, which varies depending on the

particular affiliate program. This ensures that, even if it takes a few days for the online shopper to complete their purchase, the content creator will still get credit for the sale.

50. When it comes to online referral commissions from affiliate marketing links, the industry standard used for crediting sales is "last click attribution," which means the last click determines who gets credit for a sale.

51. Consider a customer that clicks on a blogger's affiliate link to a particular product but never purchases the product. A few weeks pass, and the customer sees a different content creator's video promoting the same product. The customer clicks on the YouTuber's affiliate link for the product and completes their checkout.

52. In this scenario, last click attribution gives the YouTuber credit for the sale, not the blogger. This happens because, when the customer clicks on the YouTuber's affiliate link and opens the new checkout tab, the YouTuber's affiliate cookie displaces the blogger's affiliate cookie.

53. The Capital One Shopping browser extension is purposely designed to exploit the last-click attribution process, and it achieves this by producing pop-ups during the checkout process in order to simulate referral clicks.

54. Stated differently, downloading Capital One Shopping is not enough in and of itself. Rather, Capital One has designed its browser extension in a manner that requires users to actively engage with the browser extension—i.e. click buttons—in order to receive a discount, rewards, or cash back. These clicks are important to Capital One because, without them, the online marketer in question will still be credited with the sale and receive any corresponding commission payment. Capital One only gets credit for the sale if they get the user to click on their pop-up.

55. Accordingly, Capital One's goal is to entice online shoppers to active Capital One Shopping even when the browser extension has not identified any coupons.

C.      **Activation of the Capital One Extension**

56.    As described below, Capital One entices online shoppers to activate the Capital One Shopping browser extension in several different ways, each of which displaces the rightful referrer and claims commission credit for sales Capital One did not influence, much less generate.

57.    **Scenario 1:** In Figure 5, Capital One Shopping has been installed on the user's website browser. The online shopper clicks a content creator's marketing affiliate link and adds a product or service to their shopping cart. As the customer proceeds through the checkout process, Capital One Shopping creates a pop-up box alerting the user that it has identified a coupon, thereby enticing the user to click the "Try Codes" button.



Figure 5. Capital One Shopping generates a pop-up during the online shopper's checkout.

CLASS ACTION COMPLAINT

58.     If the online shopper clicks the "Try Codes" button, Capital One Shopping discreetly opens a new tab that acts as a simulated referral click. This process removes the content creator's affiliate cookie and replaces it with Capital One's own affiliate marketing cookie.

59.     Thus, as a result of clicking the "Try Codes" button, Capital One is able to seamlessly and invisibly insert its own affiliate cookies, thereby stealing credit for the sale.

60.     **Scenario 2:** The same online shopper follows an online influencer's marketing affiliate link to a gaming website. At checkout, Capital One Shopping generates a similar pop-up, but this time the shopper is presented with two options: "Try Codes" or "No Thanks, Activate Rewards." Like the "Try Codes" button, selecting the "No Thanks, Activate Rewards" button will also cause a simulated referral click. Thus, clicking either of the buttons shown in Figure 6 below will result in the content creator's affiliate cookies being replace by Capital One's own affiliate marketing cookie.



Figure 6. Screenshot taken during the a user's checkout where Capital One Shopping presents the user with multiple options.

CLASS ACTION COMPLAINT

61.     **Scenario 3:** The same online shopper clicks on a YouTuber's marketing affiliate link and proceeds to complete a checkout at bestbuy.com. This time, Capital One Shopping has not identified any coupons that apply to the purchase. However, as shown in Figure 7, Capital One Shopping still generates a pop-up to entice the user to activate the browser extension.



Figure 7. Screenshot taken during a user's checkout.

62.     Instead of providing a coupon, Capital One offers the user "up to 5% back" as part of the Capital One Shopping rewards program—a pseudo cash-back scheme where the user can redeem points for gift cards.

63.     If the user clicks the red "Activate" button, Capital One Shopping once again creates a simulated referral click that removes the influencer's affiliate cookies and invisibly credits Capital One with the referral and ultimate commission on the sale.

