**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| *In re Capital One Financial Corporation, Affiliate Marketing Litigation* | Civil Action No. 1:25-cv-00023-AJT-WBP |

## CONSOLIDATED CLASS ACTION COMPLAINT

Pursuant to the Court's Order dated January 27, 2025, (ECF No. 20), Plaintiffs, on their own behalf and on behalf of all others similarly situated, bring this action against Defendants Capital One Financial Corporation, Wikibuy LLC, and Wikibuy Holdings LLC ("Defendants" or "Capital One Shopping" or "Capital One"), and allege as follows:

### I.     INTRODUCTION

1.     Coupon browser extensions are widely used by online shoppers to identify coupons and discounts on products and services that the consumers have already added to their online shopping carts.

2.     According to Defendants, the Capital One Shopping browser extension is a free tool that automatically looks for coupons, offers consumers a price comparison tool, and incorporates a built-in rewards point system wherein points can be redeemed for gift cards.

3.     Because of this, the Capital One Shopping browser extension is appealing to consumers looking for a discount on a product or service that they are already interested in purchasing and have already added to their online shopping cart.

4.     Capital One Shopping can be used on desktop and laptop computers by downloading the Capital One Shopping browser extension from a web browser's browser extension store, and it can also be used on mobile devices (phones and tablets) by downloading

the Capital One Shopping mobile application from the Apple App Store or Google Play Store.

5.     An estimated 10 million people in the United States use the Capital One Shopping browser extension.

6.     The Capital One Shopping browser extension, however, is designed to steal commissions from creators, including, but not limited to, website operators, online publications, YouTubers, influencers, and other creators in the online community.

7.     Creators earn money by directing their followers and viewers to specific products and services, to which the creators provide links on their respective platforms and social media channels. A link used to purchase a particular product at a particular online merchant's website is called an "affiliate link." When a creator's followers and viewers purchase products and services using an affiliate link, the creator gets credit for the referrals and purchases and the creator earns commissions on the sale.

8.     Online merchants work with these creators through affiliate marketing programs, which rely on tracking tags and affiliate marketing cookies to determine who gets credit for online referrals and product sales.

9.     The creator is given a specific web link to share with their followers and audience, and if someone clicks on that link, the creator's unique affiliate marketing cookie populates and credits the creator with the sale.

10.     However, during the checkout process, the Capital One Shopping browser extension cheats these creators out of commissions to which they are entitled.

11.     As described in more detail throughout this complaint, Capital One programmed the Capital One Shopping browser extension to systematically appropriate commissions that belong to creators like Plaintiffs and Class members. It does so by substituting its own affiliate

marketing identity code into a consumer's cookie in place of the creator's affiliate marketing identity code, and this happens even though the consumer used the creator's specific affiliate web link to purchase a product or service.

12.     Plaintiffs are creators whose commission payments Capital One has wrongfully misappropriated. Plaintiffs bring this case on their own behalf and on behalf of all others similarly situated to recover the damages they have sustained and enjoin Capital One's wrongful conduct going forward.

## II.    JURISDICTION

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Capital One because Capital One has its principal headquarters in McLean, Virginia, does business in Virginia, directly or through agents, and has sufficient minimum contacts with Virginia such that it has intentionally availed itself of the laws of the United States and Virginia.

15.     Venue is proper under 28 U.S.C. § 1391(a) through (d) because Capital One's headquarters and principal place of business are located in this District, Capital One resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Capital One's governance and management personnel.

### III.    PARTIES

**A.    Plaintiffs**

16.    Serge Belozerov is a resident of Worcester, Massachusetts.

17.    Eddie Blotnicki is a resident of Minocqua, Wisconsin.

18.    Jesika Brodiski is a resident of Renton, Washington.

19.    Shonna Coleman is a resident of Waverly, Nebraska.

20.    Misha Dobbs is a resident of Virginia Beach, Virginia.

21.    Courtney Doran is a resident of Oakland, New Jersey.

22.    Matthew Ely is a resident of Louisville, Kentucky.

23.    Jules Fletcher is a resident of Odessa, Texas.

24.    Rebecca Gandillon is a resident of Fenton, Missouri.

25.    Peter Hayward is a resident of Los Angeles, California.

26.    Carolyn Johnston is a resident of Kiln, Mississippi.

27.    Angela Kachonik is a resident of Homestead, Pennsylvania.

28.    Cameron King is a resident of Los Angeles, California.

29.    Lauren Leatherman is a resident of Keyser, West Virginia.

30.    Amy Malcolm is a resident of Peculiar, Missouri.

31.    Jose Moran is a resident of Yonkers, New York.

32.    Tatiana Marquez is a resident of Santa Ana, California.

33.    Kara Miller is a resident of Santa Maria, California.

34.    Hassan Nasrallah is a resident of Dearborn, Michigan.

35.    Brian Moses is a resident of Wylie, Texas.

36.    Edgar Oganesyan is a resident of Los Angeles, California.

37.    Leilani Shimoda is a resident of Los Angeles, California.

38.    Xavier Smith is a resident of Arizona.

39.    Clearvision Media, Inc., is a Nevada corporation with headquarters in Nevada.

40.    GamersNexus, LLC is a limited liability company organized and existing under the laws of North Carolina with its principal place of business in Apex, North Carolina.

41.    Just Josh, Inc., is an S corporation organized and existing under the laws of Arizona, with its principal place of business in Scottsdale, Arizona. Just Josh, Inc., is owned by Joshua Van Aalst.

42.    Storm Productions LLC is a limited liability company organized and existing under the laws of New York with its principal place of business in New York, New York.

**B.    Defendants**

43.    Capital One Financial Corporation is a corporation organized and existing under the laws of Delaware.

44.    On information and belief, Capital One Financial Corporation holds all assets and liabilities of Wikibuy, LLC, and Wikibuy Holdings, LLC, two subsidiary corporations organized and existing under the laws of Delaware that originally developed the Capital One Shopping browser extension.

45.    Capital One Financial Corporation, Wikibuy, LLC, and Wikibuy Holdings, LLC, are collectively referred to herein as "Capital One."

46.    Capital One transacts business and is headquartered within this judicial district, specifically at 1680 Capital One Dr. in McLean, Virginia.

## IV.     RELEVANT FACTS

**A.     Background**

**1.     The Capital One Shopping Browser Extension**

47.     Capital One acquired a cashback rewards startup and browser extension called "Wikibuy" for an undisclosed amount in 2018.

48.     Since then, the tool has been rebranded and now operates under the name Capital One Shopping, which is controlled by Capital One.

49.     Capital One entices consumers to download the Capital One Shopping browser extension by promising to search the internet for coupons that can be applied to items that are already in the consumers' online shopping carts.

50.     The browser extension purports to employ near-instantaneous web scraping to search for and test coupon codes that may be applicable to the relevant purchase.

51.     Capital One also entices consumers to download and use the Capital One Shopping browser extension by offering price-comparison tools and shopping rewards where cashback is earned on purchases.

52.     Even if Capital One Shopping cannot find a coupon for a product or service offered by an online merchant partner, a Capital One pop-up will still appear for consumers making eligible purchases:



53.    Importantly, the Capital One Shopping browser extension is not limited to its base of credit card account holders and other account holders. Rather, it is widely advertised by Capital One, which lists Capital One Shopping as one of its sources of non-interest income.

54.    According to Capital One's Annual Report for 2023, the company earned $7.5 billion in non-interest income, including income from Capital One Shopping.[1]

55.    The Capital One Shopping browser extension works on over 30,000 online merchants' websites, including Amazon, Macy's, Walmart, and Target.[2]

56.    Capital One Shopping earns considerable revenue through commissions from its merchant partners.[3]

### 2.    Creators and the Commission System

57.    With the increasing popularity of e-commerce, social media, and platforms like YouTube, Instagram, and TikTok, many merchants have turned to the online creator community to promote and market their products to consumers. Independent creators, in turn, secure compensation for their work through commissions—all without having an express marketing agreement with a manufacturer or retailer.

58.    Online merchants, like Amazon, Target, and Macy's, partner with creators for the promotion of their products and services and, in exchange, provide commissions from the sale of

---

[1] Capital One, *Annual Report 2023*, 57 (2023), https://ir-capitalone.gcs-web.com/static-files/3381e479-cf44-4a85-a0f6-b7d8d30c2a31.

[2] Capital One, *Capital One Shopping*, https://www.capitalone.com/learn-grow/money-management/capital-one-shopping/ (last visited Feb. 4, 2025).

[3] Capital One Shopping, *United States Terms of Service*, https://capitaloneshopping.com/our-terms/terms-of-service (last visited Feb. 4, 2025).

those products and services to those creators.

59. A creator is a third-party publisher who promotes a company's products or services in exchange for a commission.

60. Creators earn commissions by directing their readers, viewers, and/or followers to affiliate links that they share on their various platforms and social media channels.

61. Plaintiffs and Class members are online creators who create content on websites such as YouTube, TikTok, Twitter/X, Facebook, and Instagram, and earn commissions for promoting products and services as affiliate marketers.

**3.    The Affiliate Link Attribution System**

62. Affiliate links are web-based hyperlinks that direct consumers to a website where they can purchase the product or service being promoted by a creator.

63. Online merchants use tracking tags to determine whether a consumer landed on the webpage for their product or service and made a purchase after clicking an affiliate link. Merchants can then attribute the sale to the creator responsible for the affiliate link and provide a commission.

64. More specifically, affiliate marketing generally works as follows:[4]

- **<u>First</u>**, a creator will partner with an online merchant to promote its products and services. Often, this partnership is facilitated through an affiliate network, a third party that connects creators and online merchants and sometimes manages the partnership. As a part of the partnership, an online merchant will provide an "affiliate link" to the content creator. An affiliate link is a unique URL associated only with that specific content creator. When a consumer clicks on the affiliate link,

---

[4] GRIN Contributor, *Affiliate Marketing for Beginners in 2024*, GRIN, https://grin.co/blog/affiliate-marketing-for-beginners/ (last visited Feb. 4, 2025).

it will redirect the consumer to the webpage of the product or service that the online merchant is selling and the creator is promoting.

- **<u>Second</u>**, a creator creates "content," promoting an online merchant's product or service. Examples of "content" include videos on YouTube and TikTok, Instagram and Facebook "stories," live streams on Twitch, and text posts on X (formerly known as Twitter). The creator will include the affiliate link with their content.

- **<u>Third</u>**, a creator will post or stream affiliate content on their social media accounts and their viewers, *i.e.* "followers," will view that content and have access to the affiliate link.

- **<u>Fourth</u>**, a consumer viewing the creator's content uses the affiliate link to view the online merchant's webpage for the product or service that the creator was promoting. The viewer then purchases the product or service.

- And **<u>fifth</u>**, because the consumer purchased the online merchant's product or service using the affiliate link, the online merchant provides the creator with a commission from the sale of the product or service. The commission rate that a creator will receive varies depending on the product or service being promoted. For example, the breakdown of averages by product category in 2022-2023 was:[5]

---

[5]Refersion, *How    to    Negotiate    with    Affiliates* (March    1,    2023), https://www.refersion.com/blog/affiliates-negotiation/#:~:text=If%20they're%20underperforming%2C%20then,be%20time%20for%20a%20bonus.

| Product Category | Affiliate Commissions (% of Sale) |
|---|---|
| Arts & Crafts | 12% |
| Beauty | 15-20% |
| Business | 20-25% |
| Clothing | 10-15% |
| Computers & Tech | 15-20% |
| Education | 20% |
| Family | 20-25% |
| Financial | 30-40% |
| Fitness | 10-20% |
| Food & Drink | 10-20% |
| Hair | 10% |
| Health | 20-30%+ |
| Home | 10-20% |
| Jewelry | 15-30% |
| Paleo | 10% |
| Pets | 10-20% |
| General Products | 10-20% |
| Recreation | 10% |
| Services | 30% |
| SaaS | 20-30% |
| Adult | 10-15%+ |

65.     Around 80% of creators earn $80,000 a year or less from affiliate marketing, while top creators can take in over $1 million:[6]

| Income | Share of Affiliate Marketers |
|---|---|
| Up to $80,000 | 80% |
| $80,000 to $1 Million | 15% |
| Over $1 Million | 1% |

66.     In 2023, the size of the affiliate marketing industry was $15.7 billion and, according to a report by Astute Analytica, it is expected to grow to $36.9 billion by 2030.[7]

67.     The affiliate marketing industry is profitable because it is an effective way to market products and services to consumers.

68.     According to the 2024 Modern Consumer Survey published by GRIN, the world's leading online creator management platform, 74% of consumers have purchased a product because

---

[6] Shubham Singh, *113 Affiliate Marketing Statistics (2025): Market Size & Trends*, demandsage (Dec. 27, 2024), https://www.demandsage.com/affiliate-marketing-statistics/.

