**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

*In re Capital One Financial Corporation,
Affiliate Marketing Litigation*

Case No. 1:25-cv-00023-AJT-WBP

<u>**MEMORANDUM IN SUPPORT OF CAPITAL ONE'S MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    The Online Marketing Industry. ................................................................. 2

    B.    The Capital One Shopping Browser Extension. ....................................... 4

    C.    Plaintiffs' Lawsuits. .................................................................................. 5

PROCEDURAL STANDARD ............................................................................................ 7

ARGUMENT ...................................................................................................................... 7

I.    Plaintiffs Lack Article III Standing to Pursue Their Claims.................................... 7

    A.    Plaintiffs have not plausibly alleged that they have been injured........... 8

    B.    Plaintiffs have not traced any alleged injury to Capital One. .............. 10

II.    Plaintiffs' Common-Law Claims Fail..................................................................... 14

    A.    The tortious interference claims should be dismissed. .......................... 14

    B.    The unjust enrichment claim should be dismissed. ............................... 19

    C.    The conversion claim should be dismissed........................................... 20

III.    Plaintiffs' Computer Fraud Claims are Meritless. ................................................. 22

    A.    The CFAA claim should be dismissed because Plaintiffs plead neither a qualifying loss nor knowing and intentional unauthorized access...................... 22

        *1.*    *Plaintiffs do not allege any qualifying loss.*............................... 22

        *2.*    *Plaintiffs do not allege any knowing and improper access.* .................... 23

    B.    The state-law computer claims should also be dismissed because of Plaintiffs' failure to allege intentional unauthorized access. ............................... 25

IV.    Plaintiffs' State-Law Consumer Protection Claims Fail Because Plaintiffs Do Not Allege Any Harm To Consumers. ................................................................................... 27

V.    Plaintiffs Cannot Pursue any  Equitable Relief...................................................... 30

CONCLUSION................................................................................................................. 30

# INTRODUCTION

Capital One Shopping is a free browser extension provided by Capital One that is popular with millions of Americans.  Consumers and merchants alike benefit from Capital One Shopping.  Consumers choose to use the browser extension because it saves them money with price comparisons and, when they make purchases, rewards and coupons.  And merchants choose to partner with Capital One Shopping because these benefits help drive sales that may not otherwise occur.  In return, merchants pay commissions to Capital One for purchases consumers make while using the extension, which Capital One shares with consumers as shopping rewards.  In this virtuous circle, both the consumer and the merchant get added value from any given transaction.

But this case is not about consumers or merchants.  Rather, it is brought by Capital One Shopping's competitors in the online marketing industry, who compete with Capital One for merchants' advertising dollars.  Plaintiffs in these cases describe themselves as publishers of content who promote merchants' goods and services.  The premise of Plaintiffs' case, however, is that they are "entitled" to be paid the entire commission for an online sale if they had any touchpoint in a consumer's purchasing journey.  Compl. ¶ 10.  If they are not paid, Plaintiffs say they are the victims of theft.

That is not how online shopping or the online advertising industry works.  Consumers decide what websites to visit, what to click on, and when and where to buy something, if at all.  A vast array of individual factors affect these behaviors, including price, incentives, and mood.  For their part, merchants choose which publishers they will partner with to promote their products and how those publishers will be compensated.  For merchants that choose to pay on a commission basis, it is up to merchants to decide who gets credit for a sale and how to distribute that credit.  Plaintiffs' lawsuit not only misrepresents the industry; it also amounts to a naked attempt to stifle competition in the marketplace, to limit the choices of merchants and consumers alike, and to

prevent consumers from harnessing (and being compensated for) their own purchasing power. It fails for multiple reasons.

*First*, Plaintiffs lack standing to pursue any of their claims. Despite filing a nearly 100-page consolidated complaint, Plaintiffs offer nothing but mere speculation that they have lost commissions due to merchants' decisions to partner with, and consumers' decisions to use, Capital One Shopping. No Plaintiff identifies a *single sale* where they earned a commission but did not receive one or a *single commission* that Capital One Shopping "diverted." Plaintiffs' conclusory allegations and "daisy chain of speculation" cannot "pass muster under Article III." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 245 (4th Cir. 2023).

*Second*, even if Plaintiffs could claim a plausible injury (and they cannot), their allegations fail to state a claim under any of the common-law or statutory provisions they invoke, which do not apply to competitive disputes like this one. "[T]he law will not provide relief to every disgruntled player in the rough-and-tumble world comprising the competitive marketplace." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 282 Va. 141, 153 (2011). This is especially true here because Capital One Shopping *benefits*, and does not harm, the consuming public. This Court should dismiss the Complaint.[1]

## BACKGROUND

### A.    The Online Marketing Industry.

For millions of Americans, online shopping has replaced brick-and-mortar stores. Every year, merchants spend millions on advertising to tap into this market and increase online sales. Competition for consumers' purchasing dollars and merchants' advertising dollars fuels the online marketing industry. There are four major players in this industry:

---

[1] Appendix A summarizes why each of the 22 counts of the Complaint should be dismissed. All arguments referenced in Appendix A are contained within this Motion.

- **Merchants**, who sell their goods online, decide how to market their products, and determine how to attribute credit for sales. Compl. ¶¶ 63, 64.

- **Publishers**, who partner with merchants to promote the sale of goods and services online and compete to earn advertising dollars and credit for sales. *Id.* ¶¶ 59, 64. Some publishers, like Plaintiffs, may advertise a merchant's products online or on social media. *Id.* ¶ 64. Others, like Capital One Shopping, may publish discounts or benefits to entice a consumer to complete a purchase. *Id.* ¶¶ 2, 49.

- **Affiliate Networks**, who facilitate partnerships between publishers and merchants and implement rules set by merchants regarding the tracking and attribution of credit associated with a sale. *Id.* ¶¶ 64, 298.

- **Consumers**, who decide whether, how, and when they will purchase a product.

Credit for sales is typically attributed via the use of tracking tags. *Id.* ¶ 63. Publishers have unique "affiliate links," which are custom URLs created by merchants that contain unique "affiliate IDs" that allow merchants and affiliate networks to determine publishers involved in the process of any particular sale. *Id.* ¶ 71. Clicking these links causes "cookies"—data files deployed and maintained by merchants and affiliate networks that "track the consumer's activity on the online merchant's website to determine whether the consumer ultimately purchased the product or service"—to be stored on a consumer's browser. *Id.* ¶¶ 74–75.

Merchants use a variety of attribution models to decide how to attribute and compensate publishers for sales. Some merchants choose to attribute sales to the publisher associated with the last-clicked link before a purchase, which is known as "last-click attribution." *Id.* ¶ 77. There are other methods of attribution, however, including "first"-click, where the first publisher involved in the process gets credit, *see id.* ¶ 71 n.11; linear attribution, where all publishers involved get credit; and time-decay attribution, where the publishers closer-in-time to the sale get more credit

than those earlier in the process. *See* Elizabeth Sramek, *Multichannel Attribution in Affiliate Marketing: All You Need to Know* (Nov. 8, 2024), available at https://www.scaleo.io/blog/multichannel-attribution-in-affiliate-marketing-all-you-need-to-know/ (summarizing various attribution models). And certain merchants do not pay based on sales at all, but rather pay "per-click," meaning that publishers can earn money even if a purchase does not occur. *See* Compl. ¶ 70 n.10. Ultimately, merchants alone decide which publishers to partner with and what attribution model to use with each publisher. *Id.* ¶¶ 58, 63, 64.

