**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

*In re Capital One Financial Corporation,
Affiliate Marketing Litigation*

Case No. 1:25-cv-00023-AJT-WBP

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
CAPITAL ONE'S MOTION TO DISMISS
<u>THE AMENDED CONSOLIDATED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

   I.   The Affiliate Marketing Industry ................................................................................. 2

   II.   The Capital One Shopping Browser Extension ........................................................... 3

ARGUMENT .......................................................................................................................... 6

   I.   Plaintiffs have Article III standing to pursue their claims. ......................................... 6

      A.   Plaintiffs plausibly allege financial harm—the classic and paradigmatic Article III injury. ....................................................................................................... 7

      B.   Plaintiffs' injuries are fairly traceable to Capital One's actions. ................................ 11

   II.   Plaintiffs adequately plead their common law claims. ................................................. 13

      A.   Plaintiffs state a claim for unjust enrichment. ............................................................ 13

      B.   Plaintiffs state claims for tortious interference. ......................................................... 16

      C.   Plaintiffs state a claim for conversion. ...................................................................... 19

   III.   Plaintiffs adequately plead violations of federal and California computer law statutes. .................................................................................................................. 20

      A.   Plaintiffs state a claim under the Computer Fraud and Abuse Act. ........................... 20

         1.   Plaintiffs properly plead loss from interruption of service, as well as damage...... 20

         2.   Plaintiffs properly plead access in excess of authorization. ................................... 22

      B.   TechSource states a claim under the California Comprehensive Computer Data Access and Fraud Act. .......................................................................... 24

   IV.   Plaintiffs adequately allege their consumer protection claims. .................................... 25

      A.   Storm Productions plausibly alleges that Capital One violated the New York General Business Law. .............................................................................. 25

      B.   TechSource plausibly alleges that Capital One violated California's Unfair Competition Law. ......................................................................................... 28

   V.   Plaintiffs' request for injunctive relief is proper. ....................................................... 30

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
  241 F. Supp. 3d 461, (S.D.N.Y. 2017) ..................................................................... 26

*Adnet, Inc. v. Soni*,
  66 F.4th 510 (4th Cir. 2023) ................................................................................ 17

*Advanced Fluid Sys., Inc. v. Huber*,
  28 F. Supp. 3d 306 (M.D. Pa. 2014) ...................................................................... 22

*Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*,
  2020 WL 3893395 (E.D. Cal. July 10, 2020) .......................................................... 30

*Air Evac EMS, Inc. v. Cheatham*,
  910 F.3d 751 (4th Cir. 2018) ................................................................................. 7

*Allen v. Wright*,
  468 U.S. 737 (1984) .......................................................................................... 13

*Andrews v. Sirius XM Radio Inc.*,
  932 F.3d 1253 (9th Cir. 2019) .............................................................................. 22

*Azby Brokerage, Inc. v. Allstate Ins. Co.*,
  681 F. Supp. 1084 (S.D.N.Y. 1988) ....................................................................... 26

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ............................................................................... 11

*Bias v. Wells Fargo & Co.*,
  942 F. Supp. 2d (N.D. Cal 2013) .......................................................................... 28

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
  3 N.Y.3d 200 (N.Y. 2004) ................................................................................... 26

*Calhoun v. Google LLC*,
  526 F. Supp. 3d 605 (N.D. Cal. 2021) ................................................................... 24

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ....................................................................................... 29

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ............................................................................................ 11

*Collins v. Yellen*,
  594 U.S. 220 (2021) .......................................................................................... 13

*Collyer v. Cataline Snacks Inc.*,
  2024 WL 202976 (N.D. Cal. Jan. 18, 2024) ........................................................... 30

*Combined Ins. Co. of Am. v. Wiest*,
  578 F. Supp. 2d 822 (W.D. Va. 2008) ................................................................... 19

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (Cal. 2000) ................................................................................ 30

*Cottrell v. Alcon Labs.*,
   874 F.3d 154 (3d. Cir. 2017)..................................................................... 7

*Daniels v. Arcade, L.P.*,
   477 F. App'x 125 (4th Cir. 2012) ............................................................ 12

*Davis v. Ford Motor Credit Co.*,
   179 Cal. App. 4th 581 (Cal. Ct. App. 2009) ........................................... 28

*Deal v. Mercer Cnty. Bd. of Educ.*,
   911 F.3d 183 (4th Cir. 2018) ............................................................... 7, 8

*Dfinity Found. v. New York Times Co.*,
   702 F. Supp. 3d 167 (S.D.N.Y. 2023) .................................................... 26

*DiCocco v. Garland*,
   52 F.4th 588 (4th Cir. 2022) .............................................................. 7, 12

*Duggin v. Adams*,
   360 S.E.2d 832 (Va. 1987)..................................................................... 18

*Duran v. Henkel of Am., Inc.*,
   450 F. Supp. 3d 337 (S.D.N.Y. 2020)..................................................... 25

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006).............................................................................. 30

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
   688 F. Supp. 2d 443 (E.D. Va. 2009) ..................................................... 20

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
   2011 WL 4625760 (E.D. Va. Oct. 3, 2011) ....................................... 19, 20

*EarthReports, Inc. v. U.S. Army Corps of Eng'rs*,
   2011 WL 4480105 (D. Md. Sep. 26, 2011) ............................................. 13

*eBay Inc. v. Digital Point Sols., Inc.*,
   608 F. Supp. 2d 1156 (N.D. Cal. 2009) .................................................. 23

*Electra v. 59 Murray Enters., Inc.*,
   987 F.3d 233 (2d Cir. 2021)................................................................... 26

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ............................................................... 23

*FEC v. Cruz*,
   596 U.S. 289 (2022).............................................................................. 10

*Fed. Ins. Co. v. Smith*,
   63 F. App'x 630 (4th Cir. 2003) ............................................................. 19

*Fernandez v. RentGrow, Inc.*,
   116 F.4th 288 (4th Cir. 2024) .................................................................. 7

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
   41 F.4th 71 (2d Cir. 2022) ..................................................................... 11

*Global Policy Partners, LLC v. Yessin*,
  686 F. Supp. 2d 642 (E.D. Va. 2010) ................................................................. 22

*Greenley v. Kochava, Inc.*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) .............................................................. 24

*Griffith v. TikTok, Inc.*,
  697 F. Supp. 3d 963 (C.D. Cal. 2023) ........................................................ 22, 23

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  277 F. Supp. 2d 269 (S.D.N.Y. 2003) ................................................................ 26

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 10

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
  37 N.Y.3d 169 (N.Y. 2021) ................................................................................ 25

*Hutton v. Nat'l Bd. of Exam's in Optometry, Inc.*,
  892 F.3d 613 (4th Cir. 2018) ........................................................................... 7, 8

*Ibarra v. Pharmagenics LLC*,
  660 F. Supp. 3d 914 (C.D. Cal. 2023) ............................................................... 30

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  2021 WL 3568394 (D.S.C. Aug. 12, 2021) ....................................................... 26

*Integrity Applied Sci., Inc. v. Clearpoint Chemicals LLC*,
  2020 WL 12584444 (D. Colo. Apr. 20, 2020) .............................................. 21, 22

*Int'l Union of N. Am.*,
  648 F.3d 295 (6th Cir.2011) .............................................................................. 21

*Jeong v. Nexo Fin. LLC*,
  2022 WL 174236 (N.D. Cal. Jan. 19, 2022) ...................................................... 29

*Jones v. Bloomigdales.com, LLC*,
  124 F.4th 535 (8th Cir. 2024) ........................................................................... 11

*JTH Tax, LLC v. Shahabuddin*,
  477 F. Supp. 3d 477 (E.D. Va. 2020) ................................................................ 30

*Kent v. PoolTogether, Inc.*,
  676 F. Supp. 3d 144 (E.D.N.Y. 2023) ............................................................... 10

*Krim v. pcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) ............................................................................ 11

*L-3 Commc'ns Corp. v. Serco, Inc.*,
  926 F.3d 85 (4th Cir. 2019) .............................................................................. 17

*Larkin v. Saber Auto., LLC*,
  736 F. Supp. 3d 193 (S.D.N.Y. 2024) ............................................................... 27

*Laufer v. Naranda Hotels, LLC*,
  60 F.4th 156 (4th Cir. 2023) ............................................................... 7, 10, 11

*LCF Grp., Inc. v. Piedmont Power Sports, Inc.,*
  688 F. Supp. 3d 323 (W.D. Va. 2023) ................................................................. 15

*WEC Carolina Energy Sols. LLC v. Miller,*
  687 F.3d 199 (4th Cir. 2012) ............................................................................. 23

*Lokhova v. Halper,*
  441 F. Supp. 3d 238 (E.D. Va. 2020) ................................................................. 18

*Lozano v. AT & T Wireless Servs., Inc.,*
  504 F.3d 718 (9th Cir. 2007) ............................................................................. 28

