# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| *In re Capital One Financial Corporation, Affiliate Marketing Litigation* | Case No. 1:25-cv-00023-AJT-WBP |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY THE SCHEDULING ORDER

Plaintiffs submit this Memorandum in Support of their Motion to Modify the Scheduling Order. Plaintiffs move the Court to modify the Scheduling Order to modestly extend the deadlines for expert disclosures and class certification briefing (and associated deadlines), as proposed in Exhibit A attached hereto. Good cause warrants the requested extensions because Plaintiffs have diligently sought discovery, including structured data and source code central to *both* parties' claims and defenses. Yet some of this data was not produced by Capital One until mid-June, leaving Plaintiffs with insufficient time to analyze it in advance of those deadlines. And some of it still has not been produced by Capital One. Still other data resides with third parties that Capital One represented it intended to subpoena. Capital One then reneged on that representation, so Plaintiffs had to issue their own subpoenas, as to which they are now awaiting responses. Plaintiffs have met and conferred with Capital One, which stated it would oppose this motion.

Although Plaintiffs previously indicated that they believed an extension might be necessary, and this Court expressed a preference to keep the current schedule, good cause now exists for a modest extension. Requiring Plaintiffs to proceed with class certification without crucial discovery and evidence—through no fault of their own—would be highly prejudicial.

## LEGAL STANDARD

A scheduling order "may be modified only for good cause and with the judge's consent." *Creekmore v. Truist Bank*, No. 2:24-CV-209, 2024 WL 4862983, at *3 (E.D. Va. Nov. 21, 2024). "To demonstrate good cause, the party seeking modification must show that the deadlines in the scheduling order cannot reasonably be met despite the party's diligence." *Id.* "[D]istrict courts within the Fourth Circuit generally consider whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Id.* The "good cause inquiry focuses on the timeliness of the amendment . . . with the primary consideration being the diligence of the moving party." *Id.* (quoting *Montgomery v. Anne Arundel Cnty.*, 182 F. App'x 156, 162 (4th Cir. 2006)).

## ARGUMENT

As detailed in prior status reports and hearings with the Court, and as summarized below, Plaintiffs have diligently pursued discovery in this matter. But they have been repeatedly delayed in obtaining several categories of critical information from Defendants, third party affiliate networks that Defendants previously subpoenaed, and additional affiliate networks Defendants informed this Court and Plaintiffs they *would* subpoena but ultimately did not. Because this missing data is critical to Plaintiffs' experts' analyses and their motion for class certification, Plaintiffs now seek to modify the schedule to provide Plaintiffs with adequate time to complete necessary discovery and, in particular, to analyze Capital One's structured data and source code, as to which corporate representative depositions needed to authenticate and explain the voluminous data cannot occur until at least July. *See* Exhibit N at 1. Granting the motion is consistent with Federal Rules of Civil Procedure 1 and 23, because proceeding under the current schedule will substantively disadvantage plaintiffs, who will be forced to move for class

2

certification before critical analysis, including of both structured data and source code, can be completed. Additionally, the requested extension does not impose any prejudice on Capital One.

1.  **Plaintiffs Require More Time and Additional Discovery to Analyze Capital One's Massive Structured Data Set**

Despite both parties working diligently to confer and manage its production, Plaintiffs and their experts only received access to Capital One's structured data production on June 10, 2025. It is difficult to overemphasize the voluminous nature of the structured data. This data includes over 375 billion records and spans over 54.5 terabytes of information. *See* Shafiq Declaration, attached hereto as Exhibit E, at ¶ 5. The data is not analysis-ready and requires significant work to even put it into a format where it can be analyzed. Moreover, certain parts of the data are not self-evident, and Plaintiffs will require deposition testimony to understand the data so they can intelligently analyze it.

Plaintiffs have diligently pursued this data and the necessary depositions, but through no fault of their own did not receive the data for more than *two months* and are now left with insufficient time to meaningfully analyze information that is critical to both Plaintiffs' claims and Capital One's anticipated defenses. Specifically, on April 4, 2025, Plaintiffs served their first sets of discovery requests seeking structured data that Capital One maintains in the ordinary course of business pertaining to all transactions that occurred during the relevant time period related to the Capital One browser extension, including, but not limited to, data showing (1) the websites each user visited prior to completing a purchase (including any affiliate links), (2) any messages the Capital One Shopping browser extension displayed to the user, (3) the actions the user took (including all clicks) in response to any messages displayed by the Capital One Shopping browser extension, and (4) whether Capital One received any commissions or other revenue from a purchase the user made. As was made clear during presentations to the Court, this data is critical

3

to identifying who is in the class and whether and how they were impacted. Thus, this structured data is central to the parties' claims and defenses in this action.

On May 19, 2025, the parties met and conferred, during which Capital One promised to produce its structured data by May 30, 2025. *See* Exhibit B (Plaintiffs' May 19, 2025 letter recapping the parties' structured data conferral that same day). Capital One missed that deadline and did not offer to make the structured data available to Plaintiffs until June 3, 2025, but Plaintiffs were unable to access it until June 10, 2025, due to technological issues on Capital One's end. *See* Exhibit C at 2-12 (parties' email correspondence discussing issues with Capital One's attempt to produce the structured data). From June 3 until June 10, 2025, Plaintiffs repeatedly informed Capital One that they were unable to access its structured data production and that it would take weeks to download given the initial method through which Capital One made the data available. *See id.*

On June 10, 2025, Capital One acknowledged that Plaintiffs' inability to access (or efficiently download) the structured data was due to an "error" on Capital One's end and finally provided a solution to that error. *See id.* at 2 (email from Capital One's counsel stating, "[o]ur team was able to replicate the error you point to below and believes they have a solution, which I am copying below."). Thus, Capital One's delay in production of structured data from April 4, 2025, until June 10, 2025, was in no way attributable to Plaintiffs or their lack of diligence. *See Creekmore*, 2024 WL 4862983, at *3. Plaintiffs were unable to fully download the structured data until 3:48 pm EST on June 11, 2025. *See* Drake Declaration, attached hereto as Exhibit D, at ¶ 11. Plaintiffs' and their experts immediately began analyzing Capital One's structured data.

Plaintiffs must now review the 375 billion records contained in Capital One's data. Before they can do so, however, they must first perform multiple initial tasks spanning several weeks just

4

to get the data into a format that can be meaningfully reviewed. *See* Shafiq Decl. at ¶¶ 6-11. First, Plaintiffs' expert must "parse" the data, which refers to the process of interpreting the data based on the format in which Capital One produced it. *See id.* at ¶ 6. Capital One produced the structured data in a format referred to as "ORC," which requires Plaintiffs' expert to develop and apply custom code to parse the ORC files and extract the relevant information therein. *See id.* That process is technically complex and requires specialized software tooling and expertise. *See id.*

Second, Capital One maintains its structured data organized into approximately 30 separate "events," which refers to a specific action or occurrence related to the functionality of the Capital One Shopping extension and users' interactions therewith or on any browser where the extension is functioning. *See id.* at ¶¶ 4, 7. That "event" based organization creates challenges for analyzing the structured data because each event type is stored in a separate table, which means each event type has its own unique schema. *See id.* at ¶ 7. Therefore, the fields included in one event type may not appear in another event type, and even when the same field is present, it may be inconsistently populated or not clearly defined. *See id*. For Plaintiffs' expert to analyze the structured data, he must first resolve these schema inconsistencies and other data quality issues, which requires input and clarification from Capital One—through a cooperative meet and confer process and through deposition. *See id*. at ¶ 8. Only after Capital One provides that input and clarification can Plaintiffs' expert move onto the next step in the process, which is to programmatically join the various event types to reconstruct the consumer journey (referred to as "stitching"). *See id.* at ¶ 9. This stitching process is incredibly labor-intensive and time-consuming because it requires aligning temporal and contextual information across disparate records. *See id*. Given the enormous size of Capital One's structured data, it will take at least two weeks to perform this analysis. *See id.*

5

Third, only after all of the foregoing is completed can Plaintiffs' expert then start to analyze the substance of the structured data, which presents additional challenges given the nature of the structured data. *See id.* at ¶ 11. For instance, given the nature of Capital One's structured data, Plaintiffs' expert must perform manually intensive work to identify and parse affiliate links and affiliate IDs to determine the involvement of affiliates, including those associated with Plaintiffs or class members. *See id.* This process is manual and time-intensive because affiliate identifiers vary in structure across affiliate networks and merchants and, in many instances, affiliate IDs are embedded in link parameters that are network-specific and inconsistently named. *See id.*

Further, through Plaintiffs' expert's review of Capital One's structured data and source code, he discovered that the Capital One Shopping browser extension captures various stand-down related events indicating whether the Capital One browser extension would have "popped up" during the course of the user's interaction or whether, alternatively, the user would have had to click on the browser extension in order to activate it, but this information was omitted from Capital One's structured data production. *See* Exhibit L at 1-2; Shafiq Decl. at ¶ 4 n.1. On June 16, 2025, Plaintiffs sent Capital One a letter raising this missing structured data issue and requesting that Capital One supplement its data production to provide this missing data. *See* Exhibit L at 1-2; Shafiq Decl. at ¶ 4 n.1. Capital One responded on June 18 requesting a conferral to discuss Plaintiffs' questions. *See* Exhibit M at 1. Thus, Plaintiffs are still evaluating the completeness of Capital One's structured data production on an ongoing, active basis, and the parties are continuing to discuss the same, which is further delaying Plaintiffs' review of the structured data. Drake Decl. at ¶ 19.

**2.    Plaintiffs Require Information from Third Party Affiliate Networks to Complete the Structured Data Analysis But Have Been Delayed In Seeking Such Information By Capital One's False Promise That It Would Do So**

Plaintiffs' Structured Data analysis will require additional information from the affiliate networks about the structure and content of their affiliate links. The affiliate networks are uniquely positioned to provide this information. However, in an effort to minimize the burden on third parties, Plaintiffs relied on Capital One's representation that it would seek this information. When Capital One reneged, Plaintiffs promptly issued their own subpoenas, but now must await responses from parties outside this district.

Capital One expressed its intention—to this Court and Plaintiffs—that it was going to subpoena *all* of Plaintiffs' affiliate networks to obtain, *inter alia*, Plaintiffs' affiliate IDs and affiliate links, which can be used to search Capital One's structured data for commissions Capital One intercepted from Plaintiffs. Specifically, during the parties' meet and confers dating back to April, Capital One demanded that Plaintiffs provide a complete list of their affiliate networks so Capital One could subpoena them. Drake Decl. at ¶ 12. In its April 25, 2025 motion to compel, Capital One told this Court that it would subpoena *all* of Plaintiffs' affiliate networks: "Capital One acknowledges that it is already seeking this information from the three largest affiliate networks, and *intends to seek this information from additional affiliate networks that Plaintiffs identify as those with which they have relationships*." ECF No. 172 at 18 (emphasis added). Therefore, on April 28, 2025, Plaintiffs provided Capital One with a list of all 34 of their affiliate networks. *See* Exhibit F.[1]

---

[1] Capital One informed Plaintiffs on numerous other occasions that it would subpoena their affiliate networks, which is why Plaintiffs provided a complete list of all their affiliate networks as early as April 2025. *See, e.g.*, Ex. F at 1 (April 28: "As discussed during the parties' conferrals last week, below is a list of each Plaintiffs' Affiliate Networks. . . . Plaintiffs consent to Defendants sharing this information with each respective Affiliate Network, for the limited purpose of seeking

One of the requests Capital One included in its subpoenas to the affiliate networks seeks "all Affiliate Links and Affiliate IDs" used by Plaintiffs. Exhibit H at 4, Document Request No. 3 (as an example, Capital One's April 15, 2025 subpoena to affiliate network Commission Junction). During the June 3, 2025 status conference, Capital One explained to the Court that these affiliate links and IDs are needed to search Capital One's structured data for transactions involving the Plaintiffs. Exhibit I at 6 (Capital One's counsel stated: "the affiliate IDs that the third-party affiliate networks have said is important for them to be able to locate information about the plaintiffs and other putative class members"). Based upon Capital One's repeated representations to Plaintiffs (from the outset of discovery), and this Court, that it would subpoena *all* of Plaintiffs' affiliate networks, Plaintiffs refrained from serving their own duplicative subpoenas on the affiliate networks seeking the same information sought by Capital One, consistent with Federal Rule of Civil Procedure 45's mandate that parties minimize the burden imposed on third parties. Fed. R. Civ. P. 45(d)(1).[2]

---

third-party discovery therefrom."); Exhibit G at 1-2 (Plaintiffs' counsel on May 20: "I want to confirm that Defendants offered to forego pursuing the requests listed below, if we agree to provide a list of each plaintiff's Affiliate Networks . . . so you can obtain this information directly from the Affiliate Networks . . . ."; defense counsel's response the next day: "We agree to pursue information that is housed with the affiliate networks from those networks in the first instance.").

[2] Indeed, at the June 3, 2025 status conference, Plaintiffs explained that they requested multiple times to be included in Capital One's conferrals with the affiliate networks they already subpoenaed—and stated they would subpoena—so Plaintiffs could ask the affiliate networks to inform the parties what information they need to identify Plaintiffs and class members. Capital One's counsel made the same argument that they will likely make in response to this motion—that Plaintiffs "have not served subpoenas on [the affiliate networks]." Ex. I at 13. But Judge Porter rejected Capital One's argument and explained that Plaintiffs do not have to serve duplicative subpoenas on the affiliate networks requesting the same information requested in Capital One's subpoenas:

> [W]e need to make sure that we're not inconveniencing third parties, to the greatest extent possible. And if you've sought discovery that would relate to the same material -- it would be maybe one thing if you had sought a different type of discovery than they are seeking. If what they're talking about is part of your request, it would seem to be efficient that you-all participate in these discussions or at least

But then on June 12, 2025, Capital One reversed course from what it represented to this Court, and for the first time stated that "Capital One does **not** currently intend to issue additional subpoenas [to] . . . the remaining [affiliate] networks identified by Plaintiffs" beyond the six it already subpoenaed. *See* Exhibit J at 2 (Capital One's June 12, 2025 letter). By doing so, Capital One deprived Plaintiffs of nearly two months of time to seek this information from the affiliate networks themselves—i.e., from mid-April when Capital One subpoenaed the affiliate networks, until mid-June when it reneged on its expressed intention to subpoena the rest of the affiliate networks. As a result, Plaintiffs must now subpoena their remaining affiliate networks to obtain their affiliate IDs and links, and they cannot analyze Capital One's structured data to identify transactions involving Plaintiffs until the third-party affiliate networks provide their affiliate IDs and affiliate links. Shafiq Decl. at ¶¶ 11, 20-21. Again, this delay was based on Capital One's explicit representations to Plaintiffs and the Court to the contrary, not any lack of diligence on Plaintiffs' part.

3. **Plaintiffs Need Additional Source Code for the Capital One Browser Extension Prior to Moving for Class Certification, But Capital One Has Still Not Produced All Requested Information, Leaving Plaintiffs Unable to Analyze It In Time to Meet the Current Schedule**

Similarly, on April 4, 2025, Plaintiffs served their first sets of discovery requests seeking source code for the Capital One Shopping browser extension, including but not limited to records of (1) when affiliate or referral links were detected, modified, or replaced, (2) Capital One's client-side code responsible for detecting, modifying, or replacing Affiliate tracking codes, (3) the

---

somehow talk about what's going on to make sure that we're only bothering these affiliate networks one time. . . . what I don't want to have happen is for the plaintiffs to go out and serve their subpoenas on these same affiliate networks and then they're on a different timeline, and then they're doing different negotiations . . . that seems inefficient and it seems to be a burden on the third-party networks . . . . *Id.* at 13-15.

9

affiliate tracking and commission allocation features of the Capital One Shopping browser extension, and (4) affiliate link modifications and the frequency, duration, and financial impact of such modifications. This source code is central to the parties' claims and defenses in this action.

The parties met and conferred on Plaintiffs' source code requests and, on May 14, 2025, Plaintiffs agreed to substantially narrow the scope thereof. *See* Exhibit K at 9 (the parties' email correspondence regarding Capital One's source code production). Capital One did not make its source code available until June 10, 2025, and insisted that Plaintiffs only access the source code in person, at Capital One's counsel's office in San Francisco, California. *Id.* at 6. After Plaintiffs' expert reviewed the source code on June 10, 2025, Plaintiffs requested that Capital One provide certain extremely limited portions of the source code in hard copy (*see id*. at 1), per the restrictions that Capital One imposed, requiring that Capital One print and produce the source code (*see* ECF No. 140 at 15-16). *See* Shafiq Decl. at ¶ 16. Plaintiffs also requested that Capital One produce additional sections of the source code which were referenced in what was produced, but were not made available. Ex. K at 6-7 (requesting the foregoing on June 13); *see also id*. at 1 (reiterating that request on June 19); Drake Decl. at ¶¶ 15-16. And, Plaintiffs requested to view all applicable versions of the relevant source code that were in effect during the Class Period, as Capital One only made available the version published in December 2024. *See* Ex. K at 9.

Capital One ultimately produced the requested source code printouts on June 16. Drake Decl. at ¶ 14. Capital One has also agreed to make prior and subsequent versions of the initially produced source code available for review, which Plaintiff's expert plans to conduct on June 26, 2025. Drake Decl. at ¶ 17. However, Capital One has not yet made available any versions of the additional sections of source code Plaintiffs have requested, much less to make all versions of those additional sections available. Drake Decl. at ¶¶ 16, 18. This piecemeal production of source

10

code, on a version by version and section by section basis, with delays interposed for printing and then in person delivery has significantly delayed Plaintiffs' ability to meaningfully analyze the source code. Drake Decl. at ¶¶ 14-19. Analyzing source code is not a simple matter of reading it like a newspaper story; rather, it can also require using developer tools to understand how certain segments of the code will operate. Shafiq Decl. at ¶¶ 6, 14, 19-20. This is why the protective order allows for printing source code for purposes of preparing expert reports, but the laborious process of requiring plaintiffs to first review one version in person, then request additional versions and sections, and to request printed copies all along the way, is significantly slowing this process down. Plaintiffs have been diligent in their review, but given the restrictions in the protective order and Capital One's failure to produce additional sections and prior/subsequent versions, it is taking significant time.

This delay has nothing to do with Plaintiffs' level of diligence. Capital One's failure to make the source code available until June 10, 2025—and failure to provide Plaintiffs' requested printouts until June 16, and ongoing failure to make additional requested sections available—has left Plaintiffs and their experts with insufficient time to analyze it prior to the July 2, 2025 deadline for their motion for class certification. *See* Shafiq Decl. at ¶¶ 13-21. Now that Plaintiffs' expert recently received the printouts, he will need to conduct a detailed programmatic analysis of the source code using standard development tools employed by software engineers to write, navigate, and test codebases. Shafiq Decl. at ¶ 19, 21. Such tools are essential for understanding complex system logic but were not available during Plaintiffs' expert's manual, in-person inspection of the source code based upon Capital One's restrictions on Plaintiffs' access thereto. *Id.* This detailed review will take Plaintiffs' expert at least a week to perform and can only meaningfully be completed once all necessary versions and printouts have been provided. *Id.*

11

Further, to date, Capital One has failed to answer Plaintiffs' straightforward questions about the completeness of its source code production—namely, whether it includes all changes Capital One has made during the relevant time period to the relevant portions of source code that Capital One made available to Plaintiffs. On June 5, 2025—before Capital One made the source code available—Plaintiffs made clear that they needed to review prior versions of, and changes to, source code related to the following:

- Stand down rules;
- Whether the extension altered/replaced pre-existing affiliate links;
- Mechanism for replacement of prior affiliate links;
- Mechanism that determines whether/how the pop-up shows up to apply coupons, get cashback, etc.;
- Mechanism of refresh or injection of new/hidden tab when a user clicks/interacts with the pop-up; and
- Mechanism and format in which the extension uploads event logs to the analytics serve.

*See* Ex. K at 11 (the parties' email correspondence regarding Capital One's source code production). Plaintiffs asked that Capital One provide the dates on which any prior or subsequent material changes were made regarding the foregoing portions of the source code. *See id.*

Capital One failed to respond to those inquiries, so Plaintiffs sent another email on June 9, 2025, repeating those requests. *See id*. at 4. Capital One sent an email that same day but failed to respond to Plaintiffs' inquiries regarding changes to the source code. *See id.* at 3-4. So Plaintiffs sent another email on June 9, 2025, asking (for a third time) that Capital One "provide the dates on which any prior or subsequent material changes were made regarding the portions of the code we identified." *See id*. at 3. Capital One failed to respond for seven days, so Plaintiffs sent an email on June 13, 2025 requesting that information for a fourth time. *See id.* at 1-2. Capital One did not respond until June 18 and confirmed that the source code it initially made available to Plaintiffs

on June 10 in fact did *not* contain information showing changes to that source code, despite Plaintiffs requesting such change information long before the initial June 10 inspection. *See* Ex. K at 2. Therefore, Capital One made that additional source code available for the first time on June 20, which requires Plaintiffs' expert to travel to Capital One's counsel's office yet again to review the source code in-person (per Capital One's insistence). *See id*. Plaintiffs' expert is not available to do so until June 26. *See id*.

Plaintiffs sent Capital One another email on June 19 reiterating their prior request for other highly relevant source code that Capital One did not include during Plaintiffs' initial review, since Capital One's communications about making additional source code available failed to address those requests. *See id*. at 1. Capital One's failure to make all of the relevant source code available during Plaintiffs' initial inspection on June 10, delay in making *some* additional source code available until June 20 (which Plaintiffs' expert cannot review in person until June 26), and ongoing failure to make additional relevant source code available (or even respond to Plaintiffs' email to confirm that it will do so) is delaying Plaintiffs' analysis of Capital One's source code.

Similarly, as mentioned above, during Plaintiffs' expert's in-person review of Capital One's source code, he discovered references to other relevant parts of the source code that Capital One did not make available during the in-person review. *See* Shafiq Decl. at ¶ 15. Those referenced (but omitted) portions of source code appear to be crucial to the parties' claims and defenses, including but not limited to, how the Capital One browser extension is implemented and the manner in which it operates with respect to affiliate links. *See* Drake Decl. at ¶ 15; Shafiq Decl. at 15. These issues will both be important to Plaintiffs' class certification motion. *See* Drake Decl. at ¶ 15. On June 13, Plaintiffs sent an email to Capital One requesting that it make this additional source code available for Plaintiffs' review. *See* Ex. K at 6-7; *see also* Drake Decl. at ¶ 15. Capital

One responded that same day but failed to address this additional source code. *See* Ex. K at 5-6. Therefore, on June 19, Plaintiffs sent yet another email requesting access to the additional source code. *See id.* at 2-3. On June 20, Capital One responded and stated that it "ha[s] been working to investigate these additional directories," but was not yet making them available. *See id.* at 1. Capital One's email put the burden on Plaintiffs to "could identify the particular source code files in these directories you are requesting to review." *See id.* Therefore, the parties are still conferring over additional relevant, but missing, source code, which is further delaying Plaintiffs' analysis of Capital One's source code.

## CONCLUSION

For the foregoing reasons, good cause exists for modifying the current schedule consistent with Plaintiffs' Exhibit A.

Dated: June 20, 2025                    Respectfully submitted,

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Alexandria, Virginia 22201
Telephone: (888) 987-9991
swebster@websterbook.com

*Plaintiffs' Local Counsel*

Norman E. Siegel (admitted *pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

E. Michelle Drake (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: 612.594.5999

emdrake@bm.net

Douglas J. McNamara (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
dmcnamara@cohenmilstein.com

James J. Pizzirusso (admitted *pro hac vice*)
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com

*Plaintiffs' Co-Lead Counsel*

15

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**