# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| *In re Capital One Financial Corporation, Affiliate Marketing Litigation* | Case No. 1:25-cv-00023-AJT-WBP |

## CAPITAL ONE'S OPPOSITION TO
## PLAINTIFFS' MOTION TO MODIFY SCHEDULING ORDER

## INTRODUCTION

Plaintiffs ask this Court to adopt a scheduling proposal—deciding whether a class should be certified *after* fact discovery has closed—that this Court has already rejected.  At the initial scheduling conference three months ago, this Court ordered that Plaintiffs' deadline to move for class certification would be 30 days after this Court ruled on Capital One's motion to dismiss.  *See* ECF No. 130.  Capital One got to work.  Following the Court's ruling on Capital One's motion to dismiss on June 2, Plaintiffs asked this Court to extend that deadline, and this Court declined.  Now, Plaintiffs' Motion to Modify the Scheduling Order, ECF No. 234 ("Mot."), asks the Court *again* to extend the deadline, and again to give them the entire period of fact discovery—until September 1—to put their motion together.  There remains no good reason to do so.

Capital One has moved expeditiously to meet the timeline set by this Court.  Over the course of these months, Capital One has produced tens of thousands of pages of documents, and it substantially completed its document production nearly two weeks ago.  It has also produced approximately 55 terabytes of structured data, repeatedly made the Capital One Shopping source code available for review, prepared to present witnesses for Rule 30(b)(6) and 30(b)(1) testimony, and served third-party subpoenas.  It has exceeded ordinary discovery obligations by informally answering Plaintiffs' counsel and their expert's questions about data and source code.  All of this easily should have put Plaintiffs in a position to meet the Court's deadline, and in no event should Plaintiffs' confusion about the data and source code on which their case relies and Capital One's sustained efforts to help them understand it become an excuse to upend the schedule.

Plaintiffs, however, have not diligently prosecuted their case, and instead spent the month of June trying to build a record why the class certification deadline should be pushed back rather than attempting to meet the Court's deadline.  They contrived delays in accessing structured data;

claimed they and their experts could not understand straightforward data field names like "url" and yet cancelled the deposition Capital One had arranged to help Plaintiffs understand the data; postponed their review of the source code so that a *different expert* could review, but only if the review happened the following week; cancelled depositions of witnesses who had cleared their calendars to meet the court's deadline just days before the depositions were scheduled to occur; and belatedly served nearly two dozen massively overbroad and irrelevant subpoenas on third parties—most of whom have never partnered with Capital One, and who have no relevant information—two days before filing the Motion.[1] A core theme of Plaintiffs' Motion is that Capital One should do Plaintiffs' work for them—whether it be serving third-party subpoenas for Plaintiffs, or acting as Plaintiffs' expert when it comes to a review of the source code and structured data—but that lack of diligence is no reason to move the schedule.

Missing from Plaintiffs' Motion is any reason why the discovery they say they need to complete relates to class certification issues. With each passing day, it is increasingly apparent that the allegations in the Amended Complaint are unsupported by any evidence, and this will not be a case where class certification is warranted. The class is not ascertainable: directly contradicting their repeated insistence that Capital One knows the "identity of the referring affiliate in every instance," *see, e.g.*, ECF No. 121 ¶ 75, Plaintiffs' Motion acknowledges that putative class members cannot be identified without third-party discovery—if they can at all—and it will require a "manual and time-intensive" process. *See* Mot. at 6, 9. Documents, data, and depositions are confirming that this is not a case where there is a common question that is capable of being

---

[1] And as discussed below, Plaintiffs then served four more massively overbroad subpoenas five days after filing this Motion.

answered by common proof—much less one that predominates—given the varying relationships between publishers, merchants, and affiliate networks.

The sooner the Court decides the class certification issue, the better for both the parties to this case and the third parties who possess information that is relevant only to the claims of absent class members. Capital One has met its discovery obligations on the timeline the Court directed, and the recitation of Plaintiffs' discovery efforts in the Motion is not accurate. The information Plaintiffs now claim they need is either not relevant to class certification or has not been produced solely because of Plaintiffs' lack of diligence, or both. Moving Plaintiffs' class certification deadline to the close of fact discovery would inappropriately shift the burdens of discovery onto third parties, notwithstanding the likelihood that a class will not be certified, and unnecessarily delay the resolution of this case.

There is no good cause for Plaintiffs' requested extension. Capital One is committing to making source code available as Plaintiffs request access, and it has committed to make all witnesses that Plaintiffs have requested for deposition available by July 18. For these reasons and those set forth more fully below, Plaintiffs' Motion should be denied, and this Court should therefore order Plaintiffs to file their class certification motion by July 23 at the latest (a three-week extension from the original date).[2]

---

[2] In response to the filing of Plaintiffs' Motion, the Court continued the previously July 2 class certification deadline until it rules. *See* ECF No. 236. And though the Court's order means Plaintiffs will get at least some additional time, the two-month extension requested by Plaintiffs is unwarranted, and at most, an extension of a couple of weeks would be appropriate.

## PROCEDURAL HISTORY

### A.    The Initial Schedule

Early in this case, the Court rejected a proposed schedule with a class certification deadline following the close of fact discovery, making crystal clear that it was not consistent with this Court's practices.  *See, e.g.*, Ex. A (April 1, 2025 Hearing Transcript) at 4:19–5:7 (explaining that the Court had "some issues" with the proposed timeline and that it was not consistent with the schedule normally provided by the Court).  Instead, the Court set a fact discovery deadline of September 1 (providing roughly five months of fact discovery), and previewed a June or July class certification deadline.  *See id.* at 5:8–18; *see also* PTO #3, ECF No. 130; Rule 16(b) Scheduling Order, ECF No. 132.  At that same hearing, Plaintiffs' counsel asked the Court to reconsider the class certification deadline and give them more time, but the Court declined, explaining that class certification must be taken up "as early as practicable."  Ex. A at 6:1–19.

### B.    Capital One's Discovery Efforts

Understanding the Court's clear direction, Capital One proceeded with discovery with all deliberate speed, and has undoubtedly satisfied its obligations consistent with the Court's schedule. Capital One's discovery efforts have focused on four main areas: documents, structured data, source code, and depositions.  Capital One provided substantial discovery to Plaintiffs in all four areas well in advance of the July 2 class certification deadline, and there is no outstanding discovery that warrants a material extension of Plaintiffs' deadline to move for class certification.

#### 1.    *Document Productions*

Capital One substantially completed its document production on June 18, more than two weeks before the July 2 class certification deadline.  In less than two months, Capital One produced over 20,000 documents, consisting of over 81,000 pages.  Plaintiffs have identified no deficiencies

in the scope or substance of Capital One's document productions, and Plaintiffs have never suggested that they lack any critical or necessary documents.

### 2.    *Structured Data*

On June 3, Capital One finished its production to Plaintiffs of nearly 55 terabytes of structured data, consisting of transaction-level data for millions of transactions made while using the extension, which would allow Plaintiffs to examine the circumstances of every *single* commission that they allege Capital One "stole" by "(i) surreptitiously forcing a refresh of the checkout page, (ii) injecting a hidden tab to overwrite the previous affiliate tracking code, and (iii) updating the browser's stored cookies to indicate that Capital One is the last-clicked affiliate link" with a "referral click" that was "artificially simulat[ed]."  ECF No. 216 at 5 (citing and quoting Plaintiffs' core allegations in the Amended Complaint).[3]  The structured data production also includes every single notification displayed to the users of the extension (including the type), click data, every coupon code used by the extension's users, and all rewards earned by the extension's users within the relevant scope and time period.

Preparing this production was extremely time-consuming and burdensome on Capital One employees.  To ensure that the parties were on the same page and avoid any delay or duplication of effort, Capital One previewed the scope and details of its expected structured data production with Plaintiffs in mid-April, provided sample data of various events to be included and descriptions of certain events and columns within the production in early May, and made the entirety of its structured data production available to Plaintiffs less than two months after it was first requested.

---

[3] Plaintiffs complain that the size of the structured data presents obstacles to Plaintiffs' analysis of it.  *See* Mot. at 3.  Of course, that is due to the extremely broad scope of Plaintiffs' discovery requests, which Capital One explained to Plaintiffs when the Parties conferred.  Plaintiffs refused to narrow their request, so Capital One produced what Plaintiffs sought.

*See* ECF No. 234-3 at 25.  Capital One also provided Plaintiffs with a consolidated, or "stitched together," version of five of the key events within the production in order to allow Plaintiffs to see chronological consumer journeys of all purchases made while using the extension during the relevant time period.[4]  *See* Ex. B (June 3, 2025 structured data production letter to Plaintiffs' Counsel).

### 3.    *Source Code*

In parallel with the structured data production, Capital One worked diligently to make relevant portions of the extension's source code—both current and historical versions—available to Plaintiffs and their expert for review, consistent with the requirements the parties agreed to and this Court ordered in the Protective Order.  *See generally* ECF No. 140.  On June 10, Capital One made portions of the extension's source code available for Plaintiffs' expert to review at the offices of Capital One's outside counsel in San Francisco, as Plaintiffs requested to accommodate Professor Shafiq, the California-based computer expert whom Plaintiffs have consistently identified as the expert who will be reviewing the code.  *See, e.g.*, ECF No. 234-11 at 15.

During that June 10 review, Plaintiffs' expert reviewed 22 source code files, relating to, among other things, how, when, and why the browser extension "stands down" in compliance with affiliate network rules and does not present users with coupons or rewards for certain transactions, how the extension displays various notifications to users, and how the browser extension processes certain user interactions, including when clicking on affiliate links.  Capital One provided printouts of source code to Plaintiffs' expert at his request.  *See id.* at 5–7.  And Capital One has continued

---

[4] Plaintiffs suggests they need more time because that their expert needs to "stitch[]" together the data, which "is incredibly labor-intensive and time-consuming."  *See* Mot. at 5.  This conveniently omits that Capital One has already done this for Plaintiffs.

to make additional relevant portions of the code specifically identified by Plaintiffs available for review, including by making those portions available to review as early as June 18. *Id*. at 4–5.

### 4.    Depositions

Capital One has also made its corporate designees available for both 30(b)(1) and 30(b)(6) depositions within the schedule provided by the Court. On June 4, Plaintiffs requested deposition dates for Capital One's witnesses between June 19 and June 30. The next day, Capital One provided dates between June 24 and June 27 for four of Capital One's witnesses, including the Co-Leads of Capital One Shopping, so that they would be completed before the class certification deadline. On June 9, Plaintiffs confirmed the dates, and the witnesses cleared their calendars. *See* ECF No. 234-14 at 5–6.

### 5.    Third-Party Discovery

Capital One also diligently pursued discovery from third parties that possess information critical to the case—in particular, data relating to transactions with both Capital One and Plaintiffs in the clickpath—and has produced to Plaintiffs what it has received from third parties to date. Capital One has issued document and deposition subpoenas to six affiliate networks that appear to have partnered with Capital One and Plaintiffs.[5] And though it was not obligated to, Capital One also offered to pass along any additional requests for discovery that Plaintiffs needed but was not requested by Capital One to those third parties. *See* ECF No. 234-10 at 2. With one single exception (a request for *Plaintiffs' own* affiliate IDs), Plaintiffs never raised any additional

---

[5] It should come as no surprise that Capital One's third-party discovery efforts have primarily focused on what Capital One needs for this case. As explained more fully below, the idea that Capital One is responsible for Plaintiffs' failure to diligently pursue information from third parties that Plaintiffs view as "critical" to their motion for class certification (Mot. at 2) is an odd position to say the least.

requests. *Id.* Instead, weeks later on June 25, Plaintiffs served their own broad subpoenas on four of these networks.

Capital One also has promptly produced to Plaintiffs all of the discovery it has received from third parties to date. Plaintiffs received the first such production on June 13. On June 27, two weeks after receiving the first production, Plaintiffs for the first time complained about the how Capital One provided those documents to them,[6] but Capital One provided those documents to Plaintiffs exactly as they were produced to Capital One.

### C. Plaintiffs Attempt to Build a Record for More Time.

In early June, Plaintiffs appeared to realize that they had not put themselves in a position to move for class certification by July 2. At a hearing on June 4, Plaintiffs' counsel asked whether this Court would consider adjusting the schedule, suggesting to this Court that Plaintiffs "would just probably need a little bit more time." *See* ECF No. 234-9 at 4:9–23. The Court was clear: "I would like to keep that date." *Id.* at 4:24–25. And to the extent there was any doubt as to the Court's intentions, in that same hearing the Court reiterated that it was "serious about keeping that [class certification] date." *Id.* at 17:2–10.

Despite the Court's repeated direction, a few days later, it appears that Plaintiffs focused less on meeting the Court's deadline and more on how to build a record they hoped would cause the Court to rethink the schedule. And because Plaintiffs knew that Capital One had met its own discovery obligations,[7] Plaintiffs began to look for other ways to try and justify more time.

---

[6] For example, Plaintiffs complain that the documents were not text-searchable and that they expected Capital One to redo these productions in a different format (i.e., not as they were produced) so that it would be easier for Plaintiffs for review.

[7] If Plaintiffs actually believed Capital One had not provided discovery related to structured data or source code that they needed, or that Capital One was not proceeding in good faith, Plaintiffs could have moved to compel. They did not do so.

Structured data. On Sunday, June 8, five days after Capital One made its structured data production available to Plaintiffs, Plaintiffs sent an email identifying a problem with their download speed (which, of course, is out of Capital One's control) and asked if Capital One could try a different method of transfer. *See* ECF No. 234-3 at 18–19. Capital One promptly responded on the same day that it would, and responded equally promptly to a series of additional issues Plaintiffs had in accessing the data, all of which were likewise on Plaintiffs' end and outside of Capital One's control. *See id.* at 2–18. Plaintiffs now claim that it will take their expert at least six, and possibly eight, weeks to finish his analysis—raising significant questions about his qualifications to analyze that data in the first place. *See* ECF No. 237 ¶ 21.

Once Plaintiffs gained access to the data, they continued to ask a series of questions in emails and letters, and their response to Capital One's answers to those questions was to ask more questions. For example, in response to a letter sent on June 16, Capital One not only answered the questions in the letter, but offered to confer and discuss further. Plaintiffs' ignored Capital One's offer to confer, instead lodging additional questions. When Capital One answered those, Plaintiffs sent *more* questions, consistently seeking via informal discovery what they refuse to ask for through formal discovery channel. Plaintiffs appear to believe that this case cannot progress until Capital One's lawyers answer every single question they or their experts can think up, but that is not how discovery works.

Plaintiffs' tactics continued even after they filed this motion. Shortly before the close of business on Friday, June 27, Plaintiffs sent Capital One another letter raising numerous questions relating to the structured data that has little relevance to class certification and that is exceedingly burdensome (such as asking for the identities of over 6,800 merchants or explaining the meaning

of 421 values in a single column).[8]  The way to answer these questions is with a deposition, which Plaintiffs have shown little interest in taking.

Source code.  On June 13, Plaintiffs complained that their expert had not been provided with printouts during his source code review because his request did not comply with the terms of the Protective Order.  *See* ECF No. 234-11 at 7–8.  This was because Plaintiffs had failed to comply with the Protective Order, but Capital One promptly provided the printouts requested and earlier than it was required to do.  *See id.* at 5–6.  And when Plaintiffs sought review of additional source code files on June 13, Capital One responded that those files would be available to review just five days later, on June 18.  Abruptly, Plaintiffs requested that the source code be moved from San Francisco to New York so that a different expert could conduct the review, and advised that this new expert was not available until June 26.  *Id.* at 4–5.

Still, Capital One accommodated Plaintiffs' request, and moved the source code review from San Francisco to New York.  Plaintiffs' new expert conducted a review on June 26, and did not raise any issues with the review at that time.  But on June 27, Plaintiffs sent a letter alleging purported deficiencies in Capital One's additional source code production.  None of Plaintiffs' complaints, which appear designed to manufacture a dispute, has merit.  Plaintiffs' primary complaint appears to be that Capital One provided "diff" or difference files to show the changes over time to the source code files it had previously produced, consistent with Plaintiffs' request to review changes to those files.  Plaintiffs' allegation that these "diff" files somehow obstruct Plaintiffs' ability to review the source code is baseless.  As explained below, the "diff" files are an

---

[8] Certain of the information that Plaintiffs' June 27 letter seeks, like the identities of merchants, is in the structured data itself.

industry standard method for reviewing changes over time to source code, and in fact facilitate a more efficient review of those changes.

Tellingly, rather than review these files on June 18 when they were made available (which would have allowed Plaintiffs to raise any issues at that time), Plaintiffs chose to wait until June 26 to review these files, then sent a letter the next day raising spurious concerns and demanding that Capital One instead produce *all* of its source code—a request that duplicates their initial position, which they had previously acknowledged during a meet and confer was overbroad. Plaintiffs' approach negates nearly two months of progress between the parties, and reverts the source code discovery process back to square one.

Depositions.    On June 20, Plaintiffs unilaterally cancelled two of the four corporate representatives depositions scheduled to begin a few days later, *see* ECF No. 234-14 at 2, ostensibly because the depositions could not proceed until the source code review was complete, though only one of the witnesses was designated to testify about the source code. The other witness was designated to testify about, among other topics, Capital One's structured data. Although Plaintiffs' complain in their motion they cannot understand certain aspects of Capital One's structured data, Plaintiffs have offered no good reason why they cancelled the deposition of the Capital One representative designated to testify about that data. The best way to get answers to questions about structured data fields is to depose Capital One's corporate representative.

Third party discovery.    On June 18, just two days before filing this Motion, Plaintiffs issued their first third-party subpoenas—more than two months after Capital One issued its first third-party discovery requests. Despite their suggestion in the Motion that they waited so long because they believed Capital One would do their work for them, *see, e.g.*, Mot. at 7, Plaintiffs' third-party discovery requests are far broader than Capital One's and seek extraordinary amounts of irrelevant

information.   15 of these 23 subpoenas were served on third parties that appear to have no relationship with Capital One, so it is unclear how they have information relevant to this dispute. Directly contradicting their repeated insistence that Capital One knows the "identity of the referring affiliate in every instance," *see, e.g.*, ECF No. 121 ¶ 75, Plaintiffs' Motion acknowledges that putative class members cannot be identified without third-party discovery and will require a "manual and time-intensive" process.[9] *See* Mot. at 6, 9.   Then, *after* filing their motion, Plaintiffs issued four third-party subpoenas on affiliate networks that Capital One had previously subpoenaed three months ago, even though Capital One had offered for weeks to pass along any of Plaintiffs' discovery requests to these parties.  *See supra* at 7–8.

On June 20, Plaintiffs filed this Motion, seeking a 60-day extension of their class certification deadline that gives them the entirety of fact discovery to prepare their motion.

## LEGAL STANDARD

Scheduling orders may be modified only for "good cause shown."   Fed. R. Civ. P. 16(b)(4).[10]   The burden in establishing good cause lies with the party seeking the modification. *See Cook v. Howard*, 484 F. App'x 805, 815 (4th Cir. 2012).   As the Fourth Circuit has explained, the "good cause" standard requires a showing by the party seeking relief that "the deadline cannot

---

[9] Plaintiffs' Motion also suggests that identifying class members may not even be possible *with* third-party discovery, in part because "affiliate identifiers vary in structure across affiliate networks and merchants and, in many instances, affiliate IDs are embedded in link parameters that are network-specific and inconsistently named." Mot. at 6.  Of course, if neither Capital One's data nor third-party discovery allow for the identification of putative class members, Plaintiffs will not be able to satisfy the Fourth Circuit's ascertainability requirement, which prohibits the certification of classes whose members cannot be identified "in reference to objective criteria," or without "extensive and individualized fact-finding or mini-trials."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (internal quotation marks and citation omitted).

[10] The parties agree that Rule 16(b)'s good cause standard governs Plaintiffs' Motion.  *See* Mot. at 2 (discussing "good cause" standard and citing *Creekmore v. Truist Bank*, 2024 WL 4862983, at *3 (E.D. Va. Nov. 21, 2024), which also focused on the good cause standard under Rule 16(b)).

reasonably be met despite the party's diligence," and the "standard will not be satisfied if the court concludes that the party seeking relief has not acted diligently in compliance with the schedule." *Id.* (cleaned up).  While courts consider other factors, including "danger of prejudice to the non-moving party, the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, and whether the movant acted in good faith, diligence is the hallmark of the Rule 16(b)(4) good cause standard." *Hunt v. Brooks Run Min. Co., LLC*, 51 F. Supp. 3d 627, 636 (S.D.W. Va. 2014) (citation omitted), *aff'd* 610 F. App'x 340 (4th Cir. 2015).  The Local Rules of this Court further make clear that "[m]ere failure on the part of counsel to proceed promptly with the normal processes of discovery shall not constitute good cause for an extension or continuance." L.Cv.R. 16(B).

## ARGUMENT

Granting Plaintiffs' request will not promote "the just, speedy, and inexpensive determination" of this proceeding, Fed. R. Civ. P. 1, and the Court should deny Plaintiffs' Motion for three primary reasons.  *First*, moving the class certification deadline to after the completion of fact discovery improperly shifts the burdens of discovery to third parties—including those Plaintiffs recently served or are planning to serve—which is inconsistent with both Rule 23 and Rule 45.  *Second*, Plaintiffs already have all the information they should need to file their motion for class certification, do not explain what discovery they need to seek class certification, and have utterly failed to demonstrate diligence that would satisfy the Rule 16(b)(4) good cause standard. *Third*, extending the schedule now will needlessly delay the resolution of this case.

## I.    Granting Plaintiffs' Motion Will Shift Discovery Burdens to Third Parties.

Rule 23 requires that motions for class certification be brought at an "'early practicable time'" after a class action lawsuit is filed.  *Davis v. Capital One, N.A.*, 2023 WL 6964051, at *11 (E.D. Va. Oct. 20, 2023) (Trenga, J.) (quoting Fed. R. Civ. P. 23(c)(1)(A)).  This is, in part, to

"prevent[ ] a waste of the parties' resources and judicial resources" by conducting unnecessary discovery. *Boyce v. Wachovia Secs., LLC*, 2010 WL 1253744, at *7 (E.D.N.C. Feb. 17, 2010); *see also In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 948 (E.D. Mich. 2022) (setting "appropriately early deadline" for class certification in part because of "the burdens associated with class action litigation"). Those concerns are particularly acute here given Rule 45's "mandate that parties minimize the burden imposed on third parties," *see* Mot. at 8 (citing Fed. R. Civ. P. 45(d)(1)). Delaying Plaintiffs' motion for class certification until the end of fact discovery will *exponentially increase* the burden on third parties, including more than two dozen third parties who Plaintiffs just served with extraordinarily broad and irrelevant subpoenas.

In April and May, Capital One served third-party subpoenas on six affiliate networks selected because they partner with both Capital One and one or more Plaintiffs. Those subpoenas seek substantial information about absent class members. In an effort to minimize the burden on these third parties, and relying on the schedule adopted by the Court, Capital One has focused on obtaining information from these third parties that is relevant to class certification issues. Because the schedule contemplates that additional discovery could occur after class certification, Capital One has reserved the right to seek additional information about absent class members— information that is time consuming to gather, and will only be relevant if a class is certified. But if this Court makes the class certification deadline co-extensive with the fact discovery cutoff, Capital One will have no choice but to pursue further efforts to seek the discovery it needs on both class certification and merits issues.

The burden is even worse for third parties who have recently been targeted by Plaintiffs with subpoenas that are not so narrowly tailored. For example, in one subpoena directed to an affiliate network that does not have overlapping relationships with Plaintiffs and Capital One,

Plaintiffs seek, among other things, all commissions ever paid *to essentially anyone*. *See* Ex. C (Plaintiffs' subpoena to InfluenceLogic, LLC). Plaintiffs do not say how this information might relate to class certification so as to support an extension while they wait to receive it, and it does not. *See, e.g.*, *Cunningham v. Vivint, Inc.*, 2022 WL 2291669, at *10 (D. Utah June 24, 2022) (rejecting plaintiffs' argument that they could not have moved for class certification without additional discovery where plaintiffs failed to explain why they needed it).

Other courts have refused to allow plaintiffs to impose far more modest discovery burdens on third parties "at a stage of the case where class certification is far from inevitable." *See, e.g.*, *Seabron v. Am. Fam. Mut. Ins. Co.*, 862 F. Supp. 2d 1149, 1153–54 (D. Colo. 2012) (limiting discovery and denying "massive" production of third-party information); *Wright v. Linebarger Goggan Blair & Sampson, LLP*, 2011 WL 13116673 (W.D. Tenn. Aug. 1, 2011) (quashing in part third-party subpoena where information sought went beyond what was needed for certification); *Kearns v. Lonadepot.com, LLC*, 2023 WL 9375111, at *6 (C.D. Cal. Dec. 4, 2023) ("[T]aking into account the privacy rights of third parties, the needs of the case, including the upcoming class certification motion filing deadline, and concerns of possible undue burdens, certain information may be more appropriately ordered disclosed if and after a class is certified.").

## II. Plaintiffs Have Not Demonstrated Good Cause to Move the Class Certification Deadline.

Plaintiffs' Motion raises no new or newly discovered issues, and it provides no explanation as to why they waited until the evening of June 20 to file it. Plaintiffs also do not explain why they told this Court at the June 4 hearing that they would need "a little bit more time" to file their class certification motion, *see* ECF No. 234-9 at 4:20–23, yet waited 17 days to file a motion requesting a two-month extension. This alone warrants denying Plaintiffs' Motion. *See, e.g.*, *Smith v. City of Greensboro*, 2021 WL 5772309, at *3 (M.D.N.C. Oct. 18, 2021) ("[T]here is no

good cause to modify the scheduling order because Plaintiff waited until the eleventh hour to seek leave to do so."); *Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 382–84 (D. Md. 2014) (considering defendant's delay in requesting schedule modification in denying majority of the request).

But even if Plaintiffs had diligently moved for an extension when they asked the Court for guidance on its willingness to modify the schedule and were told to meet the deadline weeks ago, it would still be unwarranted because the information Plaintiffs claim to need is either irrelevant to class certification, or is missing because of Plaintiffs' lack of diligence, or both.

### A.    Source Code

Plaintiffs' discovery efforts relating to the Capital One Shopping source code have been listless from the start.  For example, Plaintiffs' initial document requests, served on April 4, sought access to "all Source Code for the Browser Extension, from the time the Browser Extension was invented to present."  Ex. D (Plaintiffs' First Set of Requests for Production) at 13.  Capital One explained repeatedly that a request to review the entirety of the source code (most of which is irrelevant to the case) is inappropriate, unwarranted, and unrealistic given the sheer volume and the time it would take to review it, and asked Plaintiffs multiple times to identify which portions they wanted to review.  While Plaintiffs acknowledged that their initial requests were "overbroad," *see* ECF No. 234-11 at 14, they refused to get specific for more than a month—until May 14.  *See* ECF No. 234-11 at 15.

When Plaintiffs finally identified the aspects of the source code they wished to review on May 14, Capital One promptly worked to prepare them for review and made them available on June 10.  *Id.* at 12.  And when Plaintiffs requested on June 13 to review additional portions, including historical portions of the code that their expert had already reviewed, Capital One again

promptly made those portions available for review on June 18.[11] *Id.* at 4, 8–9. This would have allowed Plaintiffs more than two weeks for review before their July 2 class certification deadline.

Inexplicably, Plaintiffs' response to Capital One's message that the code was available to review was that Plaintiffs "intend to have a different expert review" the historical versions of the code already reviewed, and that the earliest he could do so was June 26—two days *after* the source code deposition, which had been scheduled on June 9, was set to take place.[12]  *See id.* at 4. Plaintiffs still have not explained why a different expert, who did *not* review the current code, needed to review the historical code.

Perhaps because Plaintiffs chose to have a different expert review the historical versions, Plaintiffs appear to have fundamentally misunderstood the "diff" files that were reviewed on June 26. These files show changes, identified both by date as well as code version, over time to each of the source code files Capital One had previously produced. Generating "diff" files is an industry standard way of showing changes to source code, and these files show all changes made going back to the start of the relevant time period. Capital One's production of source code files that were operative at the time this suit was filed provide the "starting point" Plaintiffs allege to be missing. And although Plaintiffs appear to have misunderstood the content of these files, they show the full context of every change made, showing "before" and "after" versions of each

---

[11] Plaintiffs' Motion claims Capital One did not make these files available until June 20, *see* Mot. at 13, but their own cited source makes clear that Capital One made the files available on June 18, and offered June 20 as a date in the event Plaintiffs' expert was not available on June 18.  *See* ECF No. 234-11 at 4–5 (June 18 email stating that the files "will be available for review in our SF office starting today at 10am PT").

[12] There is no dispute that Plaintiffs could have reviewed additional source code on June 18. Had they, Plaintiffs would have completed their review nearly a week before the schedule source code deposition. Instead, Plaintiffs chose to delay that review two days before telling Capital One that they were postponing the source code deposition scheduled for June 24. One wonders whether Plaintiffs intentionally delayed further source code review to justify their last-minute unilateral postponement of the June 24 deposition.

modified line or block of code. Indeed, these "diff" files were provided specifically because they provide this full context for changes without reproducing the entirety of the otherwise unchanged portions. The alternative, which Plaintiffs now demand, would be to provide dozens if not hundreds of different versions of the same files, often with only small differences between each version. That would only increase the time and expense necessary to review the source code without any corresponding benefit. Plaintiffs have not explained why these additional files are necessary for their forthcoming motion for class certification, and their belated demand for them should not excuse their inability to diligently complete their source code review.

Plaintiffs' lack of diligence precludes them from obtaining relief from the class certification deadline on the basis that they have not completed their review of the source code. *See, e.g.*, *Howard*, 484 F. App'x at 814–18 (affirming denial of motion to change deadline where party seeking relief showed "an overall lack of diligence" and had not "been diligent in pursuing" the information needed); *Alston v. Becton, Dickinson and Co.*, 2014 WL 338804, at *3 (M.D.N.C. Jan. 30, 2014) (collecting cases standing for the "proposition that a party who waits until the last minute to pursue discovery has not shown good cause" for an extension of time); *Inge v. Rock Financial Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (The "good cause" standard requires an inquiry into "the moving party's diligence in attempting to meet the case management order's requirements."). And to the extent Plaintiffs believe there is any *additional* code that Capital One has not made available, *see* Mot. at 13, Plaintiffs have still failed to identify with appropriate specificity which portions of code they believe are missing or how those portions are relevant or necessary to a motion for class certification. *See Cunningham*, 2022 WL 2291669, at *10. Indeed, *after* filing this Motion, Plaintiffs asserted that they no longer believe they should focus on the portions of the code that are

relevant, and instead want to review the *entire* code, walking back two-months' worth of progress and threatening to send the Parties back to square one.

### B.    Structured Data

The story of Capital One's structured data production, which was complete by June 3, is similar.  As a threshold matter, Plaintiffs' description of the events leading up to Plaintiffs' accessing the data is highly misleading.[13]  In any event, Plaintiffs gained access to the structured data by June 11, three weeks before the class certification deadline.  *See* Mot. at 4.

Capital One also made its corporate witness available to answer any questions about the structured data production at a deposition on June 25, two weeks after Plaintiffs began analyzing the data and within Plaintiffs' requested window.  *See* ECF No. 234-14 at 2.  Plaintiffs have repeatedly asserted that this deposition is necessary to their ability to understand the data.  *See* Mot. at 3, 5.  And Plaintiffs continue to raise numerous, and new questions about the structured data, questions that can be best answered, and most efficiently answered, via a 30(b)(6) deposition.

Inexplicably, Plaintiffs unilaterally and indefinitely postponed this deposition—involving one of the co-heads of the Capital One Shopping line of business—days before it was set to take place.  *See* ECF No. 234-14 at 2.  As with the source code, Plaintiffs cannot demonstrate good cause by saying they need more time to understand the structured data while simultaneously delaying the deposition that would allow them to do exactly that.  *Compare* Mot. at 3 (Plaintiffs arguing that they need "deposition testimony to understand the data so they can intelligently

---

[13] Plaintiffs assert that Capital One "acknowledged" that their initial inability to access the structured data production was "due to an 'error' on Capital One's end." Mot. at 4.  That is not true.  Capital One explained to Plaintiffs that it had been able to replicate an error *Plaintiffs* made in attempting to access the production, and then provided step-by-step instructions for Plaintiffs to fix their mistake.  *See* ECF No. 234-3 at 3–10.  Neither Capital One's counsel nor its expert had any problem accessing the production, and any delay Plaintiffs experienced was of their own making.

analyze it") *with* ECF No. 238 at 5 (Plaintiffs arguing that taking that same deposition without "such a basic understanding of the key data set" provided solely by Capital One counsel through informal discovery requests would be "malpractice")[14]; *see also Hunt*, 51 F. Supp. 3d at 635–36 (denying motion to amend deadline in part because party seeking relief did not show that the current deadline could not have been met despite their diligence).[15]  Indeed, on May 19, Plaintiffs represented to Capital One that it intended to take a 30(b)(6) deposition on the structured data "within 14 days of the data production."  ECF No. 234-2 at 3.  The deposition scheduled for June 25 fit comfortably within that timeline, making even more clear that Plaintiffs' failure to complete the source code review was a pretext for delay.  And given Plaintiffs' expert apparently needs up to *two months* to complete his analysis of the data,[16] *see* ECF No. 237 ¶¶ 20–21, further delaying that deposition is the opposite of diligence.

---

[14] Plaintiffs' positions beg the question of when they may *ever* be ready to take the deposition of Capital One's corporate representative on structured data—either the representative can provide information to help them understand the data, or they must understand the data fully in order to depose him.  Either way, the goal post is constantly moving in order to provide Plaintiffs cover for their requested extension.

[15] Plaintiffs also suggest that certain data may have been "omitted" from Capital One's structured data production.  *See* Mot. at 6.  But as their own cited exhibit demonstrates, Capital One has already explained to Plaintiffs that the information in question was *not* omitted.  *See* ECF No. 234-13 at 2 (email from Capital One's counsel to Plaintiffs explaining how the standdown information requested in Plaintiffs' letter can be identified within the structured data production).  To be clear, Capital One's structured data production is complete, and Capital One has satisfied its obligations as to Plaintiffs' structured data request.

[16] Plaintiffs' experts, including those reviewing the structured data and source code, have been retained for months, and were involved not only in putting together Plaintiffs' Amended Complaint, *see, e.g.*, ECF No. 121 ¶ 59 n.26, but also leading Plaintiffs' "tech tutorial" for the Court (in which Plaintiffs' expert seemed to misunderstand basic facts about both the affiliate marketing industry and Capital One Shopping).  Given how long they have been working on this matter, it is inexplicable why Plaintiffs' experts need as much time as they now claim—unless their initial impressions of Capital One's practices were wrong, and they are now trying to buy time to search for a new theory.

## C.        Third-Party Discovery

Plaintiffs seek to excuse their eleventh-hour third-party subpoenas by asserting that Capital One should have obtained this information for them earlier. *See, e.g.*, Mot. at 2. That contention is ridiculous. Capital One's notice of intent to serve subpoenas on third parties obviously identified recipients, and Plaintiffs cannot genuinely have believed that Capital One would serve a second round of four times as many subpoenas on third parties with only tangential relevance to the case, at best.

*First*, and most crucially, the subpoenas that Plaintiffs have served seek mostly irrelevant information and are unnecessary for class certification. More than half of Plaintiffs' 23 subpoenas—15—are issued to entities with which Capital One does not partner and has not ever partnered with, and all of the subpoenas seek massive amounts of irrelevant information. Put simply, Plaintiffs do not need the information they seek in the subpoenas at all, much less to pursue class certification. If they sincerely believed that they do, they should have sought it much sooner. And if they sincerely believed for the past few months that Capital One would be serving those subpoenas any day now so they did not have to, they should simply have asked if that was the case. Capital One would have responded that it most definitely was not.

*Second*, belying any notion that Plaintiffs genuinely believed that Capital One would do Plaintiffs' work for them, after Plaintiffs filed this Motion they served four more third-party subpoenas, this time on entities that Capital One had already served. As noted above, Capital One has repeatedly offered to pass along any requests for information from the third-party entities that Capital One had subpoenaed. *See* ECF No. 234-10 at 2. Plaintiffs made a *single* request, *id.*, and nothing further. Yet Plaintiffs now seek a massive amount of information from these entities, going well beyond the scope of Capital One's third-party requests, seeking information Plaintiffs never asked Capital One to try and obtain. Plaintiffs have long known the content of Capital One's

requests, and cannot seriously contend that they believed Capital One would obtain all the information Plaintiffs needed when they now have served their own, far broader subpoenas.

*Finally*, contrary to Plaintiffs' attempt to explain its lack of diligence, Capital One has never promised to subpoena "*all* of Plaintiffs' affiliate networks." Mot. at 7. Plaintiffs quote Capital One as representing in its April motion to compel that, "Capital One acknowledges that it is already seeking this information from the three largest affiliate networks, and intends to seek this information from *additional affiliate networks*"—not any and every affiliate network—"that Plaintiffs identify as those with which they have relationships." Mot. at 7 (quoting ECF No. 172 at 16). Moreover, to the extent there was any room for doubt, Capital One made clear in its reply in support of its motion to compel that subpoenaing "all" affiliate networks associated with Plaintiffs would be unduly burdensome and unwarranted, and it would not do so. *See* ECF No. 190 at 14.[17]

## III.   Granting Plaintiffs' Motion Will Needlessly Delay Resolution of this Case.

As set forth above, Plaintiffs have not shown that the Court's schedule "cannot reasonably be met despite the diligence of the party seeking the extension," *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003) (quoting Fed. R. Civ. P. 16, 1983 advisory committee's notes), the "hallmark" of the good cause standard, *Hunt*, 51 F. Supp. 3d at 636; *see also Howard,* 484 F. App'x at 815. Additionally, the extension requested would delay the resolution of the case considerably. With the July 2 class certification deadline, Plaintiffs' motion for class certification would have been

---

[17] Plaintiffs attempt to construe an email from Capital One's counsel as suggesting Capital One agreed to release Plaintiffs from some of their production obligations and instead seek the relevant information from affiliate networks. Mot. at 8 n.1. But Plaintiffs conveniently omit the fact that Capital One's counsel was referring to Former Plaintiffs, and not the remaining Plaintiffs. *See* ECF No. 234-7 at 2 (Capital One's counsel referencing "our position" regarding "former plaintiffs").

fully briefed by mid-August, leaving the parties time to conduct any additional fact discovery before the fact discovery cutoff.  But if Plaintiffs' Motion is granted, Plaintiffs' motion for class certification will not even be on file until September, will not be fully briefed until mid-October, with a ruling likely coming in November at the earliest.  There is simply no reason to delay this case further, particularly given Plaintiffs' lack of diligence.

## CONCLUSION

This Court has twice rejected requests to adopt the schedule that Plaintiffs now seek.  The same result is warranted here, and nothing in Plaintiffs' Motion justifies a departure from the Court's prior and correct determinations.  Plaintiffs' Motion should be denied, and this Court should therefore order Plaintiffs to file their class certification motion (including any expert reports that Plaintiffs intend to rely on in support of that motion) by July 23.

DATED: June 30, 2025                          Respectfully submitted,

By:  */s/ Connor Kelley*
Connor Kelley (VA Bar No. 93596)
Valerie Hletko*
Andrew Soukup*
Stephen Petkis*
Jeffrey Huberman*
Amee Frodle*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5606
Email:  ckelley@cov.com
        vhletko@cov.com
        asoukup@cov.com
        spetkis@cov.com
        jhuberman@cov.com
        afrodle@cov.com

*Attorneys for Capital One*

*\*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2025, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to all counsel of record.


By:  <u>/s/ *Connor Kelley*</u>
Connor Kelley