64.     In each of these scenarios, Capital One uses its browser extension to wrongfully steal commissions from their rightful owners.

**D.     Plaintiffs' Experiences**

65.     **Jesika Brodiski** is a content creator that has earned commission payments from affiliate marketing links she shared on her social media pages (@jesbro96).

66.     In the past year, Ms. Brodiski has received approximately $20,000 in commission payments from products purchased via her affiliate marketing links. However, Ms. Brodiski would have earned more income in the form of commission payments but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

67.     Capital One, via its browser extension, stole credit for sales and conversions that Ms. Brodiski originated through her own platforms, emanating from the affiliate marketing links she shared on those platforms.

68.     **Peter Hayward** is a content creator that earns commission payments from affiliate marketing links he shares on his YouTube channel (@PeterCHayward).

69.     Mr. Hayward has received commission payments from products purchased via his affiliate marketing links. However, he would have earned more income in the form of commission payments from his affiliate marketing links but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

70.     Capital One, via its browser extension, stole credit for sales and conversions that Mr. Hayward originated through his own platforms, emanating from the affiliate marketing links he shared on his platforms.

**D.      Damages & Harm**

71.     Plaintiffs and Class Members were harmed by Capital One's conduct because the Capital One browser extension systematically steals commission payments from their rightful owners—i.e. the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

72.     Plaintiff Brodiski promotes products via her social media channels and hosted affiliate marketing links to those products. She had several marketing affiliate links with Walmart.com, and her referral tag was set as an "AID" cookie, which corresponds to a specific referral program and specific referrer.

73.     When one of Ms. Brodiski's followers clicked on her affiliate marketing links and added products to their online shopping cart, her AID cookie attached and attributed the referral and sale of the product to Ms. Brodiski, thereby crediting her with the sale and corresponding commission payment.

74.     However, as depicted in Figure 8, if the user activated the Capital One Shopping browser extension during the checkout, Capital One wrongfully removed her AID cookie and replaced it with its own AID cookie (wmlspartner=imp_101044), stealing credit for the referral and corresponding commission payment for that particular product.



Figure 8. Screenshot taken at online checkout after the user activates Capital One Shopping.

75.     Ms. Brodiski spent a substantial amount of time cultivating her follower-base and promoting the products featured in her affiliate marketing links.

76.     She relied on the stream of income she generates through her work as a content creator and believes she has earned approximately $20,000 from her affiliate marketing links in 2024.

77.     Mr. Hayward also promotes products via his social media channels and hosts affiliate marketing links to those products. He is part of the Amazon affiliate marketing platform, and his affiliate links include tech equipment that he uses while making his videos.

78.     When one of Mr. Hayward's followers clicks on his affiliate marketing link to purchase one of the products he is advertising, they are redirected to Amazon.com to complete their purchase.

79.     At this point in time, his unique referral tags are generated so that he will be credited with the ultimate sale of the product and any corresponding commission payment.

80.     However, on information and belief, if the user actives the Capital One Shopping browser extension during checkout, Capital One Shopping removes Mr. Hayward's referral tag and replaces it with its own referral tag, thereby stealing credit for the referral and sale of the product and any corresponding commission payment for that particular sale.

81.     Plaintiffs were harmed by Capital One, via the Capital One Shopping browser extension, which deprived them of referral fees and sales commissions they are rightfully entitled to as the generator of those referrals and sales.

82.     The Capital One Shopping browser extension is activated during millions of online purchases each year. In the absence of the Capital One Shopping browser extension, Plaintiffs and Class Members would have earned more money in the form of referral fees and sales commissions from their respective affiliate marketing links.

83.     Plaintiffs continue to devote time and energy to content creation to generate commissions.  Plaintiffs accordingly face future harm in the form of stolen referral fees and sales commissions because the Capital One Shopping browser extension continues to steal affiliate marketing commissions with each passing day.

## VI.   CLASS ALLEGATIONS

84.   Plaintiffs, on behalf of themselves and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seek damages and injunctive relief on behalf of the members of the following Class and constituent Subclass (collectively, the "Class"):

85.   **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Capital One as a result of the Capital One Shopping browser extension.

86.   **California Subclass:** All persons in California who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Capital One as a result of the Capital One Shopping browser extension.

87.   Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

88.   **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

89. **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the Class.

90. **Adequate representation:** Plaintiffs will represent and protect the interests of the Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the Class, and their interests do not conflict with the interests of the Class members they seek to represent.

91. **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in Defendants' wrongful conduct because the injuries incurred by Plaintiffs and each member of the Class arose from the same conduct alleged herein.

92. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

    a. Whether Defendants programmed and designed the Capital One Shopping browser extension in a manner that wrongfully credits it as the originator of sales referrals;

    b. Whether the scheme described herein results in Capital One being awarded commission payments it did not rightfully earn;

    c. Whether Capital One was unjustly enriched to the detriment of Plaintiffs in the form of commission payments;

    d. Whether Defendants, through the actions alleged in this complaint, violated consumer protection laws in the state of California;

e.   Whether consumers and Class members have been damaged by Defendants' conduct; and

f.   The nature and scope of appropriate injunctive relief.

93.   **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

94.   Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

- The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## **TOLLING OF THE STATUTES OF LIMITATIONS**

95.     All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class Members could not have reasonably discovered Defendants' practice of surreptitiously manipulating network transmissions to allow Capital One to take credit for sales commissions it did not earn.

96.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class Members their practice of displacing tracking tags that point to influencers as the source of a referral and substituting their own tracking tags to appropriate commissions that belong to influencers like Plaintiffs and Class members. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF THE CLASS)

97.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

98.     Plaintiffs lack an adequate remedy at law.

99.     Plaintiffs and Class members have an interest, both equitable and legal, in the referral fees and commission payments to which they were wrongfully deprived.  These payments were rightfully earned by Plaintiffs and Class members, not Capital One.

100.     Capital One benefitted from the referral fees and commission payments that were credited to it as a function of the Capital One Shopping browser extension wrongfully claiming credit for commissions via last-click attribution.

101.    Capital One understood that it so benefitted, and it also understood and appreciated that the Capital One Shopping browser extension would cause the harm described herein.

102.    But for Capital One's unjust and improper use of the browser extension, it would not have been credited and awarded commission on sales that emanated from Plaintiffs' and Class Members' respective affiliate marketing links.

103.    As a result of Capital One's wrongful conduct as alleged in this Complaint, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class members.

104.    Capital One continues to benefit and profit from the browser extension while Plaintiffs and Class members continue to have their rightful commission payments diverted to Capital One.

105.    Capital One's unjust enrichment is traceable to, and resulted directly and proximately from the conduct alleged herein, including by using the Capital One Shopping browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

106.    The benefit conferred upon, received, and enjoyed by Capital One was not conferred officiously or gratuitously, and it would be inequitable and unjust for Capital One to retain the benefit.

107.    Equity and good conscience militate against permitting Capital One to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiffs and Class Members.

**SECOND CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

108.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

109.    Plaintiffs lack an adequate remedy at law.

110.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

111.    Capital One has engaged in acts and practices that are unfair in violation of the UCL.

112.    Capital One is a "person" as defined by Cal. Bus. & Prof. Code §17201.

113.    Capital One committed unfair business practices by using the Capital One Shopping browser extension to steal credit for sales referrals on purchases made in the state of California, and thereby received commission payments that rightfully belonged to Plaintiffs and members of the California Subclass.

114.    Capital One's conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage. *See* 5 Witkin, Summary 11th Torts § 854 (2024).

115.    Capital One wrongfully deprives Plaintiffs and Class Members of monies they rightfully earned as the true originators of sales arising from affiliate marketing links.

116.    The gravity of harm resulting from Capital One's practice of appropriating commissions that belong to influencers like Plaintiffs and Class members outweighs any potential utility therefrom. Capital One's conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

117.    Capital One actually and proximately caused harm to Plaintiffs and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

118.    The conduct alleged herein is continuing and there is no indication that Capital One will cease such activity in the future.

119.    Capital One's conduct in violation of the UCL has caused Plaintiffs and members of the California Subclass to be deprived of referral fees and commission payments for sales they

rightfully originated. Plaintiffs and the members of the California Subclass thus suffered lost money or property as a result of Capital One's conduct.

120.    Plaintiffs therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

## THIRD CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ON BEHALF OF THE CLASS)

121.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

122.    Plaintiffs and Class members are engaged in an economic relationship with eCommerce merchants by referring their followers to those merchants through affiliate links. In return, eCommerce merchants provide Plaintiffs and Class members with referral fees or commissions. These relationships are ongoing, and Plaintiffs and Class members expect to continue earning commissions in exchange for referrals.

123.    Capital One is aware of the referral and commission relationship between Plaintiffs and Class members on the one hand and eCommerce merchants on the other hand.

124.    Through use of the Capital One Shopping browser extension, Capital One steals commission payments from Plaintiffs and Class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. Specifically, Capital One displaces tracking tags that identify online marketers as the source of the referral, substitutes its own tracking tags, and holds itself out as the referrer of the specific products and/or services even though the sale in question emanated from a content creator's affiliate marketing link.

125.    Capital One either intended to usurp commissions from Plaintiffs and Class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees.

126.     Plaintiffs and Class Members were harmed by Capital One's conduct because the Capital One Shopping browser extension deprives Plaintiffs and Class Members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

127.     Capital One's conduct was a substantial factor in causing harm to Plaintiffs and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

128.     As a result of the above conduct, Capital One is liable to Plaintiffs and Class members for damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**CONVERSION**

129.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

130.     Plaintiffs and Class Members possessed or had a right to possess commissions they earned from referring consumers to products and services sold by eCommerce merchants. The amount of each commissions constituted a specific and identifiable sum.

131.     Capital One intentionally and substantially interfered with Plaintiffs' and Class members' personal property by usurping commissions and referral fees owed to Plaintiffs and Class members.

132.     Capital One, without proper authorization, assumed and exercised the right of ownership over these commissions, in hostility to the rights of Plaintiffs and Class members, without justification.

133.     Capital One's wrongful exercise of control over Plaintiffs' and Class members' personal property constitutes conversion.

134.     Plaintiffs and Class members neither assented to nor ratified Capital One's interference with their commissions.

135.    As a direct and proximate result of Capital One's conversion, Plaintiffs and Class members were harmed.

136.    Capital One is liable to Plaintiffs' and Class members for damages and costs permitted by law.

### JURY DEMAND

137.    Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 6, 2025                    Respectfully submitted,

By:  /s/ Lee A. Floyd_____
     Lee A. Floyd (VSB No. 88459)
     Justin M. Sheldon, Esq. (VSB No. 82632)
     **BREIT BINIAZAN, PC**
     2100 East Cary Street, Suite 310
     Richmond, Virginia 23223
     Telephone: (804) 351-9040
     Facsimile: (804) 351-9170
     Lee@bbtrial.com
     Justin@bbtrial.com

     Gary M. Klinger (*pro hac vice* forthcoming)
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN, PLLC**
     227 W. Monroe Street, Suite 2100
     Chicago, IL 60606
     Telephone: (866) 252-0878
     gklinger@milberg.com

     Alexandra M. Honeycutt (*pro hac vice* forthcoming)
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN, PLLC**
     800 S. Gay St., STE 1100
     Knoxville, TN 37929
     Telephone: (866) 252-0878
     ahoneycutt@milberg.com

     Adam E. Polk (*pro hac vice forthcoming*)
     Simon S. Grille (*pro hac vice* forthcoming)
     **GIRARD SHARP LLP**
     601 California Street, Suite 1400
     San Francisco, CA 94108
     Telephone: (415) 981-4800
     apolk@girardsharp.com
     sgrille@girardsharp.com