[7] Rewardful Team, *18 Affiliate Marketing Statistics for 2025*, Rewardful (Dec. 5, 2024), https://www.rewardful.com/articles/affiliate-marketing-statistics#:~:text=The%20affiliate%20marketing%20market%20size,reach%20%2415.7%20billion%20by%202024.

a social media influencer has recommended it.[8]

69.     In a 2023 survey from Matter Communications, 69% of survey respondents were more likely to trust a social media influencer's recommendation of a product or service over information an online merchant had provided about its product or service.[9]

70.     Affiliate marketing currently results in 16% of all e-commerce sales in the United States.[10]

71.     An affiliate link is a custom URL assigned to a creator by an online merchant.[11] The URL includes the creator's "affiliate ID," which is a specialized number or username that allows the online merchant to identify the affiliate involved in the sale.[12] The affiliate link thus allows an online merchant to credit a particular creator with commissions for any sales of the online merchant's product or service that result from that creator's marketing efforts.[13]

72.     While affiliate links vary in appearance, the URL for those links generally contain the following common elements:[14]



---

[8] GRIN, *U.S. Shoppers Are Under the Influence: 74% of Consumers Have Purchased a Product Because an Influencer Recommended It*, BusinessWire (Mar. 20, 2024, 8:00 AM) https://www.businesswire.com/news/home/20240320786326/en/U.S.-Shoppers-Are-Under-the-Influence-74-of-Consumers-Have-Purchased-a-Product-Because-an-Influencer-Recommended-It.

[9] Elise Dopson, *28 Important Influencer Marketing Statistics To Know in 2025*, Shopify (Nov. 11, 2024) https://www.shopify.com/blog/influencer-marketing-statistics.

[10] Arya Bina, *How Affiliate Networks Have Taken Affiliate Marketing Mainstream*, Forbes (Apr. 21, 2017, 7:00 AM) https://www.forbes.com/sites/forbesagencycouncil/2017/04/21/how-affiliate-networks-have-taken-affiliate-marketing-mainstream/?sh=5cdbd827569d.

[11] Dibakar Ghosh, *What Are Affiliate Links and How Do They Work?*, AuthorityHacker (Aug. 12, 2024) https://www.authorityhacker.com/what-are-affiliate-links/.

[12] *Id.*

[13] *Id.*

[14] *Id.*

73.    When a creator promotes an online merchant's product or service and shares the affiliate link for that product or service, a consumer viewing the creator's content can click on the affiliate link and be directed to a webpage on which the online merchant is selling the promoted product or service.[15]

74.    When the consumer clicks the affiliate link, a small text file is stored on that consumer's web browser that includes information about the creator who provided the consumer with the affiliate link.[16] The small text file is called a "cookie."

75.    Once a cookie is stored on a consumer's web browser, the cookie tracks the consumer's activity on the online merchant's website to determine whether the consumer ultimately purchased the product or service associated with the creator's affiliate link.[17]

76.    A cookie associated with an affiliate link can be stored on a consumer's web browser between 24 hours to 90 days or longer, with the permanence of the cookie determined by the online merchant that created the affiliate link for the creator.[18] That means if a consumer clicks on an affiliate link to view the product or service that a creator has promoted, closes out of the online merchant's webpage for that product or service for whatever reason, but then returns to the online merchant's website hours or days or weeks later to ultimately purchase the product or service, the creator can still be rewarded with the commission from the sale.[19]

77.    This cookie-tracking process can, however, be disrupted. For example, if a consumer clicks on affiliate links from different creators that direct the consumer to a webpage

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

that sells the same product or service, the online merchant will only provide a commission for the sale of the product or service to the creator associated with the last-used affiliate link of the purchaser.[20] This is called the "last-click attribution model."[21]

### 4.    Capital One's Exploitation of Last-Click Attribution

78.    Unbeknownst to Plaintiffs and other creators, Capital One uses the Capital One Shopping browser extension to manipulate consumers' website traffic and network traffic transmissions, namely by altering the tracking tags that are written to cookies on consumers' computing devices and transmitted during the checkout process.

79.    This allows Capital One to surreptitiously take credit for sales that it did not refer to the e-commerce website.

80.    Capital One Shopping displaces these tracking tags that point to creators as the source of the referral, substitutes Capital One's own tracking tags, and holds Capital One out as the referrer of the specific products and/or services.

81.    The Capital One Shopping browser extension does this even if the sale in question originated from a creator's specific affiliate marketing link.

82.    The Capital One Shopping browser extension is purposely designed to exploit the last-click attribution process and the operation of tracking tags, and it achieves this by producing pop-ups during the checkout process to simulate referral clicks.

83.    Stated differently, downloading Capital One Shopping is not enough in and of itself. Rather, Capital One has designed its browser extension in a manner that requires consumers to actively engage with the browser extension—i.e., click buttons—to receive a discount, rewards,

---

[20] *Id.*
[21] *Id.*

or cash back. These clicks are important to Capital One because, without them, the creator in question will still be credited with the sale and receive any corresponding commission payment. Capital One only gets credit for the sale if they get the consumer to click on their pop-up.

84.    Accordingly, Capital One's goal is to entice online shoppers to click buttons on Capital One Shopping even when the browser extension has not identified any coupons.

85.    Once a consumer clicks the buttons on any of these enticing pop-ups from the Capital One Shopping browser extension, Capital One discreetly opens a small new tab on the consumer's web browser. This small tab then replaces the cookie associated with the affiliate link for the creator with a cookie affiliated with Capital One. This new cookie falsely indicates to the online merchant that it was actually Capital One—and not the creator—that referred the consumer to the online merchant's website. With this bait-and-switch complete, Capital One automatically closes the small tab with the consumer none the wiser.

86.    The result of Capital One's programming ploy is that Capital One is given the last-click attribution for the sale of the online merchant's product or service and, subsequently, the online merchant pays Capital One the commission on the sale despite Capital One playing no role in referring a consumer to the online merchant's website.

87.    In the meantime, the content creator who had put in the time and effort to create the promotional content for the online merchant's product or service, had a consumer of that content click on an affiliated link which led that consumer directly to the online merchant's web page, and whose affiliate link ultimately resulted in the sale of that product or service, is left with no commission.

88.    Analysis of network traffic on websites through a browser that has the Capital One Shopping browser extension running reveals electronic transmissions and communications

between a consumer's web browser, a given website, and other third parties.

89.    Importantly, network traffic is typically invisible to ordinary website users.

90.    However, reviewing network traffic demonstrates that, when a consumer has downloaded Capital One Shopping, the browser extension silently and invisibly replaces affiliate tracking tags in the cookies on the consumer's computing device that would otherwise credit the rightful salesperson—the creator—with the sale of that particular product or service.

91.    The images below illustrate what happens when a consumer wants to purchase a product or service that a specific creator is promoting by clicking on that creator's affiliate link and proceeding to the online merchant's website to complete the checkout process. Importantly, whether the creator will be credited with the referral and commission ultimately depends on



whether the consumer has activated the Capital One Shopping browser extension.

92.    The image below shows the online merchant's website markup (left), which is what ordinary website visitors see, and the inspection panel (right), which provides a glimpse into what is happening behind the scenes prior to activating the Capital One Shopping browser extension.

93.    As shown below, the consumer navigated to greenmangaming.com, which was

being promoted by a creator known as "Linus Tech Tips," and they arrived there by clicking on the creator's affiliate marketing link. Next, the consumer added an item to their cart and proceeded to the checkout page.

94.    The extensions tab shows that the Capital One Shopping browser extension has been installed but has not yet been activated on the particular page. At this point, the _entry cookie correctly attributes the referral to "Linus Tech Tips," which is shown below.

95.    In this scenario, the creator gets credit for the referral and should receive a commission from the online merchant if the consumer completes their purchase.

96.    However, as demonstrated in the images below, once the Capital One Shopping browser extension is activated, the _entry cookie—which would otherwise credit "Linus Tech Tips" with the sale and affiliate commission—is revised and "Linus Tech Tips" is replaced with Capital One's own affiliate marketing identity code.



97.    Capital One Shopping alters the checkout, and Linus Tech Tips' affiliate marketing

code is overwritten with Capital One's own affiliate marketing code.

98.    Capital One thus gets credit for the referral and ultimate purchase of the product even though it did not help the consumer identify the product, nor did it provide the consumer with any additional discount for the product.

99.    Capital One entices consumers to activate the Capital One Shopping browser extension in several different ways, each of which displaces the rightful referrer and claims commission credit for sales Capital One did not influence, much less generate.

100.    **Scenario 1:** In the image below, Capital One Shopping has been installed on the consumer's website browser. The consumer clicks a creator's marketing affiliate link and adds a product or service to their shopping cart. As the consumer proceeds through the checkout process, Capital One Shopping creates a pop-up box alerting the consumer that it has identified a coupon, thereby enticing the consumer to click the "Try Codes" button.

101.    If the consumer clicks the "Try Codes" button, Capital One Shopping discreetly opens a new tab that acts as a simulated referral click. This process overwrites the creator's affiliate code and replaces it with Capital One's own affiliate marketing code.

102.     Thus, as a result of clicking the "Try Codes" button, Capital One is able to seamlessly and invisibly insert its own affiliate code into the cookies, thereby stealing credit for the sale.

103.     **Scenario 2:** The same consumer follows a creator's marketing affiliate link to a gaming website. At checkout, Capital One Shopping generates a similar pop-up, but this time the consumer is presented with two options: "Try Codes" or "No Thanks, Activate Rewards." Both the "Try Codes" button and the "No Thanks, Activate Rewards" button will cause a simulated referral click. Thus, clicking either of the buttons shown in the image below will result in the



creator's affiliate codes being replaced by Capital One's own affiliate marketing code.

104.     **Scenario 3:** The same consumer clicks on a YouTuber's marketing affiliate link and proceeds to complete a checkout at bestbuy.com. This time, Capital One Shopping has not

identified any coupons that apply to the purchase. However, as shown in the image below, Capital One Shopping still generates a pop-up to entice the consumer to activate the browser extension.



105.    Instead of providing a coupon, Capital One offers the consumer "up to 5% back" as part of the Capital One Shopping rewards program—a pseudo cash-back scheme where the consumer can redeem points for gift cards.

106.    If the consumer clicks the red "Activate" button, Capital One Shopping once again creates a simulated referral click that removes the YouTuber's affiliate code and invisibly credits Capital One with the referral and ultimate commission on the sale.

107.    In each of these scenarios, Capital One uses its browser extension to wrongfully steal commissions from their rightful owners.

108.    Capital One's unlawful tactics are not novel. The scheme is known as "cookie stuffing." Cookie stuffing is a fraudulent affiliate marketing technique in which "the Web cookies used to determine the likely source of user traffic are overwritten without the user's knowledge."[22]

---

[22] Neha Chachra, et al., *Affiliate Crookies: Characterizing Affiliate Marketing Abuse*, 1 (2015), https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf.

109.    As one academic research paper described the scheme:

> instead of using the affiliate URL as a clickable link, a fraudulent affiliate may cause the browser to directly fetch her affiliate URL on a page controlled by her without any explicit clicks from the user, thereby tricking the affiliate program into returning a cookie that then identifies the fraudulent affiliate as the referrer for the user's transactions. As a result, not only does an affiliate program pay a non-advertising affiliate, but the fraudulent cookie overwrites any existing affiliate cookie that may have already been present, thereby potentially stealing the commission from a legitimate affiliate. Furthermore, cookie-stuffing fraud is typically completely opaque to an end user and goes against the advertising guidelines issued by the Federal Trade Commission for marketers, which require declaration of any financial relationship with advertisers.[23]

110.    Cybersecurity companies such as McAfee classify extensions that attempt to commit such improper cookie-stuffing as "malicious code" because they attempt to alter cookies they are not authorized to alter.[24] Capital One Shopping engages in precisely this conduct.

## B.    Plaintiffs' Experiences

111.    **Serge Belozerov** is an affiliate marketer who shares his affiliate links to products on Habits 365 and Cocoburry on his Facebook (Serge Belozerov) and Instagram. In the past year, Mr. Belozerov has not made any referral fees for the affiliate marketing he has done.

112.    Mr. Belozerov was harmed by Capital One's conduct because the Capital One Shopping browser extension systematically steals referral fees from their rightful owners.

113.    In the absence of the Capital One Shopping browser extension, Mr. Belozerov would have earned more money in the form of referral fees from his affiliate links.

114.    Mr. Belozerov continues to devote time and energy to content creation to generate referral fees. Plaintiff accordingly faces future harm, in the form of stolen referral fees because the

---

[23] *Id.* at 2.

[24] McAfee Labs, *Malicious Cookie Stuffing Chrome Extensions with 1.4 Million Users*, McAfee (Aug. 29, 2022), https://www.mcafee.com/blogs/other-blogs/mcafee-labs/malicious-cookie-stuffing-chrome-extensions-with-1-4-million-users/.

Capital One Shopping browser extension continues to steal affiliate marketing referral fees with each referred sale.

115.    **Eddie Blotnicki** is a content creator with a substantial social media following, amassing approximately 11,400 followers on just one of the online platforms where he has a presence. As a component of his creative posts, he promotes products on YouTube.

116.    In connection with these promotions, Mr. Blotnicki participates in various online merchants' affiliate advertising programs, incorporating affiliate links into his content. Mr. Blotnicki earns commissions when users make purchases through these links. In an average month, Mr. Blotnicki receives about $45 in commissions.

117.    Until Capital One Shopping's unlawful scheme was uncovered, Mr. Blotnicki did not know why his commissions appeared lower than expected, despite his significant social media reach and high levels of audience engagement.

118.    On information and belief, a portion of Mr. Blotnicki's rightful affiliate commissions was improperly diverted from Mr. Blotnicki as a result of Capital One's unlawful scheme.

119.    Had Capital One not employed its Capital One Shopping web browser extension to reroute his commissions, Mr. Blotnicki would have received additional earnings from his affiliate links.

120.    **Jesika Brodiski** is a content creator who has earned commission payments from affiliate marketing links she shared on her social media pages (@jesbro96).

121.    Ms. Brodiski spent a substantial amount of time cultivating her follower-base and promoting the products featured in her affiliate marketing links.

122.    She relied on the stream of income she generates through her work as a content

creator and believes she has earned approximately $20,000 from her affiliate marketing links in 2024.

123.    Plaintiff Brodiski promotes products via her social media channels and hosted affiliate marketing links to those products. She had several marketing affiliate links with Walmart.com, and her referral tag was set as an "AID" cookie, which corresponds to a specific referral program and specific referrer.

124.    When one of Ms. Brodiski's followers clicked on her affiliate marketing links and added products to their online shopping cart, her AID cookie attached and attributed the referral and sale of the product to Ms. Brodiski, thereby crediting her with the sale and corresponding commission payment. However, as depicted in the image below, if the consumer activated the Capital One Shopping browser extension during the checkout, Capital One wrongfully removed her AID cookie and replaced it with its own AID cookie (wmlspartner=imp_101044), stealing credit for the referral and corresponding commission payment for that particular product.



125.    Ms. Brodiski would have earned more income in the form of commission payments but for Capital One's scheme to usurp commissions through the Capital One Shopping browser

extension.

126.    Capital One, via its browser extension, stole credit for sales and conversions that Ms. Brodiski originated through her own platforms, emanating from the affiliate marketing links that she shared on those platforms.

127.    **Shonna Coleman** is an influencer and content creator who earns commission payments from affiliate marketing links she shares on social media, including Facebook (see, e.g., https://www.facebook.com/share/p/1HYMCVzoAc/,

https://www.facebook.com/share/p/15XvJdJwmY/,

https://www.facebook.com/share/p/194HujNaX9/) and X (formerly known as Twitter) (@shonnacoleman).

128.    Ms. Coleman spends a substantial amount of time and money cultivating her follower-base and promoting the products featured in her affiliate marketing links. She relies on the stream of income she generates through her work as a content creator.

129.    In past years, Ms. Coleman has received substantial commission payments from products purchased via her affiliate marketing links.

130.    Ms. Coleman would have earned more income in the form of commission payments but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

131.    Capital One, via the Capital One Shopping browser extension, stole credit for sales and conversions that Ms. Coleman originated via her own platforms, emanating from the affiliate marketing links that she shared on those platforms.

132.    **Miesha Dobbs** is a content creator with a substantial social media following, amassing approximately 6,100 followers on just one of the online platforms where she has a

presence. As a component of her creative posts, she promotes products on Facebook, Instagram, and TikTok.

133.    In connection with these promotions, Ms. Dobbs participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, she receives about $400 in commissions.

134.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Dobbs was unaware of the reason her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

135.    On information and belief, a portion of Ms. Dobbs's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

136.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Dobbs would have received additional earnings from her affiliate links.

137.    **Courtney Doran** is a content creator with a substantial social media following, amassing approximately 56,000 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram, TikTok, X (Twitter), YouTube.

138.    In connection with these promotions, Ms. Doran participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Doran receives about $10,000 in commissions.

139.     Until Capital One Shopping's unlawful scheme was uncovered, Ms. Doran did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

140.     On information and belief, a portion of Ms. Doran's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

141.     Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Doran would have received additional earnings from her affiliate links.

142.     **Matthew Ely** is a co-owner of ToastyBros, LLC, which operates a popular YouTube channel ToastyBros, as well as several other channels.

143.     ToastyBros, which has approximately 750,000 followers, is a tech-oriented channel that offers PC hardware reviews and provides custom PC build guides. The other channels operated by ToastyBros, LLC are a mix of hobbyist channels and gaming focused channels and have a total of approximately 140,000 followers.

144.     Mr. Ely and his colleagues invest substantial time and effort into researching and trying out hardware, appliances, and tools that they promote and finding the best deals from online merchants. They rely on affiliate links that they post on their YouTube channel pages, as well as their Instagram, Twitter, and TikTok accounts, to earn commissions and help pay for their time and effort.

145.     ToastyBros, LLC regularly partners with affiliate market networks to promote products for online merchants, and occasionally partners directly with online merchants. ToastyBros, LLC posts affiliate links on all its channels and generates commission revenue by directing followers of its channels to online merchants' websites.

146.    Mr. Ely has been damaged by Capital One Shopping's interception and manipulation of his affiliate source information that resulted in Capital One Shopping diverting commissions to Capital One that he rightfully earned. He was not aware of this commission diversion scam until January 2025.

147.    **Jules Fletcher** is a content creator with a substantial social media following, amassing approximately 27,700 subscribers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram, TikTok, X (Twitter) and YouTube.

148.    In connection with these promotions, Ms. Fletcher participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Fletcher receives about $800-$1,000 in commissions.

149.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Fletcher did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

150.    On information and belief, a portion of Ms. Fletcher's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

151.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Fletcher would have received additional earnings from her affiliate links.

152.    **Rebecca Gandillon** is a blogger and content creator who promotes various products across several online platforms, including Amazon and Target.

153.    Ms. Gandillon has business relationships with several online merchants who

provide her with affiliate links to market their products and websites. Ms. Gandillon earns commission payments from these affiliate links when consumers use her affiliate links to purchase products online.

154.    Capital One used the Capital One Shopping extension to steal credit and commission for sales made using Ms. Gandillon's affiliate links that she originated and for which she should have received credit and commission.

155.    But for Capital One's fraudulent scheme to capture and misappropriate Ms. Gandillon's sales, she would have earned more money from commission payments than she did. Additionally, had Ms. Gandillon's marketing partners been aware of the true volume of sales she has generated, she would have been viewed more favorably by them and been provided with more favorable affiliate terms.

156.    **Peter Hayward** is a content creator who earns commission payments from affiliate links that he shares on his YouTube channel (@PeterCHayward).

157.    Mr. Hayward has received commission payments from products purchased via his affiliate links. However, he would have earned more income in the form of commission payments from his affiliate links but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

158.    Capital One, via its browser extension, stole credit for sales and conversions that Mr. Hayward originated through his own platforms, emanating from the affiliate links that he shared on his platforms.

159.    **Carolyn Johnston** is a content creator with a substantial social media following, amassing approximately 3,000 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook and TikTok.

160.    In connection with these promotions, Ms. Johnston participates in various merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Johnston receives substantial sums in commissions.

161.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Johnston did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

162.    On information and belief, a portion of Ms. Johnston's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

163.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Johnston would have received additional earnings from her affiliate links.

164.    **Angela Kachonik** is a content creator with a substantial social media following, amassing approximately 19,500 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram, Substack, TikTok, Twitch and YouTube.

165.    In connection with these promotions, Ms. Kachonick participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Kachonick receives about $200 in commissions.

166.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Kachonick did now know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

167.    On information and belief, a portion of Ms. Kachonick's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

168.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Kachonick would have received additional earnings from her affiliate links.

169.    **Cameron King** is a content creator and social media influencer who has a popular Instagram account under the feline alias Benjamin Butterscotch. Benjamin Butterscotch is the name of Mr. King's cat, and Mr. King uses the account to post adorable cat content and promote cat rescue and adoption efforts to the account's nearly 20,000 followers. Some of Mr. King's posts recounting his personal cat rescue efforts have gone viral and have garnered hundreds of thousands of "likes."

170.    Mr. King also provides affiliate links to cat products that he recommends to followers who are adopting or caring for cats. Mr. King earns commissions through these affiliate links as part of the Amazon Associates affiliate program.

171.    Mr. King has had followers specifically mention to him that they purchased a product through Mr. King's affiliate links, only for no such sale to be reflected in Mr. King's Amazon Associates account.

172.    Until Capital One Shopping's unlawful scheme was exposed along with several other cookie-stuffing, coupon-extension schemes, Mr. King was not able to identify the cause of his missing affiliate commissions.

173.    Some of Mr. King's affiliate commissions were improperly diverted from Mr. King as a result of Capital One's unlawful scheme.

174.    If Capital One had not utilized the Capital One Shopping web browser extension to

divert Mr. King's commissions to Capital One, Mr. King would have earned additional commission payments from his affiliate links.

175.    **Lauren Leatherman** is a content creator with a substantial social media following, amassing approximately 939,200 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram and TikTok.

176.    In connection with these promotions, Ms. Leatherman participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Leatherman receives about $20 in commissions.

177.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Leatherman did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

178.    On information and belief, a portion of Ms. Leatherman's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

179.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Leatherman would have received additional earnings from her affiliate links.

180.    **Amy Malcom** is a content creator with a substantial social media following, amassing approximately 8,500 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on TikTok.

181.    In connection with these promotions, Ms. Malcolm participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns

commissions when users make purchases through these links. In an average month, Ms. Malcolm receives about $100 in commissions.

182.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Malcolm did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

183.    On information and belief, a portion of Ms. Malcolm's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

184.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Malcolm would have received additional earnings from her affiliate links.

185.    **Jose Moran** is a content creator who, together with his son, promotes products sold by online merchants, including EnChroma and via NordVPN, pursuant to affiliate agreements. Mr. Moran promotes these products on social media platforms including YouTube and TikTok.

186.    In the last couple of years, Mr. Moran has earned approximately $1,000 in affiliate commissions.

187.    Mr. Moran would have earned more affiliate commissions but for Capital One's misconduct alleged herein. Through its conduct alleged herein, Capital One has overridden Mr. Moran's tracking tags and replaced them with its own, thereby guaranteeing itself last-click attribution and poaching Mr. Moran's affiliate commissions.

188.    Capital One has harmed and continues to harm Mr. Moran by poaching affiliate commissions as described herein. Capital One has deprived and continues to deprive Mr. Moran of affiliate commissions to which Mr. Moran is rightly entitled as the person who referred those consumers to the online merchants.

189.    By deliberately poaching Mr. Moran's affiliate commissions, Capital One reduces the income that Mr. Moran should rightfully be making from his referrals. Mr. Moran would have earned more income in the form of more affiliate commissions but for Capital One's scheme to poach affiliate commissions through Capital One Shopping.

190.    Mr. Moran continues to devote time and energy to creating online content and generating sales via his affiliate links. As a result, Mr. Moran faces future harm in the form of Capital One continuing to poach his affiliate commissions through its Capital One Shopping extension scheme described herein.

191.    **Tatiana Marquez** is a content creator with a substantial social media following, amassing approximately 6,840 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram, and TikTok.

192.    In connection with these promotions, Ms. Marquez participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Marquez receives about $299 in commissions.

193.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Marquez did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

194.    On information and belief, a portion of Ms. Marquez's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

195.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Marquez would have received additional earnings from her affiliate

links.

196.    **Kara Miller** is a content creator with a substantial social media following, amassing approximately 10,800 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Facebook, Instagram, Substack, TikTok, and X (Twitter).

197.    In connection with these promotions, Ms. Miller participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns commissions when users make purchases through these links. In an average month, Ms. Miller receives about $500 in commissions.

198.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Miller did not know why her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

199.    On information and belief, a portion of Ms. Miller's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

200.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Miller would have received additional earnings from her affiliate links.

201.    **Brian Moses** is a content creator who earns commission payments from affiliate links that he shares on his YouTube channel, @briancmoses. His channel features over 200 videos and has garnered approximately 2,380 subscribers.

202.    In addition to his YouTube content, Mr. Moses maintains a blog where he shares affiliate links to various products and services. These affiliate links serve as a primary source of income, as he earns commissions when his audience makes purchases through these links.

203.    Mr. Moses regularly partners with online merchants to promote their products and services, aiming to increase his affiliate commission payments. These partnerships often involve promoting products from merchants associated with affiliate programs.

204.    However, challenges have arisen in the affiliate marketing landscape. Browser extensions like Capital One Shopping interfere with affiliate marketing efforts. These practices result in creators like Mr. Moses suffering reduced income from their affiliate links.

205.    Capital One, via its browser extension, stole credit for sales and conversions that Mr. Moses originated through his own platforms, emanating from the affiliate links that he shared on his platforms.

206.    **Hassan Nasrallah** is a content creator with over 140,000 followers who earns commission payments from affiliate links that he shares on Instagram. As a content creator, Mr. Nasrallah reviews and discusses music videos and performances, and markets associated merchandise.

207.    Mr. Nasrallah typically earns upwards of 25% commission on the sales that are completed and for which he received appropriate attribution. Notwithstanding a constant increase in followers over the past two years, Mr. Nasrallah's commissions have steadily decreased.

208.    Until he learned about Capital Shopping's unlawful scheme, Mr. Nasrallah did not know why his commissions were not keeping up with his growth in followers and, in fact, were decreasing.

209.    A portion of Mr. Nasrallah's rightful affiliate commissions was improperly diverted from him as a result of Capital One's unlawful scheme.

210.    Had Capital One not employed its Capital One Shopping web browser extension to reroute his commissions, Mr. Nasrallah would have received additional earnings from his affiliate

links.

211.    **Edgar Oganesyan** runs a YouTube channel called TechSource that has 3.86 million followers. TechSource is dedicated to technology-related content, focusing on PC hardware reviews, custom PC builds, gaming and workstation setups and makeovers, and reviews on a wide range of tech products. TechSource regularly partners with online merchants either directly or through third-party affiliate networks, to promote products on his YouTube channel and to drive sales through affiliate links.

212.    Mr. Oganesyan has devoted tremendous effort and time to build his YouTube channel and continuously devotes time and effort to research and trying out new products before deciding whether to promote them on his platform.

213.    Over the past several years, Mr. Oganesyan noticed that his revenue from commissions had dropped, despite his viewership having increased during the same period of time. Mr. Oganesyan found this trend to be odd. He was not aware of the Capital One Shopping scam until January 2025.

214.    Mr. Oganesyan has been damaged by Capital One's interception and manipulation of his affiliate source information that resulted in Capital One diverting commissions to itself that he rightfully earned.

215.    **Leilani Shimoda** is a content creator with a substantial social media following, amassing approximately 45,000 followers on just one of the online platforms where she has a presence. As a component of her creative posts, she promotes products on Instagram, Facebook, and TikTok.

216.    In connection with these promotions, Ms. Shimoda participates in various online merchants' affiliate advertising programs, incorporating affiliate links into her content. She earns

commissions when users make purchases through these links. In an average month, Ms. Shimoda receives about $2,000 in commissions.

217.    Until Capital One Shopping's unlawful scheme was uncovered, Ms. Shimoda was unaware of the reason her commissions appeared lower than expected, despite her significant social media reach and high levels of audience engagement.

218.    On information and belief, a portion of Ms. Shimoda's rightful affiliate commissions was improperly diverted from her as a result of Capital One's unlawful scheme.

219.    Had Capital One not employed its Capital One Shopping web browser extension to reroute her commissions, Ms. Shimoda would have received additional earnings from her affiliate links.

220.    **Xavier Smith** is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. Mr. Smith works hard to create content that will interest his audience and lead them to click on the affiliate links that he posts. He partners with affiliate programs to receive commissions when his audience buys products that he recommends.

221.    Mr. Smith posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between approximately $500 and $2,500 per month.

222.    In 2023, Mr. Smith began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Capital One Shopping's interference.

223.    Mr. Smith has never himself used Capital One Shopping and did not know that Capital One Shopping was stealing his affiliate commissions.

224.    **Clearvision Media, Inc.**, operating under the brand names Think Media and Think

Media TV, is a prominent digital media company specializing in educational content tailored for aspiring and established content creators, particularly those on YouTube. The company offers a comprehensive suite of resources, including videos, podcasts, and courses aimed at guiding individuals on strategies to expand their YouTube channels, enhance video production quality, and leverage video as a powerful tool for business growth.

225.    Founded by Sean Cannell, a renowned YouTube strategist and international speaker, Clearvision Media has made significant strides in the digital content landscape. Mr. Cannell's journey into video production began when his youth pastor encouraged him to create videos for their church, a path that eventually led him to establish Think Media. Over the years, Mr. Cannell has been featured in Forbes' list of "20 Must Watch YouTube Channels That Will Change Your Business."

226.    As of February 2025, Think Media's YouTube channel boasts over 3.18 million subscribers and a library of approximately 2,430 videos. These videos cover a wide array of topics, including optimal strategies for channel growth and reviews of the latest technology, equipment, editing techniques, and more.

227.    In addition to content creation, Clearvision Media engages in affiliate marketing, establishing partnerships with various online merchants to promote products and services. However, the company has faced challenges in this arena. Notably, Capital One, through its browser extension, has been intercepting and taking credit for sales and conversions that originated from Clearvision's affiliate links shared across their platforms.

228.    Capital One, via its browser extension, stole credit for sales and conversions that Clearvision originated through its own platforms, emanating from the affiliate marketing links that Clearvision shared on its various platforms.

229.    **GamersNexus, LLC** has worked since 2008 to review products and provide valuable content to viewers through their website, YouTube, and social media channels. GamersNexus has created 3,033 videos, which have been viewed 684,000,000 times. Creating such useful content has garnered GamersNexus 2.4 million subscribers.

230.    GamersNexus uses affiliate links to direct people to NewEgg and Amazon. GamersNexus has relied on affiliate marketing since at least 2015. At its peak, GamersNexus generated approximately $161,600.00 in affiliate marketing revenue. In 2023, GamersNexus's affiliate marketing revenue was down to approximately $52,700.00 even though its channel has experienced substantial growth in the intervening years.

231.    GamersNexus has spent substantial time and money developing a community of viewers that support it. GamersNexus has spent substantial time and money reviewing products for which it provides affiliate links.

232.    When Capital One Shopping artificially replaces GamersNexus's referral tag with their own, GamersNexus is deprived of referral fees and sales commissions to which it is rightfully entitled.

233.    **Just Josh, Inc.**, has worked since 2019 to review electronic products and provide valuable content to viewers through their YouTube channel and website. Just Josh has produced nearly 300 YouTube videos and boasts 288,000 subscribers to their channel. In November 2024, Just Josh's website received at least 64,000 visitors.

234.    Just Josh has relied on affiliate marketing links on YouTube and its website since its inception.

235.    Just Josh has spent substantial time and money developing a community of viewers that support it. Just Josh has spent substantial time and money reviewing products for which it

provides affiliate links. In November 2024, Just Josh, Inc. received approximately $50,000 in affiliate link revenue.

236.    When Capital One Shopping artificially replaces Just Josh's referral tag with their own, Just Josh is deprived of referral fees and sales commissions to which it was rightfully entitled.

237.    **Storm Productions LLC** has operated a popular shopping blog called Madison Avenue Spy that showcases the best deals in the fashion world via affiliate links. The blog has nearly 22,000 subscribers and generates significant traffic. Storm Productions also runs an Instagram account by the same name and a Substack called MadSpy, where it also regularly posts fashion affiliate links. The Instagram account has approximately 110,000 followers, and the Substack has over 12,000 subscribers. In addition to these platforms, Madison Avenue Spy has an online presence on Pinterest, TikTok, X (formerly Twitter), Facebook, and Telegram.

238.    Storm Productions invests substantial time and effort into cultivating its follower base, searching for the best fashion deals from online merchants, and promoting those deals online. Storm Productions regularly partners with online merchants, either directly or through third-party affiliate networks, to advertise the online merchants' products through affiliate links. Storm Productions directly influences millions of dollars in retail purchases every year.

239.    For years, Storm Productions has earned substantial commissions on sales generated via affiliate links.

240.    Storm Productions would have earned more in commissions but for Capital One's scheme to poach commissions via its Capital One Shopping browser extension. Through this extension, Capital One stole credit for sales that Storm Productions generated with its affiliate links.

C.    **Damages & Harm**

241.    Plaintiffs and Class members were harmed by Capital One's conduct because the Capital One Shopping browser extension systematically steals commission payments from their rightful owners—i.e., the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

242.    Plaintiffs were harmed by Capital One, via the Capital One Shopping browser extension, which deprived them of referral fees and sales commissions to which they are rightfully entitled as the generator of those referrals and sales.

243.    The Capital One Shopping browser extension is activated during millions of online purchases each year. In the absence of the Capital One Shopping browser extension, Plaintiffs and Class members would have earned more money in the form of referral fees and sales commissions from their respective affiliate links.

244.    Plaintiffs continue to devote time and energy to content creation to generate commissions. Plaintiffs accordingly face future harm in the form of stolen referral fees and sales commissions because the Capital One Shopping browser extension continues to steal affiliate marketing commissions with each passing day.

## V.    CLASS ALLEGATIONS

245.    Plaintiffs, on behalf of themselves and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seek damages and injunctive relief on behalf of the members of the following Class and constituent Subclasses (collectively, the "Class"):

> **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States online merchant and had commissions diverted to Capital One as a result of the Capital One Shopping browser extension.

**Arizona Subclass:** All members of the Class who reside in Arizona.

**California Subclass:** All members of the Class who reside in California.

**Massachusetts Subclass:** All members of the Class who reside in Massachusetts.

**Michigan Subclass:** All members of the Class who reside in Michigan.

**Mississippi Subclass:** All members of the Class who reside in Mississippi.

**Missouri Subclass:** All members of the Class who reside in Missouri.

**Nebraska Subclass:** All members of the Class who reside in Nebraska.

**New Jersey Subclass:** All members of the Class who reside in New Jersey.

**New York subclass:** All members of the Class who reside in New York.

**North Carolina Subclass:** All members of the Class who reside in North Carolina.

**Pennsylvania Subclass:** All members of the Class who reside in Pennsylvania.

**Texas Subclass:** All members of the Class who reside in Texas.

**Virginia Subclass:** All members of the Class who reside in Virginia.

**West Virginia:** All members of the Class who reside in West Virginia.

**Wisconsin Subclass:** All members of the Class who reside in Wisconsin.

246.    The Arizona, California, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Texas, Virginia, West Virginia, and Wisconsin

Subclasses are referred to hereinafter collectively as "the State Subclasses."

247.    Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

248.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of each Subclass, such that joinder of all Subclass members is likewise impracticable.

249.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the Class.

250.    **Adequate representation:** Plaintiffs will represent and protect the interests of the Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the Class, and their interests do not conflict with the interests of the Class members whom they seek to represent.

251.    **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the

proposed Class are inherent in Defendants' wrongful conduct because the injuries incurred by Plaintiffs and each member of the Class arose from the same conduct alleged herein.

252.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

      a.   Whether Defendants programmed and designed the Capital One Shopping browser extension in a manner that wrongfully credits Capital One as the originator of sales referrals;

      b.   Whether the scheme described herein results in Capital One being awarded commission payments that it did not rightfully earn;

      c.   Whether Capital One was unjustly enriched to the detriment of Plaintiffs in the form of commission payments;

      d.   Whether Defendants, through the actions alleged in this complaint, violated consumer protection laws in the states of the State Subclasses;

      e.   Whether consumers and Class members have been damaged by Defendants' conduct; and

      f.   The nature and scope of appropriate injunctive relief.

253.    **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.

Further, uniformity of decisions will be ensured.

254.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## VI.    FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTES OF LIMITATIONS

255.    All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered Defendants' practice of surreptitiously manipulating network transmissions and altering Plaintiffs and Class members' cookie data to allow Capital One to take credit for sales commissions it did not earn.

256.    Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class members their practice of displacing tracking tags that point to creators as the source of a

referral and substituting their own tracking tags to appropriate commissions that belong to creators like Plaintiffs and Class members. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

257.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Defendants.

258.    **Who**: Defendants knew of and actively concealed their practice of affiliate commission diversion through cookie stuffing using the Capital One Shopping browser extension.

259.    **What**: Defendants knew that, as described above, consumers' activation of the Capital One Shopping extension diverts referral commissions from creators to Defendants by surreptitiously overwriting the affiliate cookie with Capital One's own data, thereby crediting the consumer's purchase to Capital One and not the referring creator.

260.    **When**: Defendants concealed their commission diversion scheme and Capital One Shopping's cookie stuffing functionality from Class members at all times.

261.    **Where**: Defendants concealed their commission diversion scheme and Capital One Shopping extension's cookie stuffing functionality from Class members by failing to disclose it on their website, advertisements to the public, the applicable terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course.

262.    **Why**: Defendants concealed their commission diversion scheme and Capital One Shopping extension's cookie stuffing functionality for the purpose of inducing consumers to install the Capital One Shopping extension so that Defendants could surreptitiously use consumers' computers to overwrite Class members' affiliate tracking cookies and steal commissions rightfully earned by those Class members.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF THE CLASS)

263.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

264.    Plaintiffs lack an adequate remedy at law.

265.    Plaintiffs and Class members have an interest, both equitable and legal, in the referral fees and commission payments to which they were wrongfully deprived. These payments were rightfully earned by Plaintiffs and Class members, not Capital One.

266.    Capital One benefitted from the referral fees and commission payments that were credited to it as a function of the Capital One Shopping browser extension wrongfully claiming credit for commissions via last-click attribution.

267.    Capital One understood that it so benefitted, and it also understood and appreciated that the Capital One Shopping browser extension would cause the harm described herein.

268.    But for Capital One's unjust and improper use of the browser extension, it would not have been credited and awarded commission on sales that emanated from Plaintiffs' and Class members' respective affiliate marketing links.

269.    As a result of Capital One's wrongful conduct as alleged in this Complaint, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class members.

270.    Capital One continues to benefit and profit from the browser extension while Plaintiffs and Class members continue to have their rightful commission payments diverted to Capital One.

271.    Capital One's unjust enrichment is traceable to, and resulted directly and

proximately from, the conduct alleged herein, including by using the Capital One Shopping browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

272.    The benefit conferred upon, received, and enjoyed by Capital One was not conferred officiously or gratuitously, and it would be inequitable and unjust for Capital One to retain the benefit.

273.    Equity and good conscience militate against permitting Capital One to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiffs and Class members.

## SECOND CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ON BEHALF OF THE CLASS)

274.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

275.    Plaintiffs and Class members are engaged in an economic relationship with online merchants by referring their followers to those merchants through affiliate links. In return, online merchants provide Plaintiffs and Class members with referral fees or commissions. These relationships are ongoing, and Plaintiffs and Class members expect to continue earning commissions in exchange for referrals.

276.    Capital One is aware of the referral and commission relationship between Plaintiffs and Class members on the one hand and online merchants on the other hand.

277.    Through use of the Capital One Shopping browser extension, Capital One steals commission payments from Plaintiffs and Class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an online merchant's product or service.

Specifically, Capital One displaces tracking tags that identify creators as the source of the referral, substitutes its own tracking tags, and holds itself out as the referrer of the specific products and/or services even though the sale in question emanated from a creator's affiliate marketing link.

278.    Capital One either intended to usurp commissions from Plaintiffs and Class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees.

279.    Plaintiffs and Class members were harmed by Capital One's conduct because the Capital One Shopping browser extension deprives Plaintiffs and Class members of monies that they rightfully earned as the true originators of sales arising from their affiliate marketing links.

280.    Capital One's conduct was a substantial factor in causing harm to Plaintiffs and Class members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

281.    As a result of the above conduct, Capital One is liable to Plaintiffs and Class members for damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
## (ON BEHALF OF THE CLASS)

282.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

283.    Plaintiffs and Class members have ongoing, valid, and enforceable contractual agreements with online merchants to promote products and services in exchange for commissions.

284.    Capital One knew that online merchants have these ongoing contractual relationships with Plaintiffs and Class members, under which Plaintiffs and Class members receive commissions from online merchants via affiliate links under a last-click-attribution model.

285.    Capital One intentionally disrupted this contractual relationship by intentionally

replacing the affiliate codes associated with Plaintiffs' and Class members' affiliate links with tracking codes associated with Capital One Shopping.

286.    Because Plaintiffs and Class members were deprived of their rightfully earned commissions, they sustained harm and economic injury as a direct and proximate result of Capital One's tortious interference with contractual relations. Plaintiffs and Class members accordingly seek damages in an amount to be proven at trial, as well as injunctive relief barring further interference.

**FOURTH CAUSE OF ACTION**
**CONVERSION**
**(ON BEHALF OF THE CLASS)**

287.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

288.    Plaintiffs and Class members possessed or had a right to possess commissions they earned from referring consumers to products and services sold by online merchants. The amount of each commission constituted a specific and identifiable sum.

289.    Capital One intentionally and substantially interfered with Plaintiffs' and Class members' personal property by usurping commissions and referral fees owed to Plaintiffs and Class members.

290.    Capital One, without proper authorization, assumed and exercised the right of ownership over these commissions, in hostility to the rights of Plaintiffs and Class members, without justification.

291.    Capital One's wrongful exercise of control over Plaintiffs' and Class members' personal property constitutes conversion.

292.    Plaintiffs and Class members neither assented to nor ratified Capital One's

interference with their commissions.

293.    As a direct and proximate result of Capital One's conversion, Plaintiffs and Class members were harmed.

294.    Capital One is liable to Plaintiffs and Class members for damages and costs permitted by law.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030 *ET SEQ.***
**(ON BEHALF OF THE CLASS)**

295.    Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

296.    The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, makes it unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4).

297.    Through its browser extension, Capital One, knowingly and with intent to defraud, exceeded its authorized access to the browsers and computers of consumers that downloaded its browser extension, and through this conduct furthered its fraudulent scheme to wrongfully obtain the affiliate commissions of Plaintiffs and Class members.

298.    Capital One exceeded its authorized access to the computers of its consumers by altering or removing affiliate cookies that Capital One was not entitled to alter or remove. Cookie-stuffing extensions, like Capital One Shopping, are considered "malicious code" that alter cookies

they are not authorized to alter.[25] Capital One exceeded its authorized access by exploiting vulnerabilities in the restrictions placed on browser extensions and by exploiting vulnerabilities in the restrictions put in place by affiliate networks to prevent cookie stuffing.

299.    As described above, when a consumer activates the Capital One Shopping extension, Capital One surreptitiously opens a new browser tab in the background to avoid detection by the consumer. Capital One Shopping then artificially mimics a genuine click on an affiliate marketing link associated with its own affiliate marketing account in this hidden browser tab, causing the online merchant's website to replace the affiliate cookies of Plaintiffs and the Class with Capital One Shopping's affiliate cookie.

300.    This sophisticated technique is designed to exploit vulnerabilities in the restrictions placed on browser extensions and in the technical restrictions put in place by affiliate networks to allow Capital One Shopping to artificially "trick" the consumer's browser and the online merchant's website into replacing the legitimate affiliate cookies of Plaintiffs and Class members with the illegitimate affiliate cookies of Capital One Shopping.

301.    Consumers of Capital One Shopping do not expect the Capital One Shopping extension to operate in this manner or to alter this data, and the extension's cookie-stuffing functionality is not disclosed in the applicable terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course.

302.    Capital One Shopping's malicious code is executed in the browsers of computers that are used in or affect interstate commerce, and thus meet the definition of "protected computer" under the CFAA.

---

[25] McAfee Labs, Malicious Cookie Stuffing Chrome Extensions with 1.4 Million Users (Aug. 29, 2022), https://www.mcafee.com/blogs/other-blogs/mcafee-labs/malicious-cookie-stuffing-chrome-extensions-with-1-4-million-users/.

303.    Capital One's substitution of its own affiliate cookies for the affiliate cookies of Plaintiffs and Class members impairs the integrity and availability of the data contained in the original affiliate cookies designating Plaintiffs and Class members as the proper party to receive an affiliate commission. As a result of Capital One's unlawful scheme, Plaintiffs and Class members have lost substantial revenue from these highly valuable commissions that were improperly diverted to Capital One. Thus, Plaintiffs and Class members have suffered damages and loss well in excess of $5,000 during a year within the relevant period as a result of Capital One's conduct.

304.    Plaintiffs and the Class seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CFAA.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF NEBRASKA'S UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT (UDTPA)**
**NEB. REV. STAT. § 87-301 *ET SEQ.***
**(ON BEHALF OF PLAINTIFF COLEMAN AND THE NEBRASKA SUBCLASS)**

305.    Plaintiff Coleman re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

306.    Nebraska's UDPTA makes it unlawful to engage in deceptive trade practices.

307.    Capital One violated Nebraska's UDPTA through its conduct as alleged herein. In particular, Capital One's conduct constitutes a violation of Sections 87-302(a)(2), (a)(3), (a)(5), (a)(6), (a)(12), and (a)(16).

308.    Capital One is liable to Plaintiff Coleman and the Nebraska Subclass for damages, costs and injunctive relief as permitted by law.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF NEBRASKA CONSUMER PROTECTION ACT (NCPA)**
**NEB. REV. STAT. § 59-1602 *ET SEQ.***
**(ON BEHALF OF PLAINTIFF COLEMAN AND THE NEBRASKA SUBCLASS)**

309.    Plaintiff Coleman re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

310.    The NCPA provides, in relevant part, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

311.    Capital One violated the NCPA through its conduct as alleged herein.

312.    Capital One's conduct affected the public interest because it was widespread. Affiliate links are ubiquitous, as is Capital One Shopping.

313.    Capital One is liable to Plaintiff Coleman and the Nebraska Subclass for damages, costs, and injunctive relief as permitted by law.

**EIGHTH CAUSE OF ACTION**
**VIOLATION OF ARIZONA CONSUMER FRAUD ACT**
**A.R.S. § 44-1521 *ET SEQ.***
**(ON BEHALF OF PLAINTIFFS SMITH, JUST JOSH, AND THE ARIZONA SUBCLASS)**

314.    Plaintiffs Just Josh and Xavier Smith re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

315.    Capital One is a "person" as defined by A.R.S. § 44-1521(6).

316.    Capital One advertised, offered, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

317.    Capital One engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in Arizona Consumer Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A).

318.     Capital One's business acts and practices are unfair and deceptive because they wrongfully interfere with Plaintiffs Just Josh, Smith, and the Arizona Subclass's business and contractual relationship, causing harm.

319.     Capital One wrongfully deprived Plaintiffs Just Josh, Smith, and Arizona Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

320.     Capital One actually and proximately caused harm to Plaintiffs Just Josh, Smith, and Arizona Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

321.     The conduct alleged herein is continuing and there is no indication that Capital One will cease such activity in the future.

322.     Capital One's conduct in violation of the ACFA has caused Plaintiffs Just Josh, Smith, and Arizona Subclass members to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiffs Just Josh, Smith, and the members of the Arizona Subclass thus suffered lost money or property as a result of Capital One's conduct.

323.     As a consequence of the unfair or deceptive acts engaged in by Capital One, Plaintiffs Just Josh, Smith, and the Arizona Subclass have been damaged in an amount to be proven at trial, and Plaintiffs Just Josh, Smith, and the Arizona Subclass are entitled to an injunction, all other appropriate relief in equity, restitution, the recovery of their actual damages, trebled, plus attorneys' fees and other costs of this action.

**NINTH CAUSE OF ACTION**
**VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT**
**MCLA § 445.901 *ET SEQ.***
**(ON BEHALF OF PLAINTIFF NASRALLAH AND THE MICHIGAN SUBCLASS)**

324.     Plaintiff Nasrallah re-alleges and incorporates by reference all factual allegations

above as if fully set forth herein.

325.    The Michigan Consumer Protection Act ("MCPA"), MCLA § 445.901 *et seq.* declares illegal "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MCLA. § 445.903.

326.    Capital One engaged in unfair, unconscionable, and deceptive acts and practices in trade and commerce in violation of the MCPA.

327.    Capital One's business acts and practices are unlawful because they wrongfully interfere with Plaintiff Nasrallah and the Michigan Subclass members' business and contractual relationship, causing harm.

328.    Specifically, Defendants' conversion and interference with Plaintiff Nasrallah and the Michigan Subclass members' contractual and business relationships constitutes a violation of the MCPA.

329.    Capital One wrongfully deprived Plaintiff Nasrallah and Michigan Subclass members of monies that they rightfully earned as the true originators of sales arising from their affiliate marketing links.

330.    Capital One actually and proximately caused harm to Plaintiff Nasrallah and Michigan Subclass members in that, among other things, they suffered economic injury by being deprived of commissions that they should have earned from referrals through their affiliate links.

331.    The conduct alleged herein is continuing and there is no indication that Capital One will cease such activity in the future.

332.    Capital One's conduct in violation of the MCPA has caused Plaintiff Nasrallah and the Michigan Subclass members to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff Nasrallah and the Michigan Subclass members thus suffered

lost money or property as a result of Capital One's conduct.

**TENTH CAUSE OF ACTION**
**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE**
**TRADE PRACTICES ACT**
**N.C. GEN. STAT. § 75-1 *ET SEQ.***
**(ON BEHALF OF PLAINTIFF GAMERSNEXUS AND THE NORTH CAROLINA**
**SUBCLASS)**

333.    Plaintiff GamersNexus re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

334.    North Carolina's Unfair and Deceptive Trade Practices Act ("NCUDTPA") disallows "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1.

335.    Capital One's conduct was in and affecting commerce and constitutes an unfair or deceptive practice in violation of the NCUDTPA.

336.    Capital One's business acts and practices are unlawful because they wrongfully interfere with Plaintiff GamersNexus's and the North Carolina Subclass's business and contractual relationship, causing harm.

337.    Specifically, Defendants' conversion and interference with Plaintiff GamersNexus's and the North Carolina Subclass's contractual and business relationships constitutes a violation of the NCUDTPA.

338.    Capital One wrongfully deprived Plaintiff GamersNexus and North Carolina Subclass members of monies that they rightfully earned as the true originators of sales arising from their affiliate marketing links.

339.    Capital One actually and proximately caused harm to Plaintiff GamersNexus and North Carolina Subclass members in that, among other things, they suffered economic injury by being deprived of commissions that they should have earned from referrals through their affiliate

links.

340.    The conduct alleged herein is continuing and there is no indication that Capital One will cease such activity in the future.

341.    Capital One's conduct in violation of the NCUDTPA has caused Plaintiff GamersNexus and the North Carolina Subclass members to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff GamersNexus and the North Carolina Subclass members thus suffered lost money or property as a result of Capital One's conduct.

342.    As a consequence of the unfair or deceptive acts or practices engaged in by Capital One, Plaintiff GamersNexus and the North Carolina Subclass have been damaged in an amount to be proven at trial, and, pursuant to N.C. Gen. Stat. § 75-1.1, § 75-16, and § 75-16.1, Plaintiff GamersNexus and the North Carolina Subclass are entitled to injunction, all other appropriate relief in equity, restitution, actual damages, treble damages, and attorneys' fees and other costs of this action.

## ELEVENTHCAUSE OF ACTION
## VIOLATION OF THE NEW YORK DECEPTIVE PRACTICES ACT
## N.Y. GEN. BUS. LAW § 349
## (ON BEHALF OF PLAINTIFF STORM PRODUCTIONS AND THE NEW YORK SUBCLASS)

343.    Plaintiff Storm Productions re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

344.    Under the New York Deceptive Practices Act, it is unlawful to use deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

345.    Plaintiff Storm Productions and the members of the New York Subclass are considered "persons" for the purpose of the Act.

346.     Capital One's acts, omissions, practices, and nondisclosures as alleged in this complaint constitute unlawful deceptive acts or practices within the meaning of the Act.

347.     Capital One engaged in consumer-oriented conduct by directing their deceptive acts and practices to the consuming public and the marketplace, thereby impacting the consumer decision-making process.

348.     Capital One's acts or practices were deceptive and misleading in a material way. Capital One's actions are likely to mislead a reasonable consumer acting under reasonable circumstances.

349.     Plaintiff Storm Productions and members of the New York Subclass suffered an injury as a result of Capital One's deception. Capital One covertly replaces their affiliate cookies with its own to divert their commissions to itself, with no corresponding benefit to Plaintiff Storm Productions or the members of the New York Subclass. And because the Capital One Shopping extension acted in a covert manner, Plaintiff Storm Productions and members of the New York Subclass could not have avoided the harm.

350.     As a direct and proximate result of Capital One's wrongful conduct, Plaintiff Storm Productions and members of the New York Subclass have suffered damages, including lost affiliate commissions that rightfully belonged to them. The full extent of the damages is not yet fully known and continues to impact Plaintiff Storm Productions and members of the New York Subclass.

351.     There is a causal relationship between Plaintiff Storm Productions' and New York Subclass members' loss and Capital One's actions and practices. But for Capital One's deceptive acts and practices, Plaintiff Storm Productions and members of the New York Subclass would not have had their commissions diverted to Capital One.

352.     At all relevant times, Capital One was willfully and knowingly engaged in the use of an unfair, unlawful, and deceptive practice or act.

### TWELFTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 *ET SEQ.* (ON BEHALF OF PLAINTIFFS EDWARDS, KING, MARQUEZ, MILLER, OGANESYAN, SHIMODA, AND THE CALIFORNIA SUBCLASS)

353.     Plaintiffs Edwards, King, Marquez, Miller, Oganesyan, and Shimoda ("California Plaintiffs") re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

354.     The California Plaintiffs lack an adequate remedy at law.

355.     California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200 *et seq.*

356.     Capital One has engaged in acts and practices that are unfair in violation of the UCL.

357.     Capital One is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

358.     Capital One committed unfair business practices by using the Capital One Shopping browser extension to steal credit for sales referrals on purchases made in the state of California, and thereby received commission payments that rightfully belonged to California Plaintiffs and members of the California Subclass.

359.     Capital One's conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage. *See* 5 Witkin, Summary 11th Torts § 854 (2024).

360.     Capital One wrongfully deprives California Plaintiffs and Class members of monies they rightfully earned as the true originators of sales arising from affiliate marketing links.

361.    The gravity of harm resulting from Capital One's practice of appropriating commissions that belong to creators like California Plaintiffs and Class members outweighs any potential utility therefrom. Capital One's conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

362.    Capital One actually and proximately caused harm to California Plaintiffs and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

363.    The conduct alleged herein is continuing and there is no indication that Capital One will cease such activity in the future.

364.    Capital One's conduct in violation of the UCL has caused California Plaintiffs and members of the California Subclass to be deprived of referral fees and commission payments for sales they rightfully originated. California Plaintiffs and the members of the California Subclass thus suffered lost money or property as a result of Capital One's conduct.

365.    California Plaintiffs therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

### THIRTEENTH CAUSE OF ACTION
### CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS & FRAUD ACT CAL. PENAL CODE § 502
### (ON BEHALF OF PLAINTIFFS EDWARDS, KING, MARQUEZ, MILLER, OGANESYAN, SHIMODA, AND THE CALIFORNIA SUBCLASS)

366.    The California Plaintiffs re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

367.    The California Comprehensive Computer Data Access & Fraud Act (CDAFA), Cal. Penal Code § 502, makes it unlawful to:

(1) Knowingly access[] and without permission alter[], damage[], delete[], destroy[], or otherwise use[] any data, computer, computer system, or computer network in order to

either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. . . .

(4) Knowingly access[] and without permission add[], alter[], damage[], delete[], or destroy[] any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. . . .

(8) Knowingly introduce[] any computer contaminant into any computer, computer system, or computer network.

368.    Through its browser extension, Capital One knowingly accesses and without permission alters, damages, deletes, and/or destroys the affiliate cookie data of California Plaintiffs and California Subclass members, in order to both (a) execute its unlawful and fraudulent scheme and (b) wrongfully control or obtain money, property, or data through the diversion of affiliate commissions that rightfully belong to California Plaintiffs and California Subclass members.

369.    Through its browser extension, Capital One knowingly accesses and without permission adds, alters, damages, deletes, and/or destroys the affiliate cookie data of California Plaintiffs and California Subclass members, which resides on covered computer systems.

370.    Under CDAFA, a "computer contaminant" is "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Cal. Penal Code § 502(b)(12).

371.    California Plaintiffs and California Subclass members have an ownership interest in the affiliate cookie data that is modified, damaged, and/or destroyed by the Capital One Shopping extension. The Capital One Shopping extension contains computer instructions that are designed to modify, damage, and/or destroy the affiliate cookie data of California Plaintiffs and

California Subclass members without their intent or permission, thus meeting the definition of "computer contaminant" under CDAFA. Capital One knowingly introduces this computer contaminant into the computers of consumers of its browser extension in violation of CDAFA.

372.     Capital One did not request or receive permission from either the consumers of its browser extension or California Plaintiffs and California Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of California Plaintiffs and California Subclass members residing on consumers' browsers, nor did Capital One request or receive permission to divert the affiliate commissions of California Plaintiffs and California Subclass members to Capital One.

373.     The Capital One Shopping extension's cookie-stuffing functionality is not disclosed in the applicable terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course.

374.     As a result of Capital One's unlawful scheme, California Plaintiffs and California Subclass members have lost substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

375.     California Plaintiffs and California Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CDAFA.

376.     Because Capital One's conduct is willful and fraudulent, California Plaintiffs and California Subclass members seek punitive or exemplary damages, as available under CDAFA. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving California Plaintiffs and California Subclass members of substantial commissions.

## FOURTEENTH CAUSE OF ACTION
**MISSISSIPPI COMPUTER CRIMES AND IDENTITY THEFT ACT**
**MISS. CODE § 97-45-3**
**(ON BEHALF OF PLAINTIFF JOHNSTON AND THE MISSISSIPPI SUBCLASS)**

377.    Plaintiff Johnston re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

378.    Under the Mississippi Computer Crimes and Identity Theft Act, Miss. Code § 97-45-3:

> (1) Computer fraud is the accessing or causing to be accessed of any computer, computer system, computer network or any part thereof with the intent to:
>
> > (a) Defraud;
> >
> > (b) Obtain money, property or services by means of false or fraudulent conduct, practices or representations; or through the false or fraudulent alteration, deletion or insertion of programs or data; or
> >
> > (c) Insert or attach or knowingly create the opportunity for an unknowing and unwanted insertion or attachment of a set of instructions or a computer program into a computer program, computer, computer system, or computer network, that is intended to acquire, alter, damage, delete, disrupt, or destroy property or otherwise use the services of a computer program, computer, computer system or computer network.

379.    Capital One has deployed its browser extension to access the affiliate cookie data on Plaintiff Johnston and Mississippi Subclass members' computers by diverting the affiliate commissions that rightfully belong to Plaintiff Johnston and Mississippi Subclass members.

380.    Capital One has deployed its browser extension to access the affiliate cookie data

on Plaintiff Johnston and Mississippi Subclass members' computers and obtain affiliate commissions which is the rightful property of Plaintiff Johnston and Mississippi Subclass members by means of false or fraudulent conduct, practices or representations, and/or through the false or fraudulent alteration, deletion or insertion of programs or data.

381.    Capital One has inserted or attached or knowingly created the opportunity for an unknowing and unwanted insertion or attachment of a set of instructions or a computer program, in the form of its browser extension, into Plaintiff Johnston and Mississippi Subclass members' computer systems, with an intention to acquire, alter, damage, delete, disrupt, or destroy affiliate cookie data and commissions that are the rightful property of Plaintiff Johnston and Mississippi Subclass members.

382.    Plaintiff Johnston and Mississippi Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has unlawfully acquired, altered, damaged, deleted, disrupted, and/or destroyed. The extension is programmed with computer instructions that are designed to acquire, alter, damage, delete, disrupt, or destroy the affiliate cookie data of Plaintiff Johnston and Mississippi Subclass members without their authorization, in direction violation of the Mississippi Computer Crimes and Identity Theft Act.

383.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Johnston, or (c) Mississippi Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Johnston and Mississippi Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Johnston and Mississippi Subclass members' rightful affiliate commissions for its own benefit.

384.    The Capital One Shopping extension's cookie-contaminating mechanism is not

disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

385.    As a direct result of Capital One's unlawful scheme, Plaintiff Johnston and Mississippi Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

386.    Plaintiff Johnston and Mississippi Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the Mississippi Computer Crimes and Identity Theft Act.

387.    Because Capital One's conduct is willful and deceitful, Plaintiff Johnston and Mississippi Subclass members seek punitive or exemplary damages, as available under Mississippi Computer Crimes and Identity Theft Act. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Johnston and Mississippi Subclass members of substantial commissions.

### FIFTEENTH CAUSE OF ACTION
### MISSOURI STATUTE AGAINST TAMPERING WITH COMPUTER DATA AND USERS
### R.S.MO. § 569.095, § 569.099
### (ON BEHALF OF PLAINTIFF MALCOLM, GANDILLON, AND THE MISSOURI SUBCLASS)

388.    Plaintiffs Malcolm and Gandillon re-allege and incorporate by reference all factual allegations above as if fully set forth herein.

389.    Under the Missouri statute against tampering with computer data, R.S.Mo § 569.095, it is unlawful to knowingly and without authorization:

(1) Modif[y] or destroy[] data or programs residing or existing internal to a computer, computer system, or computer network. . . .

(3) Disclose[] or take[] data, programs, or supporting documentation, residing or existing

internal or external to a computer, computer system, or computer network.

390.    Under the Missouri statute against tampering with computer data, R.S.Mo §
569.099, it is unlawful to knowingly and without authorization:

(1) Access[] or cause[] to be accessed any computer, computer system, or computer
network.

391.    Capital One has deployed its browser extension to knowingly access and without
authorization modify or destroy the affiliate cookie data of Plaintiffs Malcolm and Gandillon and
Missouri Subclass members by diverting the affiliate commissions that rightfully belong to
Plaintiffs Malcolm and Gandillon and Missouri Subclass members.

392.    Capital One has deployed its browser extension to knowingly and without
authorization take the affiliate cookie data of Plaintiffs Malcolm and Gandillon and Missouri
Subclass members that is residing or existing internal to the Plaintiffs Malcolm and Gandillon and
Missouri Subclass members' computers.

393.    Capital One has deployed its browser extension to knowingly and without
authorization access the affiliate cookie data stored within Plaintiffs Malcolm and Gandillon and
Missouri Subclass members' computer systems.

394.    Plaintiffs Malcolm and Gandillon and Missouri Subclass members have an
ownership interest in the affiliate cookie data that the Capital One Shopping extension has
unlawfully modified and/or destroyed. The extension is programmed with computer instructions
that are designed to modify and/or destroy the affiliate cookie data of Plaintiffs Malcolm and
Gandillon and Missouri Subclass members without their intent or authorization, in direction
violation of R.S.Mo § 569.095 and § 569.099.

395.    Capital One neither sought nor obtained permission from (a) consumers of its

browser extension, (b) Plaintiffs Malcolm and Gandillon, or (c) Missouri Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiffs Malcolm and Gandillon and Missouri Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiffs Malcolm and Gandillon and Missouri Subclass members' rightful affiliate commissions for its own benefit.

396.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

397.    As a direct result of Capital One's unlawful scheme, Plaintiffs Malcolm and Gandillon and Missouri Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

398.    Plaintiffs Malcolm and Gandillon and Missouri Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under R.S.Mo § 569.095 and § 569.099.

399.    Because Capital One's conduct is willful and deceitful, Plaintiffs Malcolm and Gandillon and Missouri Subclass members seek punitive or exemplary damages, as available R.S.Mo § 569.095, R.S.Mo § 569.099, and R.S.Mo § 537.525. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiffs Malcolm and Gandillon and Missouri Subclass members of substantial commissions.

## SIXTEENTH CAUSE OF ACTION
### NEW JERSEY COMPUTER RELATED
### OFFENSES ACT AND COMPUTER CRIME LAW
### N.J. STAT § 2A:38A-3, § 2C:20-25
### (ON BEHALF OF PLAINTIFF DORAN AND THE NEW JERSEY SUBCLASS)

400.    Plaintiff Doran re-alleges and incorporate by reference all factual allegations above as if fully set forth herein.

401.    Under the New Jersey Computer Related Offenses Act (CROA), N.J. Stat § 2A:38A-3, it is unlawful to engage in:

The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, database, computer program, computer software or computer equipment existing internally or externally to a computer, computer system or computer network.

402.    Under the New Jersey Computer Crime Law (CCL), N.J. Stat § 2C:20-25, it is unlawful to purposely or knowingly and without authorization, or in excess of authorization:

(a) Accesses any data, data base, computer storage medium, computer program, computer software, computer equipment, computer, computer system or computer network;

(b) Alters, damages or destroys any data, data base, computer, computer storage medium, computer program, computer software, computer system or computer network . . .

403.    Capital One has deployed its browser extension to knowingly access and without authorization alter, damage, delete, take, and/or destroy the affiliate cookie data of Plaintiff Doran and New Jersey Subclass members, in order to both (a) execute its unlawful and deceitful scheme and (b) wrongfully control or obtain money, property, or data by diverting the affiliate commissions that rightfully belong to Plaintiff Doran and New Jersey Subclass members.

404.    Capital One has deployed its browser extension to knowingly access and without authorization add, alter, damage, delete, and/or destroy the affiliate cookie data of Plaintiff Doran and New Jersey Subclass members, which resides on a covered computer system.

405.    Plaintiff Doran and New Jersey Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has unlawfully modified, damaged, and/or destroyed. The extension is programmed with computer instructions that are designed to access, modify, damage, and/or destroy the affiliate cookie data of Plaintiff Doran and New Jersey Subclass members without their intent or authorization, in direction violation of CROA and CCL.

406.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Doran, or (c) New Jersey Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Doran and New Jersey Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Doran's and New Jersey Subclass' members' rightful affiliate commissions for its own benefit.

407.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

408.    As a direct result of Capital One's unlawful scheme, Plaintiff Doran and New Jersey Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

409.    Plaintiff Doran and New Jersey Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CROA and CCL.

410.    Because Capital One's conduct is willful and deceitful, Plaintiff Doran and New Jersey Subclass members seek punitive or exemplary damages, as available under CROA and CCL. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Doran and New Jersey Subclass members of substantial commissions.

**SEVENTEENTH CAUSE OF ACTION**
**PENNSYLVANIA COMPUTER OFFENSES LAW**
**18 PA.C.S. § 7611**
**(ON BEHALF OF PLAINTIFF KACHONIK AND THE PENNSYLVANIA SUBCLASS)**

411.    Plaintiff Kachonik re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

412.    Under the Pennsylvania Computer Offenses Law, 18 Pa.C.S. § 7611, it is unlawful to:

(1) access[] or exceed[] authorization to access, alter[], damage[] or destroy[] any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof with the intent to interrupt the normal functioning of a person or to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations or promises;

(2) intentionally and without authorization access[] or exceed[] authorization to access, alter[], interfere[] with the operation of, damage[] or destroy[] any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof . . .

413.    Capital One has deployed its browser extension to knowingly access and without

permission alter, damage, delete, and/or destroy the affiliate cookie data of Plaintiff Kachonik and Pennsylvania Subclass members, by diverting the affiliate commissions that rightfully belong to Plaintiff Kachonik and Pennsylvania Subclass members.

414.    Capital One has deployed its browser extension to knowingly access and without permission add, alter, damage, delete, and/or destroy the affiliate cookie data of Plaintiff Kachonik and Pennsylvania Subclass members, which resides on covered computer systems.

415.    Plaintiff Kachonik and Pennsylvania Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has unlawfully modified, damaged, and/or destroyed. The extension is programmed with computer instructions that are designed to access, modify, damage, and/or destroy the affiliate cookie data of Plaintiff Kachonik and Pennsylvania Subclass members without their authorization, in direction violation of the Pennsylvania Computer Offenses Law.

416.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Kachonik, or (c) Pennsylvania Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Kachonik and Pennsylvania Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Kachonik and Pennsylvania Subclass members' rightful affiliate commissions for its own benefit.

417.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

418.    As a direct result of Capital One's unlawful scheme, Plaintiff Kachonik and Pennsylvania Subclass members have suffered significant financial losses, including substantial

revenue from highly valuable commissions that were improperly diverted to Capital One.

419.    Plaintiff Kachonik and Pennsylvania Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the Pennsylvania Computer Offenses Law.

420.    Because Capital One's conduct is willful and deceitful, Plaintiff Kachonik and Pennsylvania Subclass members seek punitive or exemplary damages, as available under the Pennsylvania Computer Offenses Law. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Kachonik and Pennsylvania Subclass members of substantial commissions.

**EIGHTEENTH CAUSE OF ACTION**
**TEXAS BREACH OF COMPUTER SECURITY LAW**
**TEX. PENAL CODE § 33.02**
**(ON BEHALF OF PLAINTIFF FLETCHER AND THE TEXAS SUBCLASS)**

421.    Plaintiff Fletcher re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

422.    Under the Texas Breach of Computer Security Law, Tex. Penal Code § 33.02, it is unlawful to:

> (a) . . . knowingly access[] a computer, computer network, or computer system without the effective consent of the owner. . . .
>
> (b-1) . . . with the intent to defraud or harm another or alter, damage, or delete property, . . . knowingly access[]:
>
>> (1) a computer, computer network, or computer system without the effective consent of the owner . . .

423.    Capital One has deployed its browser extension to knowingly access a computer system without the effective consent of Plaintiff Fletcher and Texas Subclass members.

424.    Capitol One has deployed its browser extension with the intent to defraud or harm or alter, damage, or delete affiliate cookie data of Plaintiff Fletcher and Texas Subclass members, and knowingly access a computer system without the effective consent of Plaintiff Fletcher and Texas Subclass members.

425.    Plaintiff Fletcher and Texas Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has unlawfully modified, damaged, and/or destroyed. The extension is programmed with computer instructions that are designed to modify, damage, and/or destroy the affiliate cookie data of Plaintiff Fletcher and Texas Subclass members without their intent or permission. Capital One knowingly introduces this extension and in turn accesses consumers' computers through its browser extension, in direction violation of Texas Breach of Computer Security Law.

426.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Fletcher, or (c) Texas Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Fletcher and Texas Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Fletcher's and Texas Subclass' members' rightful affiliate commissions for its own benefit.

427.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

428.    As a direct result of Capital One's unlawful scheme, Plaintiff Fletcher and Texas Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

429.    Plaintiff Fletcher and Texas Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the Texas Breach of Computer Security Law.

430.    Because Capital One's conduct is willful and deceitful, Plaintiffs and Texas Subclass members seek punitive or exemplary damages, as available under the Texas Breach of Computer Security Law. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Fletcher and Texas Subclass members of substantial commissions.

**NINETEENTH CAUSE OF ACTION**
**VIRGINIA COMPUTER CRIMES ACT**
**VA. CODE § 18.2-152.1 *ET SEQ.***
**(ON BEHALF OF PLAINTIFF DOBBS AND THE VIRGINIA SUBCLASS)**

431.    Plaintiff Dobbs re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

432.    Under the Virginia Computer Crimes Act (VCCA), Va. Code § 18.2-152.1 *et seq.*:

(18.2-152.3) Any person who uses a computer or computer network, without authority and:

(1) Obtains property or services by false pretenses;

(2) Embezzles or commits larceny; or

(3) Converts the property of another is guilty of the crime of computer fraud. . . .

(18.2-152.4) It is unlawful for any person, with malicious intent, or through intentionally deceptive means and without authority, to:

(3) Alter, disable, or erase any computer data, computer programs or computer software . . .

433.    Capital One has deployed its browser extension to access and without authority

obtain affiliate commissions that is the rightful property of Plaintiff Dobbs and Virginia Subclass members by using affiliate cookie data stored on Plaintiff Dobbs and Virginia Subclass members' computers.

434.     Capital One has deployed its browser extension with malicious intent or through intentionally deceptive means and without authority to alter, disable, or erase the affiliate cookie data of Plaintiff Dobbs and Virginia Subclass members, which resides on covered computer systems.

435.     Plaintiff Dobbs and Virginia Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has unlawfully modified, damaged, and/or destroyed. The extension is programmed with computer instructions that are designed to modify, damage, and/or destroy the affiliate cookie data of Plaintiff Dobbs and Virginia Subclass members without their intent or authorization, in direction violation of the VCCA.

436.     Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Dobbs, or (c) Virginia Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Dobbs and Virginia Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Dobbs and Virginia Subclass members' rightful affiliate commissions for its own benefit.

437.     The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

438.     As a direct result of Capital One's unlawful scheme, Plaintiff Dobbs and Virginia Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

439.    Plaintiff Dobbs and Virginia Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the VCCA.

440.    Because Capital One's conduct is willful and deceitful, Plaintiff Dobbs and Virginia Subclass members seek punitive or exemplary damages, as available under the VCCA. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Dobbs and Virginia Subclass members of substantial commissions.

**TWENTIETH CAUSE OF ACTION**
**WEST VIRIGINIA COMPUTER CRIME AND ABUSE ACT**
**W. VA. CODE § 61, ART. 3C**
**(ON BEHALF OF PLAINTIFF LEATHERMAN AND THE WEST VIRGINIA SUBCLASS)**

441.    Plaintiff Leatherman re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

442.    Under the West Virginia Computer Crime and Abuse Act, W. Va. Code § 61, Art. 3C, it is unlawful to:

> (3C-4) (a) . . . knowingly and willfully, directly or indirectly, access[] or cause[] to be accessed any computer, computer services, or computer network for the purpose of: (1) Executing any scheme or artifice to defraud; or (2) obtaining money, property, or services by means of fraudulent pretenses, representations, or promises . . .

> (3C-7) (a) . . . knowingly, willfully and without authorization, directly or indirectly, tamper[] with, delete[], alter[], damage[] or destroy[] or attempt[] to tamper with, delete, alter, damage or destroy any computer, computer network, computer software, computer resources, computer program or computer data or who knowingly introduces, directly or indirectly, a computer contaminant into

any computer, computer program or computer network which results in a loss of value of property. . . .

443.    Capital One has deployed its browser extension to knowingly and willfully, directly or indirectly, access the affiliate cookie data of Plaintiff Leatherman and West Virginia Subclass members, in order to both (1) execute its unlawful and deceitful scheme to defraud and (2) obtain money, property, or services by means of fraudulent pretenses, representations, or promises by diverting the affiliate commissions that rightfully belong to Plaintiff Leatherman and West Virginia Subclass members.

444.    Capital One has deployed its browser extension to knowingly, willfully and without authorization, directly or indirectly tamper with, delete, alter, damage or destroy the affiliate cookie data of Plaintiff Leatherman and West Virginia Subclass members, and has knowingly introduced, directly or indirectly, this computer contaminant, which has resulted in a loss of value of commissions that is the rightful property of Plaintiff Leatherman and West Virginia Subclass members.

445.    Under the West Virginia Computer Crime and Abuse Act, "computer contaminant" is "any set of computer instructions that are designed to damage or destroy information within a computer, computer system, or computer network without the consent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, or damage or destroy the normal operation of the computer." W. Va. Code § 61-3C-3(4).

446.    Plaintiff Leatherman and West Virginia Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has been designed to

damage and destroy within Plaintiff Leatherman and West Virginia Subclass members' computer systems without their consent or permission. The extension is programmed with computer instructions that are designed to contaminate the affiliate cookie data of Plaintiff Leatherman and West Virginia Subclass members without their intent or permission, thus meeting the definition of "computer contaminant" under the West Virginia Computer Crime and Abuse Act. Capital One knowingly introduces this computer contaminant into consumers' computers through its browser extension, in direction violation of the Act.

447.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Leatherman, or (c) West Virginia Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Leatherman and West Virginia Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Leatherman and West Virginia Subclass members' rightful affiliate commissions for its own benefit.

448.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

449.    As a direct result of Capital One's unlawful scheme, Plaintiff Leatherman and West Virginia Subclass members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

450.    Plaintiff Leatherman and West Virginia Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the West Virginia Computer Crime and Abuse Act.

451.    Because Capital One's conduct is willful and deceitful, Plaintiff Leatherman and

West Virginia Subclass members seek punitive or exemplary damages, as available under the West Virginia Computer Crime and Abuse Act. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiff Leatherman and West Virginia Subclass members of substantial commissions.

### TWENTY-FIRST CAUSE OF ACTION
### WISCONSIN COMPUTER CRIMES LAW
### WIS. STAT § 943.70
### (ON BEHALF OF PLAINTIFF BLOTNICKI AND THE WISCONSIN SUBCLASS)

452.    Plaintiff Blotnicki re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

453.    Under the Wisconsin Computer Crimes Law, Wis. Stat. § 943.70, it is unlawful to willfully, knowingly and without authorization:

(a)     Modif[y] data, computer programs or supporting documentation.

(b)     Destroy[] data, computer programs or supporting documentation.

(c)     Access[] computer programs or supporting documentation. . . .

454.    Capital One has deployed its browser extension to knowingly, willfully, and without authorization access the affiliate cookie data of Plaintiff Blotnicki and Wisconsin Subclass members by diverting the affiliate commissions that rightfully belong to Plaintiff Blotnicki and Wisconsin Subclass members.

455.    Capital One has deployed its browser extension to knowingly, willfully and without authorization, modify, delete, alter, damage or destroy the affiliate cookie data of Plaintiff Blotnicki and Wisconsin Subclass members, which has resulted in a loss of value of commissions that is the rightful property of Plaintiff Blotnicki and Wisconsin Subclass members.

456.    Plaintiff Blotnicki and Wisconsin Subclass members have an ownership interest in the affiliate cookie data that the Capital One Shopping extension has been designed to access, modify, damage and destroy within Plaintiff Blotnicki and Wisconsin Subclass members' computer systems without their authorization, in direction violation of the Wisconsin Computer Crimes Law.

457.    Capital One neither sought nor obtained permission from (a) consumers of its browser extension, (b) Plaintiff Blotnicki, or (c) Wisconsin Subclass members to add, alter, damage, delete, or destroy the affiliate cookie data of Plaintiff Blotnicki and Wisconsin Subclass members residing on consumers' browsers. Likewise, Capital One did not request or receive permission to Plaintiff Blotnicki and Wisconsin Subclass members' rightful affiliate commissions for its own benefit.

458.    The Capital One Shopping extension's cookie-contaminating mechanism is not disclosed in the applicable terms of service or privacy policy, or in any information provided to consumers in the ordinary course of installing the extension.

459.    As a direct result of Capital One's unlawful scheme, Plaintiff Blotnicki and Wisconsin Class members have suffered significant financial losses, including substantial revenue from highly valuable commissions that were improperly diverted to Capital One.

460.    Plaintiff Blotnicki and Wisconsin Subclass members seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the Wisconsin Computer Crimes Law.

Because Capital One's conduct is willful and deceitful, Plaintiff Blotnicki and Wisconsin Subclass members seek punitive or exemplary damages, as available under the Wisconsin Computer Crimes Law. Capital One concealed the material fact that it was diverting affiliate commissions from creators to itself, depriving Plaintiffs and Wisconsin Subclass members of substantial commissions.

## TWENTY-THIRD CAUSE OF ACTION

**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
MASS. GEN. LAWS. ANN. CH. 93A §1 ET SEQ.
(ON BEHALF OF PLAINTIFF BELOZEROV AND THE MASSACHUSETTS
SUBCLASS)**

461.    Plaintiff Belozerov re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

462.    Plaintiff Belozerov, the Massachusetts Subclass members, and Defendants are each a "person" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b)

463.    Defendants' conduct as described herein was in the conduct of "trade" or "commerce" directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A § 1(b).

464.    Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a), include their practices relating to the Capital One Shopping browser extension's replacing of Plaintiff Belozerov and Massachusetts Subclass members' affiliate cookie with their own to divert Plaintiff Belozerov and Massachusetts Subclass members' referral fee payments to themselves.

465.    Defendants' acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Defendants solely held the true facts about their manipulation of affiliate cookies, which Plaintiff Belozerov and Massachusetts Subclass members could not independently discover.

466.    Plaintiff Belozerov and Massachusetts Subclass members could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about who was really benefiting from referral fees, Defendants created an asymmetry of information between themselves and consumers that

precluded consumers from taking action to avoid or mitigate injury.

467.    The operation of Defendants' Capital One Shopping browser extension had no countervailing benefit to consumers or to competition.

468.    Defendants acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff Belozerov and Massachusetts Subclass members' rights.

469.    As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiff Belozerov and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to loss of their earned commission payments and referral fees.

470.    Plaintiff Belozerov and Massachusetts Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that the Court:

A.    Certify this case as a class action, and appoint Plaintiffs as Class Representatives and appoint Class Counsel;

B.    Enter judgment in favor of Plaintiffs and the Class;

C.    Enter injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Class, including to prevent the Capital One Shopping browser extension from taking credit for sales it did not originate;

D.    Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and restitution to which Plaintiffs and the Class are entitled;

E.    Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.    Award Plaintiffs and the Class pre- and post-judgment interest as provided by law;

G.    Enter such other orders as may be necessary to restore to Plaintiffs and the Class any money and property acquired by Capital One through its wrongful conduct;

H.    Award Plaintiffs and the Class reasonable litigation expenses and attorneys' fees as permitted by law; and

I.    Award such other and further relief as the Court deems necessary and appropriate.

## IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

DATED: February 12, 2025                    Respectfully submitted,

By: */s/  Lee A. Floyd_____*
Lee A. Floyd (VSB No. 88459)
Justin M. Sheldon (VSB No. 82632)
**BREIT BINIAZAN, PC**
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
(804) 351-9040
(804) 351-9170
Lee@bbtrial.com
Justin@bbtrial.com

*Attorneys for Plaintiffs Coleman, Brodiski, Hayward, GamersNexus, LLC and Just Josh, Inc.*

Gary M. Klinger (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Alexandra M. Honeycutt (admitted *pro hac vice*)
800 S. Gay St., STE 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
ahoneycutt@milberg.com

Adam E. Polk (admitted *pro hac vice*)
Simon S. Grille (admitted *pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com

*Attorneys for Plaintiffs Brodiski and Hayward*

E. Michelle Drake (admitted *pro hac vice*)
Marika K. O'Connor Grant (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
moconnorgrant@bm.net

Sophia M. Rios (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: 619.489.0300
srios@bm.net

*Attorneys for Plaintiff Coleman*

Seth Carroll, VSB No. 74745
**COMMONWEALTH LAW GROUP, PLLC**
3311 West Broad Street
Richmond, Virginia 23230
Phone: (804) 999-9999

Fax: (866) 238-6415

Josh Sanford (*pro hac vice* forthcoming)
Arkansas Bar No. 2001037
Jarrett Ellzey (*pro hac vice* forthcoming)
Texas Bar No. 24040864
Leigh S. Montgomery (admitted *pro hac vice*)
Texas Bar No. 24052214
Tom Kherkher (*pro hac vice* forthcoming)
Texas Bar No. 24113389
**EKSM, LLP**
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455
jsanford@eksm.com
jellzey@eksm.com
lmontgomery@eksm.com
tkherkher@eksm.com
service@eksm.com (service only)

Devin J. Stone (*pro hac vice* forthcoming)
**EAGLE TEAM LLP**
Washington Bar No. 260326
1050 Connecticut Ave. NW, Suite 5038
Washington, DC 20036
Phone: (833) 507-8326
devin@eagleteam.law

*Attorneys for Plaintiffs Moses and Clearvision Media, Inc.*

Steven T. Webster, VSB No. 31975
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Arlington, VA 22201
Telephone: (888) 987-9991
swebster@websterbook.com

Norman E. Siegel (admitted *pro hac vice*)
Barrett J. Vahle (admitted *pro hac vice*)
Joy D. Merklen (*pro hac vice* forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Telephone: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
merklen@stuevesiegel.com

*Attorneys for Plaintiff Storm Productions LLC*

Steven J. Toll, VSB No. 15300
Douglas J. McNamara (admitted *pro hac vice*)
Karina G. Puttieva (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
kputtieva@cohenmilstein.com

Julian Hammond (admitted *pro hac vice*)
Polina Brandler (admitted *pro hac vice*)
Ari Cherniak (admitted *pro hac vice*)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone: (310) 601-6766
Facsimile: (310) 295-2385
jhammond@hammondlawpc.com
pbrandler@hammondlawpc.com
acherniak@hammondlawpc.com

Daniel R. Schwartz (admitted *pro hac vice*)
James Ulwick (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: (312) 214-7900
dschwartz@dicellolevitt.com
julwick@dicellolevitt.com

Emma Bruder (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY 10017
Telephone: (646) 933-1000
ebruder@dicellolevitt.com

*Attorneys for Plaintiffs Oganesyan and Ely*

Thomas E. Loeser (admitted *pro hac vice*)
Karin B. Swope (admitted *pro hac vice*)
Vara Lyons (*pro hac vice* forthcoming)
**COTCHETT, PITRE & MCCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Telephone: (206)-802-1272
Facsimile: (206)-299-4184
tloeser@cpmlegal.com
kswope@cpmlegal.com
vlyons@cpmlegal.com

*Attorneys for Plaintiffs GamersNexus, LLC and Just Josh, Inc.*

Matthew T. Sutter, Esq., VSB No. 66741
**SUTTER & TERPAK, PLLC**
7540 Little River Turnpike, Suite A
Annandale, VA 22003
Telephone: (703) 256-1800
Facsimile: (703) 991-6116
Email: matt@sutterandterpak.com

Steven A. Schwartz (*pro hac vice* forthcoming)
Beena M. Mcdonald (admitted *pro hac vice*)
Alex M. Kashurba (*pro hac vice* forthcoming)
Marissa N. Pembroke (*pro hac vice* forthcoming)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
One Haverford Centre
361 Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
steveschwartz@chimicles.com
bmm@chimicles.com
amk@chimicles.com
mnp@chimicles.com

James J. Rosemergy (admitted *pro hac vice*)
jrosemergy@careydanis.com
**CAREY, DANIS & LOWE**
8235 Forsyth, Suite 1100

St. Louis, MO 63105
Telephone: (314) 725-7700

*Attorneys for Plaintiff Gandillon*


Kristi C. Kelly, VSB No. 72791
Casey S. Nash, VSB No. 84261
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: casey@kellyguzzo.com


James J. Pizzirusso (admitted *pro hac vice*)
Amanda V. Boltax (admitted *pro hac vice*)
Ian E. Engdahl (admitted *pro hac vice*)
**HAUSFELD LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
(202) 540-7200
jpizzirusso@hausfeld.com
mboltax@hausfeld.com
iengdahl@hausfeld.com


Steven M. Nathan (admitted *pro hac vice*)
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com


Joseph J. DePalma
Catherine B. Derenze
Collin J. Schaffhauser
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
570 Broad St., Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com
cschaffhauser@litedepalma.com


- 88 -

*Attorneys for Plaintiff King*


Steven T. Webster, VSB No. 31975
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Arlington, VA 22201
Telephone: (888) 987-9991
swebster@websterbook.com

Cari Campen Laufenberg (admitted *pro hac vice*)
Derek W. Loeser (*pro hac vice* forthcoming)
Adele Daniel (*pro hac vice* forthcoming)
Kylie Fisher (*pro hac vice* forthcoming)
Andrew Lindsay (*pro hac vice* forthcoming)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
claufenberg@kellerrohrback.com
dloeser@kellerrohrback.com
adaniel@kellerrohrback.com
kfisher@kellerrohrback.com
alindsay@kellerrohrback.com

Christopher Springer (admitted *pro hac vice*)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
cspringer@kellerrohrback.com

*Attorneys for Plaintiff Smith*


Jason S. Rathod, Esq. (admitted *pro hac vice*)
Nicholas A. Migliaccio, Esq. (*pro hac vice* forthcoming)
**MIGLIACCIO & RATHOD LLP**
412 H St N.E., Suite 302
Washington, D.C. 20002
Tel: (202) 470-3520
Fax: (202) 800-2730

jrathod@classlawdc.com
nmigliaccio@classlawdc.com

*Attorneys for Plaintiffs Blotnicki, Dobbs, Doran, Fletcher, Johnston, Kachonik, Leatherman, Malcom, Marquez, Miller, and Shimoda*

Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Arlington, VA 22201
Telephone: (888) 987-9991
swebster@websterbook.com

Chris A. Seeger (admitted *pro hac vice*)
David R. Buchanan (admitted *pro hac vice*)
Stephen Weiss (*pro had vice* forthcoming)
Scott A. George (admitted *pro hac vice*)
**SEEGER WEISS LLP**
55 Challenger Road, Suite 600
Ridgefield Park, NJ 05667
Tel: 973-639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
sweiss@seegerweiss.com
sgeorge@seegerweiss.com

*Attorneys for Plaintiff Hassan Nasrallah*

Steven J. Toll, VSB No. 15300
Douglas J. McNamara (admitted *pro hac vice*)
Karina G. Puttieva (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
kputtieva@cohenmilstein.com

Sean A. Petterson (admitted *pro hac vice*)
Jason L. Lichtman (*pro hac vice* forthcoming)
Danna Z. Elmasry (*pro hac vice* forthcoming)
**LIEFF CABRASER HEIMANN &**

**BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
spetterson@lchb.com
jlichtman@lchb.com
delmasry@lchb.com

*Attorneys for Plaintiff Moran*


Elizabeth K. Tripodi, VSB No. 73483
**LEVI & KORSINSKY LLP**
1101 Vermont Ave. NW, Suite 800
Washington, D.C. 20005
Tel: (202) 524-4290
Fax: (212) 363-7171
etripodi@zlk.com

Mark S. Reich (*pro hac vice* forthcoming)
Courtney E. Maccarone (*pro hac vice* forthcoming)
Colin A. Brown (*pro hac vice* forthcoming)
Alyssa Tolentino (*pro hac vice* forthcoming)
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: cbrown@zlk.com
Email: atolentino@zlk.com

*Attorneys for Plaintiff Belozerov*