### B.    The Capital One Shopping Browser Extension.

This case involves the Capital One Shopping browser extension, which is a "free tool that automatically looks for coupons, offers consumers a price comparison tool, and incorporates a built-in rewards point system" where users making purchases receive rewards that are redeemable for gift cards. *Id.* ¶¶ 2, 51. With an estimated 10 million users, the browser extension is very popular among consumers in the United States. *Id.* ¶¶ 3–5. Before it can be used, users must download the browser extension on their computers. Capital One Shopping's relationships with its customers are governed by its Terms of Service and Privacy Policy. *See, e.g.*, *id.* ¶¶ 4, 56 n.3, 301. After the browser extension is installed, a consumer must choose to "click buttons" to activate the extension in connection with each purchase. *Id.* ¶ 83.

Merchants choose to partner with Capital One Shopping, *id.* ¶ 56, because the browser extension helps them achieve their sales goals, and merchants determine how Capital One will be compensated for supporting their business, *id.* ¶¶ 58, 63. The benefits a consumer receives depend on whether the consumer has activated the extension on a website affiliated with a merchant that has partnered with Capital One Shopping. When a user activates the extension and completes a purchase on a partner website, the user always gets something of value—either a coupon or rewards—for having used the browser extension. *Id.* In connection with these purchases, Capital

One receives a commission, as determined by its merchant-partners, *id.* ¶ 56, which it shares with users in the form of shopping rewards.  The extension may also function on non-partner merchant websites.  *Id.* ¶ 55.  If a consumer activates the extension on these websites, Capital One Shopping may provide its users with a free price comparison tool or coupons (where available).  *See id.* ¶¶ 55–56.  But Capital One does not get a commission from the non-partner merchant if a purchase is made under these circumstances, and Plaintiffs do not—and cannot—allege otherwise.  *Id.*

### C.    Plaintiffs' Lawsuits.

Plaintiffs are publishers who post links for products online and can earn commissions when consumers click their links and then purchase those products.  Compl. ¶ 61.  In contrast to Capital One Shopping, Plaintiffs do not allege that they provide any discounts, price comparisons, or other tools or monetary benefits or incentives to consumers.

By way of background, in December 2024, a YouTube video purportedly "exposed a commission scam by PayPal's Honey browser extension," whereby Honey allegedly "stole" commissions from other affiliates.  *See Oganesyan et al. v. Capital One Financial Corp., et al.*, Case No. 1:25-cv-00113 (E.D. Va.), ECF 1 ¶ 3.  Although the video mentioned only Honey, a wave of lawsuits against other browser extensions—including Capital One Shopping—soon followed.  To date, 13 have been filed against Capital One; all have been consolidated into the Consolidated Amended Complaint.[2]  *See* ECF No. 93.  As the attached Appendix B illustrates, most of the Plaintiffs that sued Capital One also sued other browser extensions.  Reflecting the openly competitive nature of the online marketing industry, at least one Plaintiff has published

---

[2] Although Capital One Shopping also has a mobile application, a website, and other and services, Plaintiffs have limited their claims to the "Capital One Shopping browser extension."  Compl. ¶ 245.  References to "Capital One Shopping" throughout this Motion therefore refers to the Capital One Shopping browser extension.

source code that publishers can install on their websites to purportedly block consumers from using browser extensions like Capital One Shopping.[3]

The Complaint alleges that Capital One Shopping's purpose is to "cheat[]" Plaintiffs "out of commissions to which [Plaintiffs] are entitled." Compl. ¶¶ 6, 10. According to Plaintiffs, Capital One does this by "substituting" Capital One Shopping's affiliate ID "in place of" Plaintiffs' affiliate IDs when consumers use the extension before making a purchase. *Id.* ¶¶ 11, 83. The Complaint further alleges that this happens anytime a would-be purchaser activates the browser extension. *Id.* ¶¶ 100, 103, 105, 107. Plaintiffs accuse Capital One Shopping of "steal[ing]" commissions to which Plaintiffs allegedly are "entitled," *id.* ¶¶ 6, 10, and they bring 22 claims: four common-law claims, a federal Computer Fraud and Abuse Act claim, nine state-law computer fraud claims, and eight state-law consumer protection or unfair business practices claims. *Id.* ¶¶ 263–470. Plaintiffs seek to represent a nationwide class and 15 state subclasses. *Id.* ¶ 245.

Plaintiffs copied and pasted parts of their Complaint from complaints they filed against other companies with different browser extensions, resulting in allegations that are demonstrably inapplicable and false. While these factual flaws and contradictions need not be resolved by the Court at this time, Capital One highlights a couple of key examples:

- The Complaint alleges that the Capital One Shopping browser extension is an example of "cookie-stuffing" technology, *see, e.g.*, Compl. ¶¶ 108–110, which Plaintiffs' own sources describe as malicious code that works "without any explicit clicks from the user." *See* Neha Chachra, et al., Affiliate Cookies: Characterizing Affiliate Marketing Abuse, 1, 2 (Oct. 28–30, 2015), https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf, *cited at* Compl. ¶ 108 n.22. Yet Plaintiffs concede that Capital One Shopping is *not* a cookie-

---

[3] https://www.justjosh.tech/articles/honey-extension-blocker. *See also* ECF No. 66-1 at 5 & n.4.

stuffing technology because it "requires consumers to actively engage with the browser extension," *i.e.*, "click buttons," to work.  Compl. ¶ 83.

- The Complaint repeatedly alleges that Capital One Shopping replaces affiliate tracking tags in cookies used to determine who should receive credit for a sale.  *See, e.g. id.* ¶ 90.  Those data files, however, are provided, maintained, and updated by merchants or affiliate networks.  In other words, it is third parties who update tracking materials each time a consumer clicks on a link offered by a publisher—whether from Plaintiffs or browser extensions like Capital One Shopping—and third parties determine which publishers, if any, should be compensated for their involvement in a sale.

## PROCEDURAL STANDARD

A Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction to hear the case.  A plaintiff who fails to "allege[] an Article III injury" cannot "pursue his claim in federal court" and the lawsuit must be dismissed.  *O'Leary*, 60 F.4th at 241–42.  It is Plaintiffs' burden "to prove that federal jurisdiction is proper." *Cavey v. MarketPro Homebuyers, LLC*, 542 F. Supp. 3d 418, 422 (E.D. Va. 2021) (Trenga, J.).

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint and "should be granted unless the complaint 'states a claim to relief that is plausible on its face.'"  *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 811 (E.D. Va. 2016) (Trenga, J.).  The Court accepts well-pled allegations as true but need not accept "legal conclusion[s] couched as [] factual allegation[s]," nor conclusory assertions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## ARGUMENT

## I. PLAINTIFFS LACK ARTICLE III STANDING TO PURSUE THEIR CLAIMS.

As explained in detail below, Plaintiffs' claims fail on their merits.  But their claims also fail for a more fundamental reason:  Plaintiffs have not demonstrated they have Article III standing.

The "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing to sue, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As to the injury-in-fact element, Plaintiffs must show that they suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical," *id.* at 339 (cleaned up), nor based on speculation, *see, e.g.*, *Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017). As to the traceability element, an injury is not traceable to a defendant's allegedly wrongful conduct where the injury "depends on the unfettered choices made by independent actors not before the court." *Lujan*, 504 U.S. at 562 (cleaned up).

Plaintiffs cannot satisfy either the injury-in-fact or traceability requirements. This is fatal to their claims because, even in a class action, the named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (quotation omitted).

## A.    Plaintiffs have not plausibly alleged that they have been injured.

Plaintiffs' sole theory of injury, which forms the basis of each of their 22 claims, rests on their speculation that Capital One Shopping "steals" their "referral fees and sales commissions," Compl. ¶¶ 241–42, and that they would have "earned more money" but for the existence of Capital One Shopping, *id.* ¶ 243.

The principal problem with this theory is that Plaintiffs do not identify a single dollar of any affected commission. Plaintiffs do not identify any purchases that would have resulted in commissions paid to them but for Capital One Shopping, nor do they identify any consumers who clicked on any of their links. Instead, Plaintiffs' allegations of harm are about how the affiliate

links of *other* entities *could* be impacted.  *See* Compl. ¶ 89–96 (screenshots of non-plaintiff "Linus Tech Tips" and his affiliate link).  Plaintiffs cannot paper over the speculative nature of their alleged injury by supposing what the browser extension *could do to others.*  They need factual allegations as to what it *did to them.  See, e.g.*, *Jones v. Bloomingdales.com, LLC,* 124 F.4th 535, 539 (8th Cir. 2024) (in internet technology tort case, finding no standing and rejecting general allegations as to what technology could do because plaintiff did not plausibly allege how the technology harmed her).

The Complaint does not contain such factual allegations.  Instead, Plaintiffs offer conclusory allegations of harm, *see, e.g., id.* ¶¶ 131 (conclusorily alleging that Capital One "stole credit for sales and conversions"), 154 (similar), 158 (similar), or allegations based upon "information and belief" that are drawn from the December 2024 YouTube video about a different browser extension, *see, e.g., id.* ¶¶ 118, 135, 140, 150, 162, 167, 178, 183, 194, 199, 218.  This will not do.  *See O'Leary,* 60 F.4th at 245 (no standing and rejecting plaintiff's speculative allegations based "on information and belief"); *R.J. Investments, LLC v. Bd. of Cnty. Com'rs for Queen Anne's Cnty.*, 2009 WL 5216056, at *6 (D. Md. Dec. 29, 2009) (plaintiff lacked standing to recover for "lost profits" and noting that plaintiff's "inchoate expectation of earning money" was "entirely speculative"); *Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 2017 WL 4269458, at *5 (D.S.C. Sept. 26, 2017) (granting motion to dismiss for lack of standing and rejecting standing allegations based on information and belief).

In addition, although Plaintiffs implicitly concede that Capital One Shopping only gets commissions if a consumer makes a purchase from a merchant partner, *see* Compl. ¶ 56, they do not identify any of Capital One Shopping's merchant partners, much less allege that Plaintiffs themselves have partnered with those merchants.  This is particularly problematic because it is common sense that Capital One Shopping cannot impact commissions in the absence of a merchant

relationship. *See, e.g.*, *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 77 (2d Cir. 2022) ("common sense" suggested that plaintiff's "assertion of standing [was] implausible"); *Beck*, 848 F.3d at 276 (relying in part on a "common-sense notion" to find no standing).

At bottom, Plaintiffs have offered an "unadorned, the-defendant-unlawfully-harmed-me accusation," which is insufficient to plausibly allege injury. *Iqbal*, 556 U.S. at 678. Plaintiffs' attempt to combine speculation with conclusory assertions based on information and belief without factual support cannot satisfy their burden under Article III. *See Alig v. Rocket Mortg., LLC*, 126 F.4th 965, 975–76 (4th Cir. 2025) (no standing where class offered mere speculation that their appraisals were impacted); *Podrokin v. Am. Armed Forces Mut. Aid Assoc.*, 634 F. Supp. 3d 265, 270–71 (E.D. Va. 2022) (dismissing for lack of standing and rejecting plaintiff's conclusory allegations and speculative theory of injury).

**B.    Plaintiffs have not traced any alleged injury to Capital One.**

The closest Plaintiffs get to plausibly alleging that *they* suffered harm is their allegation that they have experienced declining commissions over time. *See, e.g.*, Compl. ¶ 134 (Plaintiff Dobbs' "commissions appeared lower than expected"). Even if the Court were to credit these allegations, any (unspecified) reduction in commissions does not provide any credible basis to assume that Capital One Shopping is the cause. *See Iqbal*, 556 U.S. at 678. There are innumerable and obvious alternative explanations for why Plaintiffs have made less money than they would have liked or expected, and they have failed to allege facts showing that any drop in their commissions is traceable to Capital One. *See* Compl. ¶ 64. This Court may draw on its "experience and common sense" to conclude that the actions of multiple independent actors break any causal chain. *Iqbal*, 556 U.S. at 679.

For example, some Plaintiffs say that a drop in commissions cannot be reconciled with an increase in their followers or views of their content. *E.g.*, Compl. ¶¶ 207, 213. But most Plaintiffs

10

do not allege they have seen such increases.  And even those that do ignore that influencers can gain followers even as overall engagement with their content decreases, and that views or followers do not equal purchases.  This is especially true if Plaintiffs' content does not include an affiliate marketing link.

Plaintiffs also ignore that changes in consumers' purchasing habits, including decisions to make fewer purchases, could explain the drop in commissions.  Plaintiffs incorrectly assume that any consumer that clicks on their respective affiliate link will complete a sale.  That is not how online shopping works.  A consumer who clicks on an affiliate link may never have intended to make any purchase at all, may have searched online and found the same product elsewhere for cheaper and decided to purchase it from there, or may have not yet been ready to make the purchase even though they would in the future decide to do so.  As Plaintiffs acknowledge, affiliate networks have adopted rules that refuse to provide a publisher with credit for a sale that the consumer takes too long to complete.  Compl. ¶ 76.  Plaintiffs would earn no commission in any of these scenarios, and Capital One Shopping would have had nothing to do with it.

Plaintiffs further overlook the unique role that Capital One Shopping plays in encouraging consumers to make purchases they might not otherwise make.  Consumers decide to download and use Capital One Shopping, including applying any coupons or rewards, and consumers decide to complete a purchase or not.  *See* Compl. ¶ 83.  Consumers might choose to make a purchase *only because of* Capital One Shopping's coupons, shopping rewards, or price comparison tool.  And while Plaintiffs belittle Capital One Shopping for the possibility that it can receive commissions even when the browser extension's coupon-finder does not identify a better deal, *see* Compl. ¶¶ 104–05, that tool, along with the price-comparison tool, may also encourage reluctant purchasers to finalize their purchase:  even where the tools do not find a coupon or a better price elsewhere, the purchaser gains the confidence to know they have a good price and so may complete

11

a purchase where they otherwise would not.  In short, purchases made using Capital One Shopping provide consumers with value; consumers who choose to make purchases using Capital One Shopping do so in exchange for benefits that they otherwise would not receive.  *Id.* ¶¶ 100, 103, 105, 107.  Plaintiffs do not and cannot say the same.

The merchants' role in the online marketing industry offers yet another explanation for any lost commissions.  Even Plaintiffs acknowledge that merchants decide how to attribute credit for any sale and how much to pay.  *Id.* ¶¶ 63–64.  As a business model, merchants could have decided to pay publishers like Plaintiffs reduced commissions.  And as Plaintiffs' own sources recognize, merchants could have changed their attribution models.  *See id.* 71–77 & nns. 11–21 (citing Dibakar Ghosh, *What Are Affiliate Links and How Do They Work?,* AuthorityHacker (Aug. 12, 2024) https://www.authorityhacker.com/what-are-affiliate-links/).  Merchants are best positioned to know what advertising practices result in sales, and it is not "stealing" if a merchant adopts an attribution model that gives a later-in-time publisher credit for a sale.

Finally, Plaintiffs overlook that competition among publishers—both with other content creators like themselves and other browser extensions like Capital One Shopping—provides yet another alternate explanation for any drop in commissions.  Plaintiffs admit that consumers often click the links of multiple publishers advertising "the same product or service," *see id.* ¶ 77, and any drop in commissions may be attributable to those publishers.  In addition, at least 22 of the 27 Plaintiffs in this case have sued at least one other browser extension in addition to Capital One Shopping, and in the process made cookie-cutter allegations that *those* browser extensions are responsible for any drop in commissions.  *Compare id.* ¶¶ 130–31 (Plaintiff Coleman alleges that she "would have earned more income . . . but for Capital One's scheme," and that "Capital One . . . stole credit for sales" she originated), *with Coleman v. PayPal Holdings, Inc.*, No. 5:25-cv-00367 (N.D. Cal.), ECF No. 1 ¶¶ 48–49 (alleging that she "would have earned more income . . .

but for PayPal's scheme," and that "PayPal . . . stole credit for sales" she originated), *and Coleman v. Microsoft Corp.*, No. 2:25-cv-00137 ECF No. 1 ¶¶ 68–69 (W.D. Wash.) (alleging she "would have earned more income . . . but for Microsoft's scheme," and that "Microsoft . . . stole credit for sales" she originated); *see also* Appendix B (comparing allegations of remaining plaintiffs who have sued multiple browser extensions).  "[C]ut-and-paste," "carbon-copy complaints" "render each Plaintiff's cookie-cutter assertion of standing implausible," *Calcano*, 36 F.4th at 77, and the duplication across cases operates as an admission that competition among publishers prevents Plaintiffs from fairly tracing their alleged injuries to Capital One under Article III.  *See Bryant v. Byron Udell & Assocs.*, 2023 WL 5180351, at *5 (E.D. Va. Aug. 11, 2023) (Trenga, J.) (finding no standing on traceability grounds where defendant was "simply *one* of the telemarketing third parties" that could have harmed plaintiff, and therefore "the connection between the wrongful conduct and [defendant] is entirely speculative"); *Scruggs v. CHW Grp., Inc.*, 2020 WL 9348208, at *4–6 (E.D. Va. Nov. 12, 2020) (dismissing for lack of standing on traceability grounds where "the alleged conduct could be attributed to an unrelated third party not before the Court" and allegations did "not foreclose the possibility that a third party wholly unrelated to [defendant]" harmed plaintiff).  It is difficult to imagine an Article III defect more fundamental than alleging different causes of the same injury in separate, concurrently filed lawsuits.

Because the choices of "independent third part[ies]" stand "directly between the [P]laintiffs and the challenged conduct in a way that breaks the causal chain," *see Frank Krasner Enter., Ltd. v. Montgomery Cnty., MD*, 401 F.3d 230, 235–36 (4th Cir. 2005), and because Plaintiffs' theory of attributing harm to Capital One Shopping relies on a "daisy chain of speculation," *O'Leary*, 60 F.4th at 245, Plaintiffs lack standing and this lawsuit should be dismissed.  *See Abshire v. Newsom*, 2023 WL 3243999, at *2 (9th Cir. May 4, 2023) (no standing to assert claims for businesses' losses allegedly caused by government actions during the pandemic, because "conclusory allegations are

not enough for us to infer that any drop in reservations is fairly traceable to [d]efendants' conduct instead of other causes, such as seasonal fluctuations in the short-term rental market or vacationers' reluctance to travel during a global pandemic"); *Bord v. Banco de Chile*, 205 F. Supp. 2d 521, 524 (E.D. Va. 2002) (no standing where multiple, independent parties not before court stood in between plaintiff's injury and defendant's conduct); *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, 677 F. Supp. 2d 847, 849 (D. Md. 2010) ("When claimed injuries are highly indirect and result from the independent action of some third party not before the court, too much speculation is required to connect the links in the chain of causation." (quotation omitted)).

## II.    PLAINTIFFS' COMMON-LAW CLAIMS FAIL.

Plaintiffs assert four common-law claims against Defendants, each based on the theory that Defendants wrongfully received or otherwise interfered with commissions Plaintiffs allegedly would have earned from online merchants.  But these claims do not apply to competitive business disputes, and "the law will not provide relief to every disgruntled player in the rough-and-tumble world comprising the competitive marketplace." *Lewis-Gale*, 282 Va. at 153.

Because Plaintiffs do not allege which state's law applies to its common law claims, Capital One assumes for purposes of this motion only that Virginia law applies.  *See, e.g.*, *Therabody, Inc. v. Walton*, 2024 WL 1260577, at *3 n.4 (E.D. Va. Mar. 25, 2024) (adopting same approach). Assuming Virginia law applies, none withstands scrutiny.

### A.    The tortious interference claims should be dismissed.

Plaintiffs' tortious interference claims (Claims 2 and 3) allege that Capital One interfered with Plaintiffs' existing "contractual agreements" and future "economic relationships" with merchants by "displac[ing] tracking tags that identify [Plaintiffs] as the source of the referral" and "substitut[ing] [Defendants'] own tracking tags."  Compl. ¶¶ 275, 277, 283, 285.  Plaintiffs fail to allege any specific existing contracts or specific future economic relationships with which Capital

One interfered, and their claims are contrary to the purpose of tortious interference law, which "is not to protect . . . the operation of marketplace generally," but rather to "provide a legal remedy where a particular party's *specific*, existing contract or business expectancy or opportunity has been interfered with" by another. *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003).

To state a tortious interference claim, plaintiffs must allege: "(1) existence of a business relationship or expectancy with a probability of future economic benefit; (2) defendant's knowledge of the relationship or expectancy; (3) reasonable certainty that, absent defendant's intentional misconduct, plaintiff would have continued the relationship and/or realized the expectancy; (4) defendant's intentional interference including the loss of the relationship or expectancy; (5) defendant's interference was done by improper methods; and (6) resulting damages." *Symbionics, Inc. v. Ortlieb*, 2009 WL 10676530, at *9 (E.D. Va. Aug. 7, 2009) (Trenga, J.). Plaintiffs' tortious interference claims fail for several reasons, each related to their failure to allege a *specific* economic interest with which Defendants allegedly interfered.

*First*, "courts routinely dismiss tortious interference claims where," as here, "the plaintiff fails to identify a *specific* customer or business expectancy." *Trans-Radial Sols., LLC v. Burlington Med., LLC*, 2019 WL 3557879, at *11 (E.D Va. Aug. 5, 2019) (emphasis added); *see also Mirafuentes v. Estevez*, 2015 WL 8177935, at *6 (E.D. Va. Nov. 30, 2015) (insufficient to "not actually state by name the individuals or businesses with which [the plaintiff] had business relationships"); *AdvanFort Co. v. Int'l Registries, Inc.*, 2015 WL 2238076, at *4 (E.D. Va. May 12, 2015) (insufficient to allege "contractual relationships with various customers"); *Jeffrey J. Nelson & Assocs., Inc. v. LePore*, 2012 WL 2673242, at *10 (E.D. Va. July 5, 2012) (insufficient to allege "contracts with numerous third parties").

15

Plaintiffs do not identify the merchants with which they purportedly have contractual relationships and future business expectancies. Instead, most of the Plaintiffs generally allege only that they participate in unspecified affiliate advertising programs with unspecified "online merchants." Compl. ¶¶ 116, 133, 138, 144, 147, 160, 165, 176, 181, 192, 197, 211, 227, 238; *see also id.* ¶¶ 127, 157, 206, 220, 234 (referring generally to affiliate programs). Under "the great weight and consensus of the law," these generic allegations are insufficient to state a tortious interference claim. *Baron Fin. Cop. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006).

To be sure, 6 of the 27 Plaintiffs allege that they advertised a specific online merchant's products or services, *see* Compl. ¶¶ 111, 120, 152, 170, 185, 230, but none alleges the substantive content or key terms of any contractual relationship with these online merchants, including the relevant attribution model. Therefore, they have also failed to plead the existence of a valid contractual relationship or business expectancy. *See, e.g.*, *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 631 (W.D. Va. 2015) (dismissing tortious interference claim because "there [was] no explication of the length of the contract, its substantive content or terms, or when it was terminated").

Even if Plaintiffs had alleged valid contractual relationships or business expectancies— which they have not—Plaintiffs also fail to allege that any such relationship or expectancy had a probability of future economic benefit. "A mere possibility that a future economic benefit will accrue" or "[m]ere proof of a plaintiff's belief and hope that a business relationship will continue" is insufficient. *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019). Similarly, "the expectancy of remaining in business is too general to support a tortious interference claim." *Masco*, 279 F. Supp. 2d at 710. Rather, there must be "concrete" evidence of a probable benefit. *Moore v. United Intern. Investigative Servs., Inc.*, 2009 F. Supp. 2d 611, 619 (E.D. Va. 2002).

Plaintiffs' allegations that their unspecified contractual and economic relationships are "ongoing" and that they "expect to continue earning commissions" in the future, Compl. ¶ 275, at most suggest a mere possibility of future benefit. They also pretend away the fundamental nature of the online marketing industry, which is a fiercely competitive fight for every click. A consumer's click last week, yesterday, or even five minutes ago hardly creates an expectancy that a purchase will be completed or an entitlement to a commission from that purchase. Numerous courts have found similar nonspecific and speculative allegations insufficient to state a tortious interference claim. *See, e.g.*, *Cox v. MAG Mut. Ins. Co.*, 2015 WL 1640513, at *5 (E.D. Va. Apr. 9, 2015) (insufficient to allege that "unnamed former or current" customers would "choose [plaintiff]" for business in the future); *Salvin v. Am. Nat'l. Property & Casualty Co.*, 2006 WL8448734, at *4 (E.D. Va. July 25, 2006) (insufficient to allege that the plaintiff "would have been able to sell more" in the future); *Government Emp. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (insufficient to allege "that consumers will purchase" from the plaintiff in the future).

*Second*, Plaintiffs generally allege that Capital One "knew" and was "aware" of Plaintiffs' unspecified contracts and business expectancies, but these generic allegations also are not enough. Compl. ¶¶ 276, 284. Plaintiffs do not allege that Capital One had knowledge of any specific contractual relationships or business expectancies, as they must. For instance, in *AdvanFort*, the court held that the plaintiffs' "conclusory statement that [the defendant] had knowledge of [the plaintiffs'] contracts" could not "reasonably support an inference" of such knowledge because the plaintiffs' "ha[d] not named a single customer that was the subject of tortious interference" by the defendant. 2015 WL 2238076, at *5 (cleaned up); *see also Lohkova v. Halper*, 441 F. Supp. 3d 238, 265 (E.D. Va. 2020) (affirming dismissal of tortious interference claim because plaintiff alleged only "vague and conclusory language" to suggest the defendant "was aware of any specific

17

contracts or business expectancies"). Plaintiffs' general allegations, at most, amount to knowledge of the existence of third-party competitors somewhere in consumers' click-paths. But "alleged knowledge of [the plaintiff's] business" is insufficient because it "does not equate to [a defendant] having knowledge of specific, existing contracts." *Mirafuentes*, 2015 WL 8177935, at *5.

*Third*, Plaintiffs fail to allege that Capital One caused a breach or loss of any contract. "Under Virginia law, one must demonstrate a contract breach to support a tortious interference claim." *Baxter Research Med., Inc. v. Medtronic, Inc.*, 1999 WL 92472, at *2 (4th Cir. Feb. 24, 1999) (citing *Chaves v. Johnson*, 230 Va. 112, 120 (1985)). That is because a defendant "could not have induced or caused a breach that did not occur." *McAfee v. Cauthorne*, 2022 WL 2118982, at *7 (W.D. Va. June 13, 2022). Here, Plaintiffs do not allege that any unspecified contracts with online merchants were breached. To the contrary, Plaintiffs allege that their contracts are "ongoing" and that any alleged interference from Capital One Shopping, at most, "disrupted" them. Compl. ¶¶ 283–85. Plaintiffs therefore have not alleged the requisite breach of contract.

*Fourth*, Plaintiffs fail to allege that Defendants used improper methods because they do not allege any conduct that is "illegal or independently tortious," "violate[s] an established standard of a trade or profession," is "unethical," or constitutes "unfair competition." *Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*, 2017 WL 57134, at *6 (E.D. Va. Jan. 4, 2017) (Trenga, J.). Merchants ultimately decide who should get credit for a sale, and Plaintiffs allege that Capital One Shopping, like Plaintiffs themselves, is compensated under an attribution model well-known in the industry. Compl. ¶¶ 77, 82, 86. Capital One's receipt of commissions under its own, separate contracts with its merchant partners does not constitute "improper methods" for purposes of a tortious interference claim. *See Lewis-Gate*, 282 Va. at 153 ("existence" of tortious interference claim "does not mean" that "a third party promoting its own interests will result in tort liability" even where a contract relationship is terminated; plaintiff must

18

prove "that the third party's actions were illegal or fell so far outside the accepted practice of that 'rough-and-tumble world' as to constitute improper methods").

Put simply, Plaintiffs' generalized complaint that they are not making enough money under the rules and standards that they do (and must) acknowledge govern the online marketing industry does not constitute tortious interference. *See, e.g.*, *Masco*, 279 F. Supp. 2d at 710–11 (allegations towards "the entire market" insufficient); *Synopsys, Inc. v. Risk Based Sec., Inc.*, 2022 WL 3005990, at *18 (E.D. Va. July 28, 2022) ("vague" allegations that "reflect[ed] the harsh reality of a competitive market . . . lack[ed] the specificity required to prevail on a tortious interference claim"). The tortious interference claims should therefore be dismissed.

## B.    The unjust enrichment claim should be dismissed.

Plaintiffs' unjust enrichment claim (Claim 1) alleges that Capital One received commissions that Plaintiffs were entitled to "as a function of the Capital One Shopping browser extension wrongfully claiming credit for commissions via last-click attribution." Compl. ¶ 266. "To avoid unjust enrichment, equity will effect a contract implied in law . . . requiring one who accepts and receives the services of another to make reasonable compensation for those services." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165 (4th Cir. 2012). An unjust enrichment claim therefore requires that the plaintiff allege: "(1) [plaintiff] conferred a benefit on the defendant; (2) defendant knew of the benefit and should reasonably have expected to repay plaintiff; and (3) defendant accepted or retained the benefit without paying for its value." *Podgoretsky v. Ocwen Loan Servicing LLC*, 2014 WL 12524654, at *2 (E.D. Va. Aug. 19, 2014) (Trenga, J.).

There is no unjust enrichment here because Plaintiffs do not allege that Capital One should reasonably have expected to pay Plaintiffs for any benefit conferred. A "general assertion" of such an expectation is insufficient; rather, the plaintiff must allege "facts supporting" that assertion. *Rosetta Stone*, 676 F.3d at 166 (affirming dismissal of unjust enrichment). Plaintiffs do not even

generally allege that Capital One should reasonably have expected to repay them, much less facts supporting that assertion. Indeed, as previously discussed, Plaintiffs' allegations make clear that Capital One is exercising its rights under its own agreements with merchants and affiliate networks that provide for a well-known attribution model. *See* Compl. ¶¶ 77–86. Just as there is nothing improper sufficient to support a tortious interference claim, there is nothing inequitable to support an unjust enrichment claim under these circumstances. *See, e.g.*, *Chapman v. Asbury Automotive Group, Inc.*, 2017 WL 3324486, at *6 (E.D. Va. Aug. 3, 2017) (no unjust enrichment where defendant "merely maintained the status quo" by exercising rights it already had).

What Plaintiffs really seek is for the Court to rewrite the merchant terms and affiliate network rules allocating credit for sales that they agreed to and do not like. But "[t]he law will not impose an implied contractual relationship . . . in contravention of an express contract," especially when that contract is between the plaintiff and a third-party. *Nedrich v. Jones*, 245 Va. 465, 477 (1993); *see Datastaff Tech. Grp., Inc. v. Centex Const. Co., Inc.*, 528 F. Supp. 2d 587, 598–99 (E.D. Va. 2007) (collecting cases holding that "this rule applies to bar a suit between A and B where an express contract on the same subject matter exists between A and C"); *In re Va. Block Co.*, 16 B.R. 771, 774 (W.D. Va. 1982) (refusing to "impose an implied contractual relation" on defendant because money at issue was "the subject of an express contract" between the plaintiff and a third party). If Plaintiffs have a complaint that their commissions are lower than expected or that other publishers involved in a particular purchase are receiving commissions instead, their complaint is with the merchants and affiliate networks with whom they have partnered and the attribution model and tracking rules to which they agreed. It is not with Capital One.

### C.    The conversion claim should be dismissed.

Plaintiffs' conversion claim (Claim 4) alleges that Capital One interfered with Plaintiffs' "right to possess commissions [they] earned" by "assum[ing] and exercis[ing] the right of

ownership over these commissions." Compl. ¶¶ 288, 290. To state a claim for conversion, Plaintiffs must allege: (1) "the ownership or right to possession of the property at the time of the conversion" and (2) "the wrongful exercise of dominion or control by defendant over the plaintiff's property, thus depriving plaintiff of possession." *Cumulus Investor, LLC v. Bernardi*, 2022 WL 20043085, at *3 (E.D. Va. July 21, 2022) (Trenga, J.).

Plaintiffs fail to allege the first element—the ownership or right to property at the time of the alleged conversion. Under Virginia law, money may only be the subject of a conversion claim under "limited circumstances." *Id.* at *3; *see also Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010) ("The general rule in Virginia is that money cannot be the subject of conversion . . . ."). To be the subject of a conversion claim, the money at issue must be "part of a segregated and identifiable fund," *i.e.,* a fund that is "separate from the defendant's general funds and one to which the plaintiff is entitled." *Cumulus Investor*, 2022 WL 20043085, at *3. In addition, the plaintiff must also have a "clear, definite, undisputed, and obvious" right to the funds. *Grayson v. Westwood Buildings, L.P.*, 300 Va. 25, 73 (2021) (citation omitted).

Here, Plaintiffs have not alleged that the commissions are part of a separate and identifiable fund, as opposed to Capital One's general funds. This is fatal to their claim. *See, e.g.*, *Student A v. Liberty Univ., Inc.*, 602 F. Supp. 3d 901, 914 (E.D. Va. 2022) (dismissing conversion claim for failure to allege that money was part of a segregated and identifiable fund, and rejecting argument that it was sufficient to allege that the money was "meant for a specific, identifiable purpose"); *Cumulus Investor*, 2022 WL 20043085, at *3 (similar).

Even if commissions could be the subject of a conversion claim, Plaintiffs have not alleged they have a "clear, definite, undisputed, and obvious right" to the commissions. As the Complaint makes clear, the online marketing industry is complex and involves different entities and attribution models. Compl. ¶¶ 57–77. At the very most, Plaintiffs allege that Defendants

21

"exploit[]" the industry-standard "last-click attribution model." *Id.* ¶¶ 77, 82.  Yet that allegation implicitly recognizes that Capital One Shopping has a right to the commissions under its own agreements.  And as discussed above, Capital One Shopping provides a valuable service to consumers and merchants in exchange for those commissions.  *See supra* Section I.B.  Plaintiffs' allegations are therefore ill-suited for, and cannot state, a conversion claim.

## III.    PLAINTIFFS' COMPUTER FRAUD CLAIMS ARE MERITLESS.

Plaintiffs also claim that a popular browser extension used by millions of Americans is actually "malicious code" that secretly hacks its users' browsers in violation of the federal criminal Computer Fraud and Abuse Act ("CFAA") and various state-law counterparts.  *See* Compl. ¶¶ 295–304, 366–460.  This inflammatory but novel theory should be rejected.  These laws are "anti-hacking statute[s]" designed to "prohibit the use of hacking techniques to gain unauthorized access to electronic data," and they are inapplicable to the conduct alleged here.  *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 932 (E.D. Va. 2010) (CFAA); *see also S.E. Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*, 2013 WL 2147478, at *7 (E.D. Va. May 14, 2013) (similar for Virginia law).  But even if Plaintiffs plausibly alleged conduct that fell under the ambit of these statutes, Plaintiffs' computer claims would still fail for multiple reasons.

### A.    The CFAA claim should be dismissed because Plaintiffs plead neither a qualifying loss nor knowing and intentional unauthorized access.

To bring a civil claim under 18 U.S.C. § 1030(a)(4) of the CFAA, Plaintiffs must allege (1) a qualifying "loss" of at least $5,000, and (2) knowing and intentional unauthorized access.  *See id.* 1030(a)(4), (g).  Plaintiffs fail on both accounts.

#### 1.    Plaintiffs do not allege any qualifying loss.

Plaintiffs fail to plausibly allege loss.  "Loss" is a defined term under the CFAA and is limited to the costs "of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue

lost, cost incurred or other consequential damages *incurred because of interruption of service*." *Id.* (e)(11) (emphasis added); *see also CoStar Realty Information, Inc. v. Field*, 737 F. Supp. 2d 496, 513 (D. Md. 2010) (collecting cases noting that Congress's intent was to limit loss of revenue to "traditional computer 'hacker' scenario—where the hacker deletes information, infects computers, or crashes networks"). Plaintiffs have alleged solely "lost [] revenue" but have not alleged they lost more than $5,000, as the CFAA requires.

Nor have Plaintiffs alleged facts showing that they lost revenue "because of [an] interruption of service," such as an attack that renders a website or computer inaccessible. *Id.* Courts around the country have made clear that the "CFAA does not recognize lost revenue damages as 'loss' unless [they were] 'incurred because of interruption of service.'" *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 653 (E.D. Va. 2010) (quoting 18 U.S.C. § 1030(e)(11)); *see also Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) (rejecting similar lost revenue argument under CFAA); *CoStar Realty*, 737 F. Supp. 2d at 513–15 (collecting cases). Plaintiffs allege no such losses here. Nor could they, because the kind of conduct at issue here is not the kind of conduct the CFAA was enacted to prohibit. Because generalized claims of lost revenue without a connection to an interruption of service are not cognizable under the CFAA, Plaintiffs' CFAA claim must be dismissed.

### 2.    *Plaintiffs do not allege any knowing and improper access.*

Even if Plaintiffs had a qualifying loss, their claims would still fail because Capital One's actions were authorized by Capital One Shopping's users. "The CFAA is concerned with the unauthorized access of protected computers." *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012). Here, before Capital One Shopping can do anything, it must be downloaded by a user. Compl. ¶ 4. By downloading and using the browser extension, users agree to the extension's Terms of Service and Privacy Policy (which is incorporated into the Terms of

Service).[4]  *See* Ex. 1, Kelley Decl., Ex. A at 1, 3 ("By accessing or using any portion of the Services, you consent to the collection, use, and sharing of certain information about you, as specified in the Capital One Shopping Online & Mobile Privacy Policy.").  That Privacy Policy in turn makes clear that in using the browser extension, users agree to give Capital One Shopping access and the right to use their "[b]rowsing, product, and e-commerce data, which includes transaction data . . . pages viewed . . . advertising identifiers . . . and [c]ookies and similar technologies data."  *See* Ex. 1, Kelley Decl., Ex. B at 2–3.  These policies leave no doubt that Capital One has been granted authorization to access the cookies and Plaintiffs' "advertising identifier[s]."  Consumers then make an additional, affirmative decision to activate the browser extension by "click[ing] buttons."  *Id.* ¶ 83.  Thus, Capital One's authorization is clear and fatal to the CFAA claim.  And even if Capital One used the data it was authorized to access contrary to the Terms of Service and Privacy Policy (and it did not), that still would not create CFAA liability. *See Van Buren v. United States*, 593 U.S. 374, 396 (2021) (individual who used information that he had access to for "improper purpose" did not violate CFAA); *Miller*, 687 F.3d at 207 (similar).

Moreover, even if Capital One did ultimately exceed the limits of its authorized access set out in the Terms of Service and Privacy Policy—which it did not—Plaintiffs still have not plausibly alleged that it did so knowingly and with intent to defraud.  *See Butera & Andrews v. IBM Corp.*, 456 F. Supp. 2d 104, 109–10 (D.D.C. 2006) (noting that CFAA "require[s]

---

[4] This Court may consider the Terms of Service because Plaintiffs incorporated it into their Complaint by citing it explicitly, *see* CAC ¶ 56 n.3, as well as the Privacy Policy because it is expressly incorporated into the Terms of Service, integral to certain of Plaintiffs' claims, and is publicly available and judicial notice may be taken of it. *See, e.g., Goines v. Valley Comty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Keogh v. Meta Platforms, Inc.*, 680 F. Supp. 3d 601, 606 n.2 (D.S.C. 2023) (considering on motion to dismiss company's cookie policy because it was cited in complaint, as well as privacy policy incorporated into cookie policy); *Tatum v. X Corp.*, 733 F. Supp. 3d 453, 459 (E.D.N.C. 2024) (taking judicial notice of online terms of service and collecting cases indicating that courts may judicially notice information "from publicly available websites").

'intentional' conduct before giving rise to a statutory violation" and that the intentional act "must have been the person's conscious objective," and not the result of a mistake or even carelessness (cleaned up)). They do not plausibly allege, for example, that Capital One "purposefully access[ed]" data "and kn[e]w that it was forbidden." *Abu v. Dickson*, 107 F.4th 508, 516 (6th Cir. 2024). Nor do Plaintiffs plausibly allege that Capital One's intent or purpose was to hack, alter, or destroy their affiliate links. As Plaintiffs concede, the purpose of Capital One Shopping is to provide value to its users in the form of coupons, price comparisons, and shopping rewards, Compl. ¶ 2, and the browser extension receives and uses data provided by its users as described in its Terms of Use and Privacy Policy to do so, *id.* ¶ 301. In short, Plaintiffs have not plausibly alleged Capital One had any reason "to know [its] conduct," which is described in its Terms of Service and Privacy Policy, was "off-limits." *Abu*, 107 F.4th at 516–18 (affirming finding under CFAA that defendant did not intentionally exceed access as a matter of law). Plaintiffs' conclusory theory that Capital One's intent is to commit fraud via Capital One Shopping "rests on an implausible chain of inferences," *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018) (dismissing CFAA fraud claim), and also defies common sense. *Iqbal*, 556 U.S. at 664.

Because Plaintiffs cannot plausibly allege that Capital One knowingly and with intent to defraud "access[ed] a computer without authorization or exceed[ed] [its] authorized access," the CFAA claim fails. *See Miller*, 687 F.3d at 207 (fraudulent intent required for liability); *see also SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 610 (E.D. Va. 2005) (dismissing CFAA claim where plaintiff failed to allege acts taken without authorization or in excess of authority).

### B.    The state-law computer claims should also be dismissed because of Plaintiffs' failure to allege intentional unauthorized access.

Plaintiffs also piggy-back nine state-law computer hacking claims onto their CFAA claim, but these claims fail for largely the same reasons as their CFAA claim. As a threshold matter,

three such laws are criminal statutes which contain no private right of action and cannot be invoked by civil plaintiffs. *See* Miss. Code § 97-45-3; 18 Pa. C.S. § 7611; N.J. Stat § 2C:20-25.

In any event, all of these laws—like the CFAA—target *intentional unauthorized* access, and do not apply to authorized use.[5]  As explained above, the users of Capital One Shopping expressly gave Capital One permission to receive and use their browsing data, which includes Plaintiffs' affiliate IDs.  Accordingly, all of Plaintiffs' state-law computer claims fall with their CFAA claim. *See, e.g.*, *Eng. Boiler & Tube, Inc. v. Mullican Flooring, L.P.*, 2006 WL 8438984, at *5 (S.D.W. Va. Mar. 23, 2006) (no liability under West Virginia statute where access was authorized); *Stultz v. Va. Dept. of Motor Vehicles*, 185 F. Supp. 3d 890, 903–04 (W.D. Va. 2015) (dismissing Virginia computer claim where plaintiff simply asserted elements to claim but did not plausibly allege acts taken "without authority"); *In re Google Android Consumer Priv. Litig.*, 2013 WL 1283236, at *11–12 (N.D. Cal. Mar. 26, 2013) (dismissing California computer claim where plaintiffs failed to plausibly allege defendants acted "without permission").

Moreover, these state-law computer claims also require Plaintiffs to plausibly allege that Capital One *intentionally* accessed and/or altered data for which it lacked authorization or knowingly accessed a computer for the purpose of committing fraud.  As explained above, Plaintiffs do not plead plausible facts in support of their conclusory assertions and legal conclusions that Capital One acted knowingly and with intent to commit fraud.  This too dooms

---

[5] *See* Cal. Penal Code § 502 (penalizing acts taken "knowingly" and "without permission"); Miss. Code § 97-45-3(1)(c) (prohibiting intentional fraudulent acts as well as "unknowing and unwanted" access); Rev. Stat. Mo. § 569.095, 099 (penalizing acts taken "knowingly" and "without authorization or without reasonable grounds to believe that he or she has such authorization"); W. Va. Code § 61, Art. 3C4, 7 (similar); Wis. Stat. § 943.70 (similar); N.J. Stat § 2A:38A-3 (penalizing "purposeful" or "knowing" "unauthorized" acts"); N.J. Stat § 2C:20-25 (same); 18 Pa. C.S. § 7611 (prohibiting intentional acts taken "without authorization"); Tex. Penal Code § 33.02 (penalizing accessing computers or computer networks "knowingly" and without "consent of the owner" of the computer or network); Va. Code Ann. § 18.2-152.3–4 (penalizing acts "without authority" and with "malicious intent" or "intentionally deceptive means").

Plaintiffs' state-law computer claims. *See, e.g.*, *Satmodo, LLC v. Whenever Comm'cns, LLC*, 2017 WL 1365839, at *6–7 (S.D. Cal. Apr. 14, 2017) (dismissing California computer fraud claims and rejecting plaintiff's "conclusory" allegations that "merely restates the statutory language instead of providing factual support"); *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 469–70 (2007) (affirming judgment for defendant under New Jersey computer law where defendants' conduct was not done "purposefully or knowingly"); *Supinger v. Virginia*, 167 F. Supp. 3d 795, 820–21 (W.D. Va. 2016) (dismissing Virginia state-law computer claim where plaintiff did not plausibly allege intent and rejecting "conclusory" allegations and legal conclusions).

## IV.    PLAINTIFFS' STATE-LAW CONSUMER PROTECTION CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE ANY HARM TO CONSUMERS.

The consumer protection statutes collected in the Complaint were created to provide greater protections to consumers from sellers—not to inject courts into business-to-business disputes like this one. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) ("The clear intent of [ACFA] is to protect unwary buyers from unscrupulous sellers."); *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009) (UCL "protect[s] California's consumers against unfair business practices"); *Nat'l Union Fire Ins. Co. v. Goodin & Bigelow Const., Inc.*, 1991 WL 303607, at *2 (W.D. Mich. Oct. 15, 1991) ( MCPA "designed to protect consumers as opposed to businesses or businesspersons.").[6] While these claims all fail for slightly

---

[6] *See also* Neb. Rev. Stat. § 59-1601(2), *id.* 59-1602 (actionable conduct must "directly or indirectly affect[] the people of the State of Nebraska"); *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (N.Y. App. Div. 1995) (emphasizing that the GBL "was intended to empower consumers," not to "become an adjunct to ordinary commercial litigation" (cleaned up)); *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 519 (4th Cir. 1999) (NCUDTPA "is not intended to apply to all wrongs in a business setting" but instead "to protect the consuming public"; *UBS Fin. Servs., Inc. v. Aliberti*, 133 N.E.3d 277, 291 (Mass. 2019) (Chapter 93A is intended to better relationships between consumers and businesses).

different reasons particularized to the specific claim, the common theme with each of the defects stems from the general principle that these laws do not apply to business-to-business disputes.

The procedural and substantive standards those statutes established specifically prevent opportunistic commercial plaintiffs from bringing business disputes under the guise of consumer protection.  For example, only buyers have standing to sue under ACFA, *Sutter*, 971 F.2d at 407, so the ACFA claim must be dismissed.  *See Cellco P'ship v. Hope*, 2011 WL 3159172, at *1, 5 (D. Ariz. July 26, 2011) (dismissing ACFA claim because the plaintiff "must be the buyer in the merchandise transaction").  Courts have also required that acts challenged under these state statutes be "consumer-oriented" or negatively impact the consuming public to state a claim.  *Ordosgoitti v. Werner Enterprises, Inc.*, 2021 WL 826504, at *6 (D. Neb. Mar. 4, 2021) (requiring deceptive practices to "affect the people of the State of Nebraska in order to be prohibited" (cleaned up)); *Polidoro v. Chubb Corp.*, 354 F. Supp. 2d 349, 353 (S.D.N.Y. 2005) ("A claim under § 349 must charge conduct that is consumer oriented and have a broad impact on consumers at large.");  *Food Lion*, 194 F.3d at 519–20 (a business can bring NCUDTPA claims against another business only where there is "harm [to] the consuming public"); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 789 (E.D. Mich. 2014) (requiring purchase for personal purposes to state claim).

Plaintiffs complain that they—not consumers—were harmed because of lost commissions. *See, e.g.*, *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 274 (S.D.N.Y. 2003) (dismissing a § 349 claim for lost profits because "the gravamen of the complaint [was] harm to a business as opposed to the public at large").  Even assuming Capital One Shopping is the reason why, Plaintiffs have not adequately alleged that Capital One Shopping has negatively impacted consumers or the public interest.  *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 142 (Neb. 2000) (lower court erred by not dismissing NCPA action involving a business dispute that "affected no one other than the parties to the transaction"); *Durling v. King*, 554 S.E.2d 1, 4–5

28

(N.C. App. Ct. 2001) (withholding commissions has no impact on the consuming public); *Nat'l Union Fire Ins.*, 1991 WL 303607, at *2 (dismissing MCPA claim because "a plain reading of the [MCPA] indicates that it was not meant to apply to conduct between business entities").  They cannot do so, as Plaintiffs admit that Capital One Shopping benefits consumers by sharing its commissions with them in the form of discounts and shopping rewards.  Compl. ¶¶ 2, 83; *see also Food Lion*, 194 F.3d at 520 (reversing NCUTPA judgment against defendant in part because defendant's actions were "intended to benefit the consuming public").  Permitting Plaintiffs to use consumer protection statutes against their competitor for advertising dollars would turn these statutes on their heads, especially when Capital One Shopping shares a portion of commissions with consumers and Plaintiffs do not allege that they do the same.

Courts routinely dismiss attempts to bring disputes over commissions and similar fees as consumer protection claims on the basis that they fall outside these consumer protection statutes. *See, e.g.*, *Triple 7, Inc. v. Intervet, Inc.*, 338 F. Supp. 2d 1082, 1087 (D. Neb. 2004) (dismissing NCPA claim where plaintiff alleged competitor failed to pay owed rebates and worked with third parties to disrupt plaintiff's rebates); *Stack v. Abbott Lab'ys, Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013) (dismissing NCUDTPA claim where the claim involved dispute over royalties); *Durling*, 146 N.C. App. at 488–89 (affirming that " withholding commissions that were owed to plaintiffs" did not violate NCUDTPA); *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1085, 1089 (S.D.N.Y. 1988) (dismissing GBL claim where defendant "maliciously pirat[ed] away . . . accounts and commissions" without consumer consent).  This Court should do the same.

In addition, the conduct that Plaintiffs claim violates the consumer protection laws is the same that underlies Plaintiffs' failed common-law claims.  *E.g.* Compl. ¶¶ 318–19 (alleging Capital One's acts are unfair because they wrongfully interfered with Plaintiffs' contracts and converted their commissions); *id.* ¶¶ 327, 329 (same); *id.* ¶¶ 336–38 (same); *id.* ¶ 346 (same); *id.*

¶¶ 358–59 (same); *id.* ¶ 464 (same).  Accordingly, Plaintiffs' consumer protection claims fail for the same reasons discussed above.  *See supra* at Section II; *Childers v. Hayes*, 336 S.E.2d 146, 149 (N.C. Ct. App. 1985) (affirming dismissal of consumer protection claim derived from failed negligence claim); *Asby v. Medtronic, Inc.*, 673 F. Supp. 3d 787, 797–98 (E.D.N.C. 2023) (similar); *Beshada v. Millard Realty*, 2004 WL 60321, at *7 (Mich. Ct. App. Jan. 13, 2004) (similar); *Bose Corp. v. Ejaz*, 2011 WL 5402634, at *5 (D. Mass. Nov. 7, 2011) (similar).

## V.    PLAINTIFFS CANNOT PURSUE ANY  EQUITABLE RELIEF.

Many of Plaintiffs' claims seek equitable relief, such as an injunction or restitution.  To obtain this relief, Plaintiffs must demonstrate a lack of adequate legal remedies.  *eBay v. MercExchange LLC*, 547 U.S. 388, 391 (2006) (plaintiffs must demonstrate "that remedies available at law, such as monetary damages, are inadequate to compensate for [their] injury").  Plaintiffs have not alleged they lack an adequate remedy.  Nor can they.  The primary harm Plaintiffs claim they have suffered is lost revenue, which can be redressed through a claim for money damages, so any claims seeking equitable relief should be dismissed.  *See JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 487 (E.D. Va. 2020) (refusing to issue an injunction because a harm that is compensable by money damages is not irreparable); *see also Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312–13 (9th Cir. 2022) (court lacked equitable jurisdiction where plaintiff had an adequate remedy at law, despite the remedy being time-barred).

### CONCLUSION

The Consolidated Amended Complaint should be dismissed.  Because any amendment would be "futile in light of the fundamental deficiencies in plaintiffs' theory of liability," the dismissal should be with prejudice or at a minimum, without leave to amend.  *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

DATED:  March 4, 2025

Respectfully submitted,

By:  */s/ Connor J. Kelley*

Connor Kelley (VA Bar No. 93596)
Valerie Hletko*
Andrew Soukup*
Jeffrey Huberman*
Amee Frodle*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5606
Email:  ckelley@cov.com
        vhletko@cov.com
        asoukup@cov.com
        jhuberman@cov.com
        afrodle@cov.com

*Attorneys for Capital One*

*\*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2025, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to all counsel of record.


By: <u>*/s/ Connor J. Kelley*</u>
    Connor Kelley