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................... 7, 8, 12

*Mackey v. McDannald,*
  842 S.E.2d 379 (Va. 2020) ................................................................................ 19

*Maurizio v. Goldsmith,*
  230 F.3d 518 (2d Cir. 2000) ............................................................................... 25

*Mirafuentes v. Estevez,*
  2015 WL 8177935 (E.D. Va. Nov. 30, 2015) ...................................................... 18

*Nat'l Funding, Inc. v. Modern Renovations, LLC,*
  712 F. Supp. 3d 733 (W.D. Va. 2024) ................................................................ 15

*Nedrich v. Jones,*
  429 S.E.2d 201 (Va. 1993) ................................................................................. 16

*O'Leary v. TrustedID,*
  60 F.4th 240 (4th Cir. 2023) .............................................................................. 9

*Opiotennione v. Bozzuto Mgmt. Co.,*
  130 F.4th 149 (4th Cir. 2025) ............................................................................ 9

*Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank,*
  85 N.Y.2d 20 (N.Y. 1995) .................................................................................. 25

*Perk v. Vector Res. Grp., Ltd.,*
  485 S.E.2d 140 (Va. 1997) ................................................................................. 19

*Prakashpalan v. Engstrom, Lipscomb & Lack,*
  223 Cal. App. 4th 1105 (Cal. Ct. App. 2014) ..................................................... 28

*Preira v. Bancorp Bank,*
  885 F. Supp. 2d 672 (S.D.N.Y. 2012) ................................................................. 28

*R.J. Invs., LLC v. Bd. of Cnty. Comm'rs,*
  2009 WL 5216056 (D. Md. Dec. 29, 2009) ........................................................ 9

*RitLabs, S.R.L. v. RitLabs, Inc.,*
  2012 WL 6021328 .............................................................................................. 22

*RitLabs, S.R.L. v. RitLabs, Inc.,*
  2012 WL 3263893 (E.D. Va. Aug. 9, 2012) .................................................. 21, 22

*Rosetta Stone Ltd. v. Google, Inc.*,
   676 F.3d 144 (4th Cir. 2012) ...................................................................... 14

*Satanic Temple v. Labrador*,
   76 F. Supp. 3d 989 (D. Idaho 2024) ........................................................... 11

*Schwartz v. Visa Int'l Corp.*,
   2003 WL 1870370 (Cal. Super. Ct. Apr. 7, 2003) ...................................... 28

*Se. Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*,
   2013 WL 2147478 (E.D. Va. May 14, 2013) ............................................... 20

*SecureInfo Corp. v. Telos Corp.*,
   387 F. Supp. 2d 593 (E.D. Va. 2005) .......................................................... 23

*Securitron Magnalock Corp. v. Schnabolk*,
   65 F.3d 256 (2d Cir. 1995) .......................................................................... 26

*Serrano v. Cablevision Sys. Corp.*,
   863 F. Supp. 2d 157 (E.D.N.Y. 2012) ......................................................... 27

*Simbeck, Inc. v. Dodd-Sisk Whitlock Corp.*,
   1997 WL 1070458 (Va. Cir. Nov. 21, 1997) ............................................... 17

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ................................................................. 13, 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ....................................................................................... 7

*Stuart v. County of Riverside*,
   2024 WL 3455263 (C.D. Cal. Apr. 22, 2024) ............................................. 24

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) ..................................................................... 25

*TK Elevator Corp. v. Shropshire*,
   2022 WL 564648 (W.D. Va. Feb. 23, 2022) ................................................ 19

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ....................................................................................... 8

*Van Buren v. United States*,
   593 U.S. 374 (2021) ..................................................................................... 21

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
   579 F. Supp. 2d 334 (E.D.N.Y. 2008) ......................................................... 27

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
   472 F. Supp. 3d 649 (N.D. Cal. 2020) .................................................... 23, 24

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
   774 F.3d 1065 (6th Cir. 2014) ..................................................................... 21

*Zeiger v. WellPet LLC*,
   526 F. Supp. 3d 652 (N.D. Cal. 2021) ......................................................... 29

Statutes

18 U.S.C. § 1030(e)(8) ................................................................................................ 20

Cal. Bus. & Prof. Code § 17200 ............................................................................... 28

Cal. Bus. & Prof. Code § 17203 ............................................................................... 29

Cal. Penal Code § 502(b)(8) ...................................................................................... 24

N.Y. Gen. Bus. Law § 349 ................................................................................... 25, 26

## INTRODUCTION

Plaintiffs Ahntourage Media LLC, Just Josh, Inc., Storm Productions LLC, TechSource Official, and ToastyBros, LLC, are content creators who have spent years cultivating loyal audiences by sharing original content online.[1] Their influence is hard-won—built post by post, video by video—and their audiences turn to them for authentic recommendations. Recognizing the power of those endorsements, merchants partner with Plaintiffs and other creators to promote their products and services. Consumers' online journeys are tracked at every step, and merchants pay creators commissions when a consumer clicks a creator's affiliate link and completes a purchase on a merchant's website. The result is a multi-billion-dollar affiliate-marketing industry powered by creators' ingenuity and the rigorous tracking of consumers' purchasing behavior.

This case arises from Capital One's exploitation and manipulation of that system. Capital One operates a browser extension designed to manufacture a trail that makes it appear as though the consumer arrived at a merchant's website by clicking on a Capital One affiliate link, when the consumer landed there through a creator's affiliate link. Capital One fabricates this trail to take credit for referrals and divert commissions to itself. And this scheme works: Capital One has pocketed commissions on purchases made through Plaintiffs' affiliate links.

Plaintiffs allege concrete financial harm, caused by deceptive misconduct that violates both statutory and common law. Capital One's motion to dismiss the Amended Complaint ("Complaint") ignores those well-pleaded allegations and rests on its own self-serving account of "how the industry works," ECF No. 143 at 1—a narrative that appears nowhere in the Complaint

---

[1] A content creator is someone who produces media for public consumption on the internet. They create materials like articles, blog posts, videos, images, and more, typically for websites, social media, and video-sharing platforms.

and thus cannot be credited at the pleading stage. Because Plaintiffs have Article III standing and plausibly allege their claims, the Court should deny Capital One's motion to dismiss in full.

## BACKGROUND

### I.        The Affiliate Marketing Industry

Affiliate marketing is a performance-based strategy under which creators promote merchants' products and services in exchange for commissions on resulting sales. Am. Compl. ¶¶ 2, 28–29. Merchants assign unique "affiliate links" to creators, who then share those links in promotional content on their platforms and social media channels. *Id.* ¶¶ 39–41. When a consumer clicks an affiliate link, the link takes the consumer to the merchant's website. *Id.* At the same time, a small text file called a "cookie" is stored on the consumer's web browser that identifies the creator as the source of the referral and "tracks the consumer's activity on the merchant's website to determine whether the consumer ultimately purchase[s] a product or service." *Id.* ¶¶ 42–43. Affiliate tracking occurs primarily through these cookies, but it can also take place via other affiliate tracking codes, like server-side functions or tracking tags embedded directly in a URL. *Id.*

Most merchants adhere to an industry-standard "last click" attribution model to credit and compensate referring creators for sales. *Id.* ¶¶ 45–46. This model gives full credit for a sale to the creator associated with the last-clicked affiliate link that drove the consumer to the merchant's website. *Id.* Under this model, a "click" is defined as "the measurement of navigating from one page to another by activating a hyperlink."[2] In other words, a last click refers to a consumer's action of clicking an affiliate link that takes the consumer to a merchant's website where the consumer then completes a purchase; it does *not* refer to anything the consumer does once they

---

[2] Am. Compl. ¶ 47 (quoting *Digital Attribution Primer 2.0* at 3 (Aug. 2016), https://www.iab.com/wp-content/uploads/2016/10/Digital-Attribution-Primer-2-0-FINAL.pdf).

are on the merchant's website. *Id.* ¶¶ 47–49. For example, if a consumer clicks an affiliate link posted on a creator's blog, navigates to a merchant's website via this link, and makes a purchase, that referring creator will earn a commission on the sale—regardless of what buttons the consumer clicks once on the website. *See id.* But if a consumer does not purchase anything during that visit, returns to the website later by clicking a different creator's affiliate link, and at this point completes a purchase, the second referring creator receives the commission. *Id.* ¶ 45.

Plaintiffs have entered into contractual agreements with Capital One's merchant partners that are consistent with the last-click attribution model. *Id.* ¶¶ 50, 51–58. Pursuant to these contracts, Plaintiffs are entitled to a commission on a sale when the consumer's final click to reach a merchant's website—that is, a click from a different website that brings the consumer to the merchant's website—is on their affiliate link.[3] *Id.* But as explained below, Capital One Shopping is designed to surreptitiously disrupt this rightful commission stream and deprive Plaintiffs of attribution and sales commissions they are entitled to. *See id.* ¶¶ 1, 3, 63–68, 82, 85–86, 90, 106.

## II.        The Capital One Shopping Browser Extension

Capital One Shopping is a browser extension that claims to help consumers search for coupons, find better prices, and earn rewards.[4] *Id.* ¶¶ 1, 17–22. Once installed, the extension runs continuously in the background on every webpage the consumer visits, harvesting data about every aspect of their online activity. *Id.* ¶ 23. But the extension offers its services to the consumer only

---

[3] *See, e.g.*, Am. Compl. ¶ 51 (Zadig & Voltaire: commissions for purchases made "using the Qualifying Link"); *id.* ¶ 53 (Best Buy: commissions for purchases "made via the intentional click by a Customer of a Qualifying Link"); *id.* ¶ 54 (Walmart: commission if purchase occurs through affiliate link "within the relevant cookie window" and "not through another affiliate link").

[4] Capital One attempts to lump itself in with Plaintiffs under the label "publishers," a term not found in the Complaint. But whether Capital One and Plaintiffs both "publish" anything is irrelevant here. Plaintiffs allege that Capital One Shopping is not a fellow participant in affiliate marketing but masquerades as one to steal commissions.

*after* the consumer has already arrived at a merchant's website (i.e., after the "last click"), and predominantly at the point of checkout, just before the consumer completes a purchase. *Id.* ¶¶ 3, 22, 64, 101–02. On partner websites, the extension may prompt the consumer to activate rewards or test coupons. *Id.* ¶¶ 20–22, 24–25. On non-partner websites, it may offer a price-comparison tool. *See id.* ¶¶ 21, 24–25. To use these services, the consumer must click a button on the extension's pop-up. *Id.* ¶¶ 77–78.

Although Capital One markets its extension as a helpful shopping tool, it is designed to hijack affiliate commissions from creators like Plaintiffs.[5] *Id.* ¶¶ 1–3, 64–65. When a consumer engages with the extension, the extension manufactures a fake "last click" that makes it appear as though the consumer navigated to the merchant's website via a Capital One affiliate link. *Id.* ¶ 64. In reality, the consumer was already on the merchant's website and never clicked a Capital One affiliate link. *Id.* ¶¶ 64–69, 85–86, 90, 97, 106. This fake "last click" causes the extension to replace any existing affiliate tracking code with Capital One's own, wrongly crediting Capital One with the referral, the purchase, and the commission. *Id.* ¶ 64–69, 96, 106.

Capital One requires the consumer to physically click on the extension's pop-up because that physical click enables the extension to trigger the technical process needed to generate the bogus "last click." *Id.* ¶¶ 64, 76–77, 96–102. In particular, when the consumer clicks to test coupons or activate rewards while on a merchant's website, the extension quietly opens an ephemeral, hidden tab. *Id.* ¶¶ 78, 95–106. The extension then injects a "redirect" URL to a Capital One affiliate link into this new tab, which forces a refresh of the merchant's website. *Id.* ¶ 78. This

---

[5] Despite acknowledging that "[t]his case involves the Capital One Shopping browser extension," Capital One's motion says little about how the extension works. ECF No. 143 at 5. Capital One devotes less than a page to describing the extension, includes just one vague sentence on monetization, and ignores Plaintiffs' technical explanation of how it receives commissions. *See id.*

sequence of events makes it appear as though the consumer started on a different website and then clicked on a Capital One affiliate link that landed on the merchant's website. *Id.* ¶¶ 78–80, 65–68, 97–102. Capital One's forced refresh causes the affiliate tracking code stored in the consumer's browser to falsely indicate to the merchant that the consumer clicked on Capital One's affiliate link to navigate to the merchant's website. *Id.* ¶¶ 79, 106. With this scheme complete, the extension closes the hidden tab, and the merchant is made to believe that Capital One referred the consumer to the merchant's website.[6] *Id.* ¶¶ 79, 81; *see also id.* ¶ 85–90, 96–102, 106. By performing this sleight of hand, Capital One gets credit for being the last click that navigated the consumer to the merchant's website, and for any purchase that consumer ultimately makes. *Id.* ¶¶ 68–69, 80, 96, 106.

Significantly, Capital One does all this even when it knows that the consumer navigated to the merchant's website by clicking a creator's affiliate link. Capital One knows this information because its extension comprehensively monitors browsing history URLs that contain both: (1) other affiliate tracking codes (including ones that identify creators) and (2) its own affiliate codes that overwrite the legitimate tracking codes. *Id.* ¶¶ 70–75, 100. Contrary to Capital One's characterization, its scheme does not amount to mere participation in the "rough-and-tumble world" of affiliate marketing. ECF No. 143 at 4. Instead, Capital One is using electronic deception to impersonate something it is not: a referrer who drives traffic to merchants' websites.

Capital One's tactics are not novel. The scheme it employs is a well-known form of affiliate fraud called "cookie stuffing"—a method used by bad actors to trick a website into thinking they

---

[6] At times, Capital One forces a refresh of the same tab the consumer is already on, instead of opening a second, hidden tab. Am. Compl. ¶ 90. In either case, the outcome is the same: Capital One's affiliate tracking code displaces that of the creator whose affiliate link brought the consumer to the merchant's website. *Id.* ¶¶ 80, 84–86, 90–93.

sent the website traffic, when they did not. *Id.* ¶¶ 95–106. Capital One misleadingly asserts that Plaintiffs "concede" the extension is not cookie-stuffing technology because Plaintiffs' cited sources describe cookie-stuffing technology "as code that works without any explicit clicks," and Plaintiffs acknowledge that the extension requires consumers to click buttons to work. ECF No. 143 at 9. But this reads Plaintiffs' Complaint too narrowly—Plaintiffs expressly allege that cookie stuffing occurs here "without any explicit clicks from a user *on a Capital One affiliate link.*" Am. Compl. ¶ 106 (emphasis added). Thus, although consumers must click to activate rewards or test coupons, that click is not on an affiliate link. Instead, the click is a ruse by Capital One to force a refresh of the merchant's website, which surreptitiously injects Capital One's own affiliate link and overwrites the actual referring creator's tracking code. *Id.* ¶¶ 96–106. That simulated "last click," in the absence of an express click by the consumer on a Capital One affiliate link, is what makes this scheme a textbook case of cookie stuffing. *Id.*

The result of Capital One's cookie-stuffing scheme is exactly as Capital One intended: Capital One steals credit for referrals and thus syphons commissions owed to the creators who actually referred the consumer to the merchant's website. *Id.* ¶ 82–83, 93–94, 106. Meanwhile, the creator responsible for the actual last click is left without a commission, despite creating the promotional content for the merchant's product that convinced a consumer to click on the creator's affiliate link and ultimately purchase the promoted product. *Id.* ¶ 83. Indeed, Plaintiffs have themselves been deprived of commissions because Capital One Shopping displaced their affiliate tracking code by faking a final click. *See id.* ¶¶ 85–86, 90, 109–50.

## ARGUMENT

## I.    Plaintiffs have Article III standing to pursue their claims.

Plaintiffs have constitutional standing to bring their claims in federal court. To establish

Article III standing, a plaintiff must show (1) "an injury in fact," (2) "fairly traceable to the challenged conduct," (3) that is "likely to be redressed" by the requested relief. *DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022).

When, as here, standing is challenged on the pleadings, the court "accepts as valid the merits of the plaintiff's legal claims." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (cleaned up). The court must also "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). At this initial stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss" the court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Hutton v. Nat'l Bd. of Exam's in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### A. Plaintiffs plausibly allege financial harm—the classic and paradigmatic Article III injury.

To show injury in fact, Plaintiffs must allege "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 340 (quoting *Lujan*, 504 U.S. at 560 n.1). And to be concrete, an injury must be "real, and not abstract." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (quoting *Spokeo*, 578 U.S. at 340). "[F]inancial harm is a classic and paradigmatic form of injury in fact." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d. Cir. 2017)). When a plaintiff alleges financial harm, courts often assume standing "without discussion." *Cottrell*, 874 F.3d at 163.

Here, Plaintiffs plausibly allege financial harm. They allege that, through its extension, Capital One stole commissions Plaintiffs were contractually entitled to receive.[7] Am. Compl. ¶¶ 85–86, 90–91, 121, 127, 134, 141, 150–52. But for Capital One's illegal conduct, then, Plaintiffs would have "earned more money" from their affiliate marketing. *Id.* ¶¶ 86, 90, 121, 127, 134, 140–41, 150, 153, 167. This alleged financial harm—lost revenue in the amount of commissions diverted to Capital One—is a classic pocketbook injury that "readily" satisfies Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

Resisting this conclusion, Capital One asserts that, even before discovery, Plaintiffs must but fail to identify specific purchases made by "actual consumers" involving "real dollars of affected commission." ECF No. 143 at 11. Yet Capital One identifies no case requiring that Plaintiffs plead such transaction- or consumer-level detail to establish standing at the pleading stage, and Plaintiffs are aware of none. And importantly, *Capital One* possesses the data showing exactly when its extension overwrote an affiliate tracking code *and* whose code it overwrote. Am. Compl. ¶¶ 70–75, 100. That Capital One chose to bring only a facial challenge to standing—rather than a factual one that would have allowed it to present evidence establishing it never overwrote Plaintiffs' affiliate tracking codes and took their commissions—is telling. In any event, Plaintiffs each plausibly plead that Capital One diverted commissions they were contractually entitled to receive, and that is sufficient for standing purposes at this stage. *See Hutton*, 892 F.3d at 620; *Lujan*, 504 U.S. at 561.

The cases Capital One cites do not suggest otherwise. *See* ECF No. 143 at 11. *O'Leary v. TrustedID* was a data-breach case involving only "an abstract privacy injury" based on a statutory

---

[7] Contrary to Capital One's passing suggestion, these allegations are not conclusory; they are material factual allegations that the Court must "accept as true." *Deal*, 911 F.3d at 187.

violation, which will not satisfy Article III unless the plaintiff alleges a future, "nonspeculative, increased risk of identity theft." 60 F.4th 240, 242–44 (4th Cir. 2023). The remaining two cases involved theories of injury that rested on speculative assumptions. *See Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 155–56 (4th Cir. 2025) (no standing where alleged loss of housing opportunities depended on speculative assumption that plaintiff would have received defendant's housing ads on Facebook absent age-based targeting, despite ad delivery depending on multiple other criteria and Facebook's algorithm); *R.J. Invs., LLC v. Bd. of Cnty. Comm'rs*, 2009 WL 5216056, at *6 (D. Md. Dec. 29, 2009) (no standing at summary judgment where claimed "lost profits" rested on plaintiff's mere "inchoate expectation of earning money" if selected as builder for a project—assuming that plaintiff would not be outbid and that the developer "did not sell the land in the first place"). Here, by contrast, Plaintiffs allege a concrete, nonspeculative injury that has already occurred: Capital One diverted commissions Plaintiffs were entitled to receive for purchases made from their affiliate links, and Plaintiffs demonstrate exactly how this scheme worked through screenshots that show the extension overwriting their affiliate tracking codes.

Through this proof of concept demonstration, though not required at the pleading stage, Plaintiffs *have* identified specific purchases where Capital One stole commissions. As detailed in the Complaint, Plaintiffs' expert made multiple purchases from Plaintiffs' affiliate links. *See, e.g.*, Am. Compl. ¶¶ 59–94. When the expert did not engage with the extension, Plaintiffs received a commission. *Id.* But whenever the expert activated the extension, Capital One replaced Plaintiffs' affiliate tracking codes with its own and took the commissions. *Id.* These are real purchases involving "real dollars of affected commission," to use Capital One's words—dollars that now sit in Capital One's pockets, and not Plaintiffs'. ECF No. 143 at 11.

Capital One asserts, without support, that these pocketed commissions do not count for

standing purposes because they resulted from purchases made by Plaintiffs' expert for purposes of

this litigation. *Id.* But the Supreme Court has made clear that there is no exception to Article III

standing "for injuries that a party purposely incurs" for purposes of the litigation. *FEC v. Cruz*,

596 U.S. 289, 296–97 (2022). An injury can satisfy Article III "even if the injury could be

described in some sense as willingly incurred." *Id.* at 297. "It has long been accepted, for example,

that a plaintiff may intentionally create standing to test the lawfulness of a particular practice."

*Kent v. PoolTogether, Inc.*, 676 F. Supp. 3d 144, 150–51 (E.D.N.Y. 2023); *see also Laufer*, 60

F.4th at 172 (observing that the *Cruz* Court, "[w]ithout even a hint of criticism," described *Havens*

*Realty Corp. v. Coleman*, 455 U.S. 363 (1982), as holding that "'a "tester" plaintiff posing as a

renter for purposes of housing-discrimination litigation still suffered an injury under Article III'"

(quoting *Cruz*, 596 U.S. at 297)). Thus, the fact that Plaintiffs' expert made the purchases for

purposes of this litigation does not change "the simple fact of injury" that resulted from Capital

One's deceptive practice. *Laufer*, 60 F.4th at 172 (quoting *Havens Realty*, 455 U.S. at 374 (1982)).

Plaintiffs' statistical analysis reinforces their well-pleaded injury allegations. As described

in the Complaint, Plaintiffs' expert conducted a statistical analysis showing that even

conservatively assuming the extension overwrites affiliate tracking codes only 10% of the time,

there is a 96% probability that a creator with 500 purchases on which they were eligible to receive

a commission, like each Plaintiff here, had at least one commission diverted by Capital One's

extension.[8] Am. Compl. ¶¶ 108–11, 115, 124, 131, 138, 137. Capital One argues that "showing a

---

[8] Capital One asserts in a conclusory fashion that "eligibility and entitlement are not the same."
ECF No. 143 at 11. Yet Plaintiffs' eligibility to receive a commission—that is, when a consumer
clicks their affiliate link and makes a purchase—entitles them to that commission. Am. Compl.
¶ 50. So the two words, as used in the Complaint, refer to the same thing. Additionally, the
Complaint supports a reasonable inference that each Plaintiff's 500 purchases were made from
merchants that also partner with Capital One, since Plaintiffs' allegations center exclusively on
their contracts with those merchants. *See, e.g.*, *id.* ¶¶ 50, 114, 124, 131, 138, 147.

'statistical probability' of injury alone does not satisfy Article III," ECF No. 143 at 12, but Plaintiffs do not rely on statistics alone to establish standing.[9] Again, Plaintiffs specifically allege that Capital One diverted their commissions to itself through the extension, and this financial harm, on its own, is enough to establish standing. The expert's conservative statistical analysis merely reinforces those allegations and shows that this diversion does occur.

Plaintiffs also face a "real or immediate threat that [they] will be wronged again." *Laufer*, 60 F.4th at 161 (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). Capital One has already diverted Plaintiffs' commissions, and its misconduct is ongoing, with no indication that it will stop. *See* Am. Compl. ¶¶ 85–86, 90–91, 121, 127, 134, 141, 150–54. Thus, Plaintiffs plausibly allege not only a concrete injury that has already occurred but also a risk of future harm sufficient to support standing for prospective, injunctive relief. *See Laufer*, 60 F.4th at 161.

### B.    Plaintiffs' injuries are fairly traceable to Capital One's actions.

Plaintiffs have also plausibly alleged that their injuries are traceable to Capital One's actions. To satisfy Article III's traceability requirement, a plaintiff must allege "'a causal connection between the injury and the conduct complained of,' rather than [that] the injury occurr[ed] as a result of 'the independent action of some third party not before the court.'" *Daniels*

---

[9] Capital One's cited cases are also inapposite. *Jones v. Bloomigdales.com, LLC* did not address statistical probabilities at all—the plaintiff lacked standing because she alleged an abstract privacy injury. 124 F.4th 535, 539 (8th Cir. 2024). Other cases rejected statistical theories of injury where the probabilities of harm were far lower or rested on speculation. *See Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017) (33% risk of future identity theft); *Satanic Temple v. Labrador*, 76 F. Supp. 3d 989, 997–98 (D. Idaho 2024) (finding theory of injury speculative because it required "one [to] jump through a variety of hoops in the hopes of finding" a plaintiff with standing). Moreover, neither *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022), nor *Krim v. pcOrder.com, Inc.*, 402 F.3d 489 (5th Cir. 2005), addressed Article III standing at the pleading stage. *Gamma Traders* considered whether the plaintiff adequately pleaded injury under the Commodity Exchange Act, which "is *more* demanding than pleading an Article III injury." 41 F.4th at 78. And *Krim* applied a preponderance-of-the-evidence standard to determine standing under Section 11 of the Securities Act. 402 F.3d at 501–02.

*v. Arcade, L.P.*, 477 F. App'x 125, 129 (4th Cir. 2012) (quoting *Lujan*, 504 U.S. at 560). "At the motion-to-dismiss stage, this burden is relatively modest, and lower than the causation showing required to prevail in a tort suit." *DiCocco*, 52 F.4th at 592 (cleaned up).

Plaintiffs plausibly allege a clear causal link between their injuries and Capital One's conduct. They allege that Capital One deliberately used its extension to divert Plaintiffs' affiliate commissions into its own pockets. Am. Compl. ¶¶ 85–86, 90–91, 121, 127, 134, 141, 150–52. But for the extension, Plaintiffs allege, they would have received these commissions. *Id.* ¶¶ 86, 90, 121, 127, 134, 140–41, 150, 153, 167. Plaintiffs' injuries are thus fairly traceable to Capital One's actions.

Capital One argues that the actions of three independent actors—(1) consumers, who decide to buy; (2) merchants, who set attribution rules; and (3) affiliate networks, who apply them—"break any causal chain." ECF No. 143 at 14–15. But this argument ignores Plaintiffs' well-pleaded allegations: Plaintiffs are entitled to a commission when a consumer reaches a merchant's website through their affiliate link and makes a purchase. Am. Compl. ¶ 50. A consumer's decision to buy, whatever the reason, triggers that entitlement. *See id.* The injury occurs only when Capital One's extension fabricates a last click and overwrites a Plaintiff's affiliate tracking code, wrongfully diverting the commission to Capital One.

Capital One's attempt to blame merchants and affiliate networks for the diverted commissions fares no better. Capital One argues that "it is not 'stealing' if a merchant adopts an attribution model that gives a later-in-time publisher credit for a sale, even where the publisher was not the one who 'referred' the customer to the website." ECF No. 143 at 15. Perhaps, but that is not the allegation here. As alleged in the Complaint, Plaintiffs' contracts with merchants are consistent with the last-click attribution model, which "gives all credit for a purchase to the final

touchpoint in a consumer's journey that leads the consumer to merchant's page where the consumer will ultimately complete a purchase." Am. Compl. ¶¶ 45–58. Plaintiffs are thus contractually "entitled to commissions when a consumer's final external click before entering a merchant's websites and making a qualifying purchase was a click on the creator's affiliate link."[10] *Id.* ¶ 50. Plaintiffs claim Capital One overwrites Plaintiffs' proper affiliate tracking codes and deceives merchants and affiliate networks into wrongly awarding Capital One the commissions. Thus, although merchants and affiliate networks credit and pay an entity who is not entitled to a commission, those injuries are traceable to Capital One's deceptive conduct.[11]

Even if Capital One points the finger at these third parties, traceability "does not require the defendant to be the only party responsible for the injury" or even "the party that contributes most significantly to the injury." *EarthReports, Inc. v. U.S. Army Corps of Eng'rs*, 2011 WL 4480105, at *6 (D. Md. Sep. 26, 2011). The relevant question is whether the injury is fairly traceable to the defendant's "allegedly unlawful conduct." *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Because Plaintiffs' injuries flow from Capital One's misconduct, the traceability requirement is met.

## II.    Plaintiffs adequately plead their common law claims.

### A.    Plaintiffs state a claim for unjust enrichment.

To state a claim for unjust enrichment in Virginia, Plaintiffs must allege that: (1) they

---

[10] Although Capital One repeatedly asks this Court to disregard these well-pleaded factual allegations in favor of its own self-serving account, the Court must "accept all factual allegations in the complaint as true" and draw "all reasonable inferences" in their favor at this stage. *Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018).

[11] Contrary to Capital One's assertion, that other extensions engage in the same misconduct, and that some Plaintiffs have sued those extension, does not undermine traceability here. ECF No. 143 at 16. The fact that other extensions may also have diverted other commissions does nothing to negate Plaintiffs' allegations that Capital One did too.

conferred a benefit on Capital One; (2) Capital One knew of the benefit and should reasonably have expected to repay Plaintiffs; and (3) Capital One accepted or retained the benefit without paying for its value.[12] *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165–66 (4th Cir. 2012). Here, Plaintiffs plausibly allege that the extension enables Capital One to claim credit for customer referrals it did not generate and pocket commission payments it did not rightfully earn. *See, e.g.,* Am. Compl. ¶¶ 1–3, 45–49, 63–69, 82–86, 90–106. Capital One does not dispute that Plaintiffs conferred a benefit or that Capital One accepted or retained that benefit without paying for its value. Instead, Capital One challenges only the second element of unjust enrichment.

Relying on *Rosetta Stone*, Capital One asserts Plaintiffs' allegations that it should have reasonably expected to repay Plaintiffs for their marketing efforts—which drove consumers to merchants' web pages via unique affiliate links—"fall[] way short." ECF No. 143 at 18. This conclusory assertion ignores Plaintiffs' well-pleaded factual allegations, and Capital One's reliance on *Rosetta Stone* is misplaced. In that case, the plaintiff failed to allege sufficient "*facts* supporting its general assertion that [the defendant] 'should reasonably have expected' to pay for the use of [the plaintiff's trademarks]" because it "did not allege[] that [the defendant] pays any other [trademark] holder for the right to use a [trademark]." 676 F.3d at 166. Here, the Complaint specifically alleges that "Capital One knows" that "creators are entitled to commissions for driving traffic to merchants," at least in part because "Capital One itself pays affiliates . . . for driving traffic to its [own] site." Am. Compl. ¶ 166. Plaintiffs further allege that the extension "is designed to monitor for other tracking codes," so Capital One "knows when a consumer navigate[s] to a specific merchant's website from a specific affiliate." *Id.* ¶ 165. And "[b]ut for Capital One's unjust and improper use of the browser extension[,] Capital One would not have been credited and

---

[12] Plaintiffs, like Capital One, assume that Virginia law applies here. *See* ECF No. 143 at 15 n.8.

awarded commission on sales that emanated from" Plaintiffs' affiliate links. *Id.* ¶ 167. These allegations are sufficient to satisfy the second element of Plaintiffs' unjust enrichment claim.[13]

Capital One's remaining arguments rely on its erroneous and self-serving representations about "the merchant terms and affiliate network rules" that govern the affiliate marketing industry. *See* ECF No. 143 at 18. For example, Capital One asserts that the last-click attribution model "gives a later-in-time publisher credit for a sale, even where that publisher was not the one who 'referred' the customer to the website." *Id.* at 13. Based on this misrepresentation, Capital One argues it is entitled to claim credit for customer referrals and commissions on resulting sales even when: (1) the customer's interaction with the extension occurs after the customer is referred to the merchant's website by clicking on one of Plaintiffs' affiliate links, (2) the customer never leaves the merchant's website, and (3) the customer never clicks a Capital One affiliate link. *See id.* at 16 (arguing the extension merely "exercis[es] rights [Capital One] already had").

Capital One's characterization of the last-click attribution model is squarely contradicted by Plaintiffs' well-pleaded allegations. As alleged in the Complaint, this model credits the owner of the last-clicked *external* affiliate link that drives a consumer to a merchant's website with the referral and any subsequent commission. *See* Am. Compl. ¶¶ 3, 47–49, 50, 58, 61–62, 88–89. And at this stage, the Court must "accept all factual allegations in the complaint as true" and draw "all reasonable inferences in [Plaintiffs'] favor." *Singer*, 883 F.3d at 437.

Capital One's argument that the unjust enrichment claim is precluded by Plaintiffs' express

---

[13] Virginia courts also recognize that "[a]n action in equity—such [as] the unjust enrichment claim here—does not require mechanical application of rules." *LCF Grp., Inc. v. Piedmont Power Sports, Inc.*, 688 F. Supp. 3d 323, 331 (W.D. Va. 2023). Courts applying Virginia law have thus concluded that a defendant "not knowing that it should reasonably have expected to repay [the plaintiffs] at the time it received [a] benefit is *not fatal* to [an] unjust enrichment claim." *Id.*; *see also Nat'l Funding, Inc. v. Modern Renovations, LLC*, 712 F. Supp. 3d 733, 741 (W.D. Va. 2024).

contracts with merchants is therefore unavailing. *See* ECF No. 143 at 18–19. Capital One relies on the general rule that "[t]he law will not impose an implied contractual relationship . . . in contravention of an express contract." *Id.* at 18 (quoting *Nedrich v. Jones*, 429 S.E.2d 201 (Va. 1993)). But here, Plaintiffs allege that Capital One unjustly enriched itself at the expense of Plaintiffs' rights under their contractual agreements with merchants. *See, e.g.*, Am. Compl. ¶¶ 3, 47–49, 50, 58, 63, 82–83, 85–86, 90–91, 163–71. Pursuant to those contracts, Plaintiffs are entitled to commissions when their affiliate links are the last *external* affiliate link clicked by a consumer before making an online purchase. *Id.* ¶¶ 50–58. By overwriting Plaintiffs' affiliate tracking codes, Capital One exploits the terms of those contracts to claim credit for customer referrals it did not generate and pilfer commissions it did not earn. *See, e.g.*, *id.* ¶¶ 64–70. These allegations sufficiently plead an unjust enrichment claim under Virginia law.

### B.    Plaintiffs state claims for tortious interference.

Plaintiffs properly allege all elements of their claims for tortious interference with prospective economic advantage and contractual relations under Virginia law: (1) Plaintiffs are engaged in ongoing economic partnerships with merchants, including contractual agreements to promote products and services to their audiences via content published on their platforms and social media channels in exchange for commissions, Am. Compl. ¶¶ 116–20, 125, 132–33, 139, 149, 174, 182; (2) Capital One knew or had grounds to know of Plaintiffs' contracts and partnerships with merchants, *id.* ¶¶ 175, 183; (3) Capital One employed improper methods to intentionally interfere with those contracts and partnerships, *id.* ¶ 176, 184–85; (4) Capital One's intentional misconduct caused merchants to breach their agreements with Plaintiffs, *id.* ¶¶ 178, 185; (5) Capital One's intentional misconduct caused Plaintiffs to lose rightfully earned commissions, *id.* ¶¶ 177–79, 184–85; and (6) Plaintiffs were harmed thereby, *id.* ¶¶ 178, 185–86.

16

Capital One's argument that Plaintiffs fail to sufficiently identify "a contract or expectancy that was interfered with" ignores Plaintiffs' well-pleaded allegations. ECF No. 143 at 20–21. The Complaint not only identifies Plaintiffs' partnerships with specific merchants, *see, e.g.*, Am. Compl. ¶¶ 50–63, 114, 124, 131, 138, 147, 174, 182, but it also specifically details the substantive terms of Plaintiffs' contractual agreements, which "are consistent with the last-click attribution model," *Id.* ¶ 50. Each Plaintiff alleges they have relied on commissions earned through affiliate links to help pay for the considerable time and effort they invest in producing and publishing their original marketing content. *Id.* ¶¶ 113, 123, 129–31, 136, 144. And Plaintiffs allege hundreds of customer purchases using their affiliate links, through which Plaintiffs were eligible for and did receive commissions, yielding hundreds of thousands of dollars in revenue. *Id.* ¶¶ 115, 124–26, 128–30, 137–38, 145–47. Finally, Plaintiffs allege that these economic relationships are ongoing, *id.* ¶¶ 174, 182, and—based on the length and duration of those ongoing partnerships, *id.* ¶¶ 116–20, 125, 132–33, 139, 149—Plaintiffs plausibly allege a probability of future economic benefit. These allegations are more than sufficient, especially at the pleading stage. *See, e.g.*, *Adnet, Inc. v. Soni*, 66 F.4th 510, 518–19 (4th Cir. 2023); *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019) (noting that "probability of future economic benefit" requires "a fact-intensive inquiry," and plaintiffs may "rely on their long-standing business relationship[s]" to show reasonable expectation of future economic benefit (cleaned up)).

Capital One's contention that "Plaintiffs effectively acknowledge that Capital One did not know of their contractual relationships" is equally unavailing. ECF No. 143 at 22. Allegations of "knowledge of facts that, upon reasonable inquiry, should lead to the disclosure of the existence of [a] contract or potential business relationship" are sufficient to sustain a tortious interference claim under Virginia law. *Simbeck, Inc. v. Dodd-Sisk Whitlock Corp.*, 1997 WL 1070458, at *7

(Va. Cir. Nov. 21, 1997), *aff'd*, 508 S.E.2d 601 (Va. 1999). Here, the Complaint contains detailed factual allegations demonstrating that Capital One knew of Plaintiffs' contracts and partnerships with merchants. *See* Am. Compl. ¶¶ 45–49, 166, 175, 183. Plaintiffs specifically allege that Capital One's extension continuously uploaded to Capital One's server detailed logs of the affiliate links its extension replaced. *Id.* ¶ 72–75. These specific factual allegations distinguish Plaintiffs' claims here from those asserted by plaintiffs in *Lokhova v. Halper*, 441 F. Supp. 3d 238, 261, 265 (E.D. Va. 2020) ("vague and conclusory language"), and *Mirafuentes v. Estevez*, 2015 WL 8177935, at *5 (E.D. Va. Nov. 30, 2015) (plaintiff alleged defendant's knowledge of her own business, rather than "knowledge of specific, existing contracts").

Contrary to Capital One's argument, its use of the extension constitutes an "improper method" of interfering with Plaintiffs' contracts and business partnerships. *See Duggin v. Adams*, 360 S.E.2d 832, 836–37 (Va. 1987) (noting that "[i]mproper methods" include those that "are illegal or independently tortious, such as violations of statutes . . . or recognized common-law rules," and/or "violate an established standard of a trade"). Plaintiffs plausibly allege the extension exploits the prevailing attribution model adopted by the industry as well as Plaintiffs' contractual agreements, in violation of statutory and common law. Capital One's insistence that Plaintiffs' allegations "attack the entire industry and the rules that govern it" is not a cogent basis to dismiss the claim at the pleading stage. ECF No. 143 at 20.

Finally, Capital One claims that Plaintiffs' tortious interference claims fail because "they do not allege that Capital One actually caused a breach or loss of any contract." *Id.* at 22. Capital One is wrong. *See* Am. Compl. ¶¶ 50–58 (describing contracts), ¶¶ 63–94 (explaining how Capital One's extension overwrites and replaces Plaintiffs' affiliate tracking codes, causing merchants to pay Capital One commissions rightfully owed to Plaintiffs under their contracts).

### C.     Plaintiffs state a claim for conversion.

"Virginia law defines conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights." *Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 632 (4th Cir. 2003). The gravamen of the tort of conversion is the deprivation of the possession or use of one's property (e.g., a civil claim for theft). W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 15, at 102 (5th ed. 1984). Here, Plaintiffs plausibly allege that Capital One's extension wrongfully overwrites and replaces their unique affiliate tracking codes, converting them for Capital One's own benefit.

Capital One argues that the "[o]nline tracking codes are undocumented, intangible property" that are not subject to the law of conversion. ECF No. 143 at 24. Although conversion typically "applies only to tangible property," Virginia law has long recognized that intangible assets, which have monetary value but lack physical form, can be the subject of a conversion claim. *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, at *4 (E.D. Va. Oct. 3, 2011). And Virginia courts specifically recognize that electronic data can properly constitute the subject of a conversion claim. *See, e.g.*, *TK Elevator Corp. v. Shropshire*, 2022 WL 564648, at *3 (W.D. Va. Feb. 23, 2022); *Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 835 (W.D. Va. 2008) (finding electronic version of company's recruitment list was property that could be converted); *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 143 (Va. 1997) (recognizing conversion of "computer programs, data, and software," including "the value of [plaintiff's] efforts in creating the converted items, the fair market value of the items, and future profits").

Virginia law also recognizes "the conversion of intangible property rights that arise from or are merged with a document." *Mackey v. McDannald*, 842 S.E.2d 379, 387 (Va. 2020). And here, Plaintiffs' intangible property interests in their unique affiliate tracking codes arise from their

contractual agreements with merchants. *See* Am. Compl. ¶¶ 50–58, 182. Virginia courts have also shown "a distinct willingness to expand the scope of the doctrine of conversion in light of advancing technology." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 455 (E.D. Va. 2009). In *E.I. DuPont*, the court held that intangible property may be protected even if not merged into a document evidencing title or ownership. 2011 WL 4625760, at *4. Otherwise, the court warned, the tort of conversion would be outpaced by technological developments and fail to protect modern property rights. *Id.* at *5.

At minimum, it would be inappropriate for the Court to conclude here, as a matter of law and before discovery, that Plaintiffs have no property or possessory interest in their uniquely assigned affiliate tracking codes. *See Se. Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*, 2013 WL 2147478, at *8 (E.D. Va. May 14, 2013) (declining to dismiss conversion claim "[b]ecause there is a significant split of authority on this issue (and importantly, little guidance from the Virginia courts)," and "it seems inappropriate to conclude that as a matter of law [p]laintiff has no property interest in the toll-free telephone number").

## III. Plaintiffs adequately plead violations of federal and state computer law statutes.

### A. Plaintiffs state a claim under the Computer Fraud and Abuse Act.

#### 1. Plaintiffs properly plead loss from interruption of service, as well as damage.

Capital One argues that Plaintiffs' claim under the Computer Fraud and Abuse Act ("CFAA") fails because the Complaint does not allege a loss due to interruption of service. ECF No. 143 at 25–26.[14] Capital One misreads the Complaint. Plaintiffs do not allege that Capital One

---

[14] Though Capital One raises the issue only in a footnote, ECF No. 143 at 25 n.10, Plaintiffs adequately plead damage under the CFAA. The statute defines "damage" as any "impairment to the integrity *or* availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8) (emphasis added). "'[I]ntegrity' includes an 'uncorrupted condition,' an 'original perfect state,'

interrupts a service that "direct[s] consumers to a website where they can purchase the product or service being promoted." *Id.* at 26. They allege that Capital One's extension "disrupts the commission attribution process, including communications between the merchant website and the merchant servers that attributed the sale to a Class member instead of Capital One." Am. Compl. ¶ 204; *see also id.* ¶¶ 95–106.

Lost revenue under the CFAA is not limited to revenue lost from "an attack that renders a website or computer inaccessible." ECF No. 143 at 26. Loss under CFAA "relates to costs caused by harm to computer data, programs, systems, or information services," and it "focus[es] on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 593 U.S. 374, 391–92 (2021). For instance, in *Integrity Applied Sci., Inc. v. Clearpoint Chemicals LLC*, the court upheld the plaintiff's CFAA claim alleging that two former employees gained access to its email and computer system and intercepted and diverted its customer orders and vendor communications to prevent it from being able to effectively conduct its business. 2020 WL 12584444, at *2 (D. Colo. Apr. 20, 2020). Similarly, in *Ritlabs I*, this Court upheld a CFAA claim alleging that a former director had accessed the domain registration accounts associated with the plaintiff's domain names and changed the name of the registrant from the plaintiff's company (RitLabs, S.R.L.) to the defendant's company (RitLabs, Inc.). *RitLabs, S.R.L. v. RitLabs, Inc.*, 2012 WL 3263893 (E.D. Va. Aug. 9, 2012) (Trenga, J.) ("*RitLabs I*"), *vacated in part on other grounds by* 2012 WL

---

and 'soundness.' And 'availability' is the 'capability of being employed or made use of.'" *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1075 n.5 (6th Cir. 2014) (quoting *Pulte Homes, Inc. v. Labs.' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir.2011)). Plaintiffs allege both. Capital One's extension impairs the "uncorrupted condition" and "original perfect state" of affiliate tracking codes by replacing them with its own. *Id.*; *see also* Am. Compl. ¶¶ 197–98, 201, 204. And once overwritten, those codes are no longer "capable of being employed or made use of." *Yoder*, 774 F.3d at 1075 n.5; *see also* Am. Compl. ¶¶ 198, 201, 204.

6021328 (E.D. Va. Nov 30, 2012) ("*RitLabs II*"). At summary judgment, this Court found that unauthorized alteration of the registrant information of plaintiff's domains to redirect consumers who sought plaintiff's software products to third parties associated with defendant violated the CFAA. *See RitLabs I*, 2012 WL 3263893, at *8; *RitLabs II*, 2012 WL 6021328, at *9.[15]

Like the plaintiff in *Integrity* who alleged loss in the amount of diverted customer orders from the defendant's interception and diversion of communications, Plaintiffs here allege lost revenue in the amount of commissions diverted to Capital One through its interception and manipulation of communications between the merchant website and the merchant servers. *See* 2020 WL 12584444, at *2; Am. Compl. ¶ 204. And, like the plaintiff in *Ritlabs I*, who claimed that defendant changed its identifying electronic information to redirect sales revenue that should have gone to plaintiff, Plaintiffs here allege that Capital One changed the affiliate tracking codes to redirect commission payments that should have gone to Plaintiffs to Capital One. *See RitLabs I*, 2012 WL 3263893, at *8; *RitLabs II*, 2012 WL 6021328, at *9; Am. Compl. ¶ 204.[16]

### 2.    Plaintiffs properly plead access in excess of authorization.

Capital One argues that it did not exceed authorized access because *users* gave Capital One access to affiliate tracking codes when they accepted Capital One Shopping's Terms of Service and Privacy Policy. ECF No. 143 at 26–27. This argument fails because users neither gave nor can

---

[15] Though evidence at trial later revealed that the plaintiff could stop the defendant's redirecting of customers, the Court's initial ruling shows that changing the registrant information to redirect consumers elsewhere for the defendant's monetary gain otherwise qualified as loss from interruption of service under the CFAA. *Accord RitLabs II*, 2012 WL 6021328, at *9–10.

[16] Capital One's cited cases inapposite: none involve an alleged interruption of service. *See Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 653 (E.D. Va. 2010) (loss from a misappropriation of information); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) (lost profits plaintiff may have received from selling his personal information that defendant accessed); *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 331 (M.D. Pa. 2014) (no alleged interruption of service); *Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 974-75 (C.D. Cal. 2023) (alleged under $5000 in out-of-pocket costs for additional privacy software).

give Capital One the access necessary to overwrite *Plaintiffs'* affiliate tracking codes at issue. *See, e.g.*, *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (cookie-stuffing violates the CFAA); *Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 974 (C.D. Cal. 2023) (surreptitious placement of cookies can violate the CFAA).

Under the CFAA, a person "exceeds authorized access" when they have approval to access a computer but use it "to obtain or alter information that falls outside the bounds of [their] approved access." *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012). Relevant considerations include whether the defendant engaged in "technological gamesmanship" to "aid in access." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016).

*WhatsApp Inc. v. NSO Grp. Techs. Ltd*. is instructive. There, plaintiffs alleged that the defendants created WhatsApp accounts and then sent malware to other users using WhatsApp's system. 472 F. Supp. 3d 649, 658 (N.D. Cal. 2020). The defendants argued that they did not exceed authorized access, claiming the terms of service granted them permission to access WhatsApp's computers and servers. *Id.* at 680. The court rejected this argument, noting that "no WhatsApp user had permission to access the technical call settings or evade WhatsApp's security" and that the defendants built their program to "avoid the technical restrictions built into WhatsApp Signaling Servers" and, like Capital One here, had formatted their "malicious code to appear like a legitimate call." *Id.* at 658, 681.

Knowing that Plaintiffs never gave it permission to overwrite their affiliate tracking codes, Capital One argues it obtained permission from its users. ECF No. 143 at 27–28. But nothing in the Privacy Policy grants Capital One the access necessary to overwrite affiliate tracking codes. *See* ECF No. 143-2; *cf. also SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 610 (E.D. Va. 2005) (third party explicitly gave defendants access to the servers that plaintiffs argued were

unlawfully accessed). The Privacy Policy only grants Capital One access to *observe* that information—not to *alter* it. *See* ECF No. 143-2 at 2–5. Here, as in *WhatsApp*, no user had the level of access necessary to alter affiliate tracking codes without specialized "developer tools" or other specialized software. Am. Compl. ¶ 200. And, like in WhatsApp, Capital One had to "avoid technical restrictions built into" the affiliate attribution system and "cause[] the tracking code to be overwritten through an indirect approach: a forced redirect to another website or a hidden tab opening." *WhatsApp*, 472 F. Supp. 3d at 681; Am. Compl. ¶ 199.

### B. TechSource states a claim under the California Comprehensive Computer Data Access and Fraud Act.

Because Capital One engaged in "technological gamesmanship" to overwrite affiliate tracking codes, Capital One exceeded authorized access under both the CFAA and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA").[17] *See supra* Section III.A; Am. Compl. ¶¶ 95–106, 198–201. Capital One also claims, without support, that TechSource does not "own" its affiliate tracking code because that data is "created and maintained by the merchants and affiliate networks and stored in the '*consumer's* web browser.'" ECF No. 143 at 29. CDAFA defines data as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." Cal. Penal Code § 502(b)(8). TechSource has an ownership interest in its affiliate tracking codes which are unique to it and identify it as the party entitled to receive commissions. Am. Compl. ¶¶ 2, 29, 31–32, 39, 237. *Cf. Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 622 (N.D. Cal. 2021) (unique identifiers are personal information). And unlike in *Stuart v. County of Riverside*, 2024 WL 3455263, at *19 (C.D. Cal. Apr. 22, 2024), the data at issue here was *generated* by Plaintiff's unique affiliate links, *see* Am. Compl. ¶¶ 31–32, 39. Nor

---

[17] Contrary to Capital One's claim, it is not necessary to plead circumvention of technical barriers to show that Capital One acted "without permission." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023).

does it matter that TechSource's tracking code is on the consumer's browser: a plaintiff can recover for violation of the CFAA when a defendant accesses a third party's device if the plaintiff is harmed by such an act, particularly if the plaintiff has a right to data stored on the third-party device. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004). Therefore, TechSource properly pleads a claim under the CDAFA.

## IV.    Plaintiffs adequately allege their consumer protection claims.

### A.    Storm Productions plausibly alleges that Capital One violated the New York General Business Law.

To state a claim under New York General Business Law ("GBL") § 349, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)). Capital One makes two arguments related to only the first element, both of which fail.

First, Capital One argues that Storm Productions fails to allege Capital One's conduct was "consumer-oriented." To the contrary, Storm Productions sufficiently alleges that Capital One's conduct was explicitly "directed at consumers," which is defined as any conduct that has "a broader impact on consumers at large." *Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25–27 (N.Y. 1995). The Complaint alleges Capital One's conduct of stealing affiliates' commissions pushes affiliates out of the market, which diminishes consumers' options in the marketplace and harms their decision-making process. Am. Compl. ¶ 212. The consumer-oriented element does not depend on whether the conduct directly misled the intended users of the product. Instead, the relevant question is whether the misleading conduct was the conduct that impacted the consuming public and marketplace writ large. *Himmelstein, McConnell, Gribben,*

*Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 177 (N.Y. 2021). And § 349 is "intentionally broad, applying to virtually all economic activity." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 205 (N.Y. 2004).

Moreover, businesses may bring claims under the GBL. "While the typical case under [§] 349 generally involves claims arising directly out of a commercial transaction between a plaintiff consumer and a defendant seller, neither the text of the statute nor the case law establishes this requirement." *In re Blackbaud, Inc., Customer Data Breach Litig.*, 2021 WL 3568394, at *13–14 (D.S.C. Aug. 12, 2021). Indeed, the Second Circuit has held that "corporate competitors [may] bring a claim under this statute so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (cleaned up). "The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." *Id.* The Complaint's allegations satisfy that critical question: the New York public (and consumers therein) are harmed by Capital One's conduct.

The cases Capital One cites to argue that Storm Productions fails to allege consumer-oriented conduct are distinguishable and involve private disputes. For instance, *Gucci Am., Inc. v. Duty Free Apparel, Ltd.* 277 F. Supp. 2d 269 (S.D.N.Y. 2003), *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233 (2d Cir. 2021), and *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461 (S.D.N.Y. 2017), are trademark infringement cases, and *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 172 (S.D.N.Y. 2023), is a defamation case. In *Azby Brokerage, Inc. v. Allstate Ins. Co.*, the plaintiffs failed to plead that consumers were harmed or that the public interest was implicated. 681 F. Supp. 1084, 1089 (S.D.N.Y. 1988). In contrast, the Complaint alleges conduct broadcasted on the internet to consumers at large via a browser extension used by over ten million users. Am. Compl. ¶¶ 1, 18, 153. In a footnote, Capital One makes a conclusory

26

argument that "consumers shop for goods—not content creators," ECF No. 143 at 30 n.13—ignoring the reality that consumers follow creators and click their affiliate links to purchase goods. By introducing misleading conduct into the chain of commerce, Capital One's conduct impacted Plaintiffs *and* the marketplace in which consumers shop. Am. Compl. ¶¶ 211–13. To the extent Capital One challenges the Complaint's allegations about how its conduct impacts the marketplace, Capital One raises premature "fact-intensive" questions that cannot form the basis for dismissal at this stage. *Larkin v. Saber Auto., LLC*, 736 F. Supp. 3d 193, 207 (S.D.N.Y. 2024).

Second, Capital One argues that Storm Productions fails to allege Capital One's conduct was deceptive solely because "Capital One disclosed that it often receives commissions for converted sales" in Capital One's "Terms of Service." ECF No. 143 at 30–31. In support, Capital One relies on Terms of Service posted on Capital One's website that are 18 pages, single-spaced, and comprised of 9,880 words. *See id.* Capital One identifies no language that discloses the actual conduct at issue, which is Capital One's practice of improperly stealing creators' commissions. *See id.* And Capital One does not even attempt to argue that the Terms of Service inform consumers *at the time they view Plaintiffs' content* and click on their affiliate links—or interact with the extension—that Capital One will misappropriate the creator's commission. At best, this argument raises premature fact questions about the nature, adequacy, and delivery of Capital One's purported disclosure that cannot be adjudicated on a motion to dismiss.

None of Capital One's cases stand for the proposition that disclosures buried in terms and conditions can defeat a claim of material misleading acts at the pleading stage. In *Watts v. Jackson Hewitt Tax Serv. Inc.*, the court found that a blanket disclaimer did not adequately disclose fees to consumers. 579 F. Supp. 2d 334, 347 (E.D.N.Y. 2008). Similarly, *Serrano v. Cablevision Sys. Corp.*, was decided on summary judgment after the parties conducted discovery. 863 F. Supp. 2d

157, 167 (E.D.N.Y. 2012). And *Preira v. Bancorp Bank* turned on the sufficiency of the allegations in the complaint, not consumer disclosures. 885 F. Supp. 2d 672, 679 (S.D.N.Y. 2012).

### B.    TechSource plausibly alleges that Capital One violated California's Unfair Competition Law.

California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. To establish an unfair business act or practice, a plaintiff must show the unfair nature of the conduct and that the harm caused by the conduct outweighs any benefits that the conduct may have. *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1133 (Cal. Ct. App. 2014). To state a claim based on an unlawful business act or practice under the UCL, a plaintiff must allege facts sufficient to show a violation of some underlying law. *Id.* at 1133–34.

TechSource adequately pleads violations of the unlawful prong of the UCL. It alleges Capital One's conduct is unlawful because it constitutes conversion, interference with prospective economic advantage, interference with contractual relations, and violations of the CFAA, New York's GBL, and California's CDAFA. Am. Compl. ¶ 225.

TechSource also adequately pleads violations of the "unfair" prong of the UCL. There is no definitive test for consumer cases under the "unfair" prong of the UCL. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 594–98 (Cal. Ct. App. 2009). Instead, two "not mutually exclusive" tests for unfairness have developed. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). One such test, the "balancing test," assesses "whether the alleged business practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 942, 933 (N.D. Cal 2013). "The 'unfair' standard is intentionally broad." *Schwartz v. Visa Int'l Corp.*, 2003 WL 1870370, at

*46 (Cal. Super. Ct. Apr. 7, 2003). Here, the Complaint alleges that Capital One's conduct is unscrupulous, offensive, and substantially injurious and that the harm created by this conduct is not outweighed by any potential utility. Am. Compl. ¶ 227. At this stage, this is all that is required.

Capital One incorrectly frames the allegations in the Complaint as a dispute between competitors in their efforts to evade the balancing test. While Capital One may operate as a true competitor when it openly shares affiliate links in ads or on its website, that is not what its extension does. The extension is designed to *masquerade* as a "competitor," when in reality it is just altering data to make it appear it has done something it did not. Moreover, application of the "tethering test" is limited to actions alleging antitrust or similar violations. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 187 n.12 (1999). This is not an antitrust case. And the dispute is not analogous to the allegations in *Cel-Tech*, which involved a pricing dispute between cellular phone providers in a government-protected duopoly. *Id.* at 168. In any event, TechSource has alleged an impact on competition, which suffices to meet the *Cel-Tech* test. Am. Compl. ¶¶ 211–13, 230.

There is no basis to dismiss TechSource's UCL claim at this stage in the proceeding based on the relief sought in the Complaint. Restitution and injunctions are available remedies under the UCL. Cal. Bus. & Prof. Code § 17203. At the pleading stage, TechSource may seek alternative remedies, including a request for equitable remedies and damages. *See Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022). As properly pleaded in the Complaint, TechSource can assert these equitable remedies because it lacks an adequate remedy at law, namely injunctive relief and restitution. Am. Compl. ¶ 219; *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 687 (N.D. Cal. 2021). Additionally, TechSource is entitled to seek restitution: the California Supreme Court has held that restitution under the UCL includes instances in which the

defendant retains money in which the plaintiff has a vested or legally protected interest, as alleged here. *Cortez v. Purolator Air Filtration Prods. Co*., 23 Cal. 4th 163, 168 (Cal. 2000).

Capital One contends that TechSource cannot show a lack of adequate legal remedies because the Complaint seeks damages. But the cases Capital One relies on are inapplicable to this stage or are distinguishable. For example, *eBay Inc. v. MercExchange, LLC*, concerns an award of permanent injunctive relief to a prevailing plaintiff under the Patent Act, not a UCL violation at the pleading stage. 547 U.S. 388, 390 (2006). Similarly, *JTH Tax, LLC v. Shahabuddin*, is not a UCL case and concerns a request for a mandatory injunction rather than a prohibitory injunction, a remedy carrying a more exacting standard that is "disfavored" and "warranted only in the most extraordinary circumstances. 477 F. Supp. 3d 477, 485 (E.D. Va. 2020). Last, the court in *Ibarra v. Pharmagenics LLC* dismissed the complaint because it failed to allege that the plaintiff lacked a legal remedy, not because it sought both equitable remedies and damages. 660 F. Supp. 3d 914, 922 (C.D. Cal. 2023). In any event, Capital One's argument is premature, as this case is at the pleading stage, when it is well-established that courts should "allow the pursuit of alternative remedies." *Collyer v. Cataline Snacks Inc.*, 2024 WL 202976, at *7 (N.D. Cal. Jan. 18, 2024).

## V.    Plaintiffs' request for injunctive relief is proper.

As just discussed, Plaintiffs can seek injunctive relief because they lack an adequate remedy at law. The Complaint alleges that Plaintiffs were harmed by Capital One and that Capital One's conduct is ongoing, with no indication that it will cease in the future. Am. Compl. ¶¶ 151–54, 228–29. These allegations are sufficient to support a claim for injunctive relief. *See Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, 2020 WL 3893395, at *5 (E.D. Cal. July 10, 2020).

## CONCLUSION

For these reasons, the Court should deny Capital One's motion to dismiss.

Dated: April 30, 2025                    Respectfully submitted,


/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Alexandria, Virginia 22201
Telephone: (888) 987-9991
swebster@websterbook.com

*Plaintiffs' Local Counsel*

Norman E. Siegel (admitted *pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

E. Michelle Drake (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net

Douglas J. McNamara (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
dmcnamara@cohenmilstein.com

James J. Pizzirusso (admitted *pro hac vice*)
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com

*Plaintiffs' Co-Lead Counsel*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**