IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| *In re Capital One Financial Corporation, Affiliate Marketing Litigation* | Case No. 1:25-cv-00023-AJT-WBP |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION TO MODIFY THE SCHEDULING ORDER</u>**

## I. INTRODUCTION

Plaintiffs embrace this District's zeal for the prompt prosecution of cases and pay heed to Rule 23's command that a motion for class certification be filed "at an early practicable time." But these principles are embedded in Plaintiffs' request, which seeks a modest 60-day extension of the existing deadline. Plaintiffs did not seek a lengthier extension hoping the Court would comprise at 60—Plaintiffs requested the bare *minimum* time necessary to complete the task at hand in light of the size, complexity, and lack of sufficient explanations of the values in Capital One's structured data; the piecemeal and incomplete production of source code; and the belated subpoenas served on third parties, which Capital One reneged on serving early in the case.

Importantly, Plaintiffs' requested 60-day extension is dependent on the success of continued meet and confers with Capital One over its structured data and source code, which all parties acknowledge hold many of the key facts going to liability, class certification, and damages in this case. As of this filing, Capital One has agreed to produce some additional source code, and Plaintiffs are hopeful that Capital One will also agree to provide sufficient information for Plaintiffs to understand the meaning of various codes and values in Capital One's structured data. But Capital One has not firmly committed to any of these things and has not provided any dates certain by which additional source code and information about the structured data will be provided.[1] Motions to compel and modify the protective order may be a necessary next step.

---

[1] Specifically, the parties conducted two separate conferrals yesterday (July 2)—one to discuss Plaintiffs' unanswered questions and concerns over the source code, and another to discuss Plaintiffs' unanswered questions and concerns over the structured data—as set forth in detail in Plaintiffs' June 27 letters. Despite having had six days to formulate responses to Plaintiffs requests, on *both* conferrals, Capital One failed to have *anyone* from the client involved, and did not have authority to provide *any* concrete commitments to Plaintiffs' requests. Instead, both calls ended with Capital One's lawyers saying they would have to "take things back" to Capital One and revert to Plaintiffs with answers to *all* the questions and concerns raised in their letters. Thus, Capital One rendered both conferrals a total waste of time, their counsel failed to gather information from

1

Moreover, unlike traditional discovery, the review and processing of which is largely in the hands of the lawyers, understanding structured data and source code *requires* the assistance of experts, not merely the diligence and commitment of counsel. Plaintiffs' experts cannot reasonably be expected to be on 24-hour call to review voluminous source code, in person, at Capital One's offices, the moment it is produced. Nor can they be expected to analyze a 54.5 terabyte data set instantaneously, the moment clarification about basic aspects of the data is provided. Nor can Plaintiffs' counsel be expected to be instantaneously ready to take complex data depositions within minutes of being provided additional information.

While Capital One filed a 23-page opposition to Plaintiffs' requested extension, the ultimate basis for that opposition is not that Plaintiffs have failed to be diligent or that Capital One will suffer some prejudice. Nor is it grounded in a persuasive case that Plaintiffs could somehow move more quickly while fulfilling their obligations to the class. To the contrary, Capital One has already agreed to provide the additional source code that Plaintiffs requested on June 13, and the parties are working towards a mechanism for Capital One to provide information about the various values contained within its data. Only after this foundational information is provided can depositions on these topics commence and only then can Plaintiffs' experts begin to *analyze* the data produced.

Instead of genuinely demonstrating a lack of diligence or any remote notion of prejudice, Capital One instead seeks to weaponize the schedule and cajole the Court into establishing a deadline that will put Plaintiffs at a severe disadvantage. To do so turns Rules 1 and 23 on their

---

Capital One responding to the questions raised in Plaintiffs' letters in advance of the conferrals, and Capital One deferred the issues to after the holiday weekend, further delaying Plaintiffs' review of the source code and structured data.

heads. A speedy resolution only serves justice where it does not impede substantive consideration of the underlying issues.

Capital One cannot change the immutable truth that its source code and structured data productions to date have been inadequate. Nor can it change the reality that Plaintiffs are beholden to third parties to obtain critical information for class certification. Each of these items directly relates to Plaintiffs' motion for class certification, including (but not limited to) data necessary to identify: (1) instances where Capital One stole commissions owed to Plaintiffs and class members, (2) the identity of those class members, and (3) the amount of damages experienced by Plaintiffs and the class.

Given Capital One's present inability to commit to a timeline for production of additional source code and data definitions, and Plaintiffs' near-total dependence on expert review of the information once produced, Plaintiffs believe the most prudent approach to the instant Motion would be for the Court to enter an order granting Plaintiffs' Motion, extending the deadline for Plaintiffs' class certification motion to September 1 (and extending the other deadlines as listed in Exhibit A to Plaintiffs' Motion) and ordering a deadline of July 10, 2025, by which Capital One must provide all final positions on all of Plaintiffs' outstanding questions and requests with respect to source code and structure data. That way, if the parties are unable to resolve all outstanding disputes, Plaintiffs can promptly seek the Court's adjudication of all remaining disputes thereafter. The parties have fully vetted all presently known issues, and Plaintiffs anticipate that Capital One will be able to make more concrete commitments during the follow-up call the parties have scheduled for Monday July 7.[2] If allowed by the Court, Plaintiffs will file a brief update for the

---

[2] To the extent any issues remain in dispute after Monday, which Plaintiffs sincerely hope to avoid, Plaintiffs intend to request a status conference as invited by Judge Porter to quickly

Court on July 7 regarding the anticipated timeline for Capital One's forthcoming productions. In anticipation of providing the Court with that update, Plaintiffs offer the following argument in support of the presently requested extension:

II.     **ARGUMENT**

    A.     **Plaintiffs Require Explanations of the Structured Data Capital One Has Produced and Additional Source Code to Move for Class Certification**

As set forth in in Plaintiffs' Motion, Capital One failed to produce any structured data for more than *two months* from when Plaintiffs initially requested it, and Plaintiffs were unable to access it until only three weeks ago on June 11, 2025. Mot. at 3. Capital One's production included 23 fields that were not included in the "sample" it provided prior to the full production. *See* Ex. 7 at ¶ 2. Capital One failed to provide *any* definitions for these 23 additional data fields until June 26, 2025. *See id.*; *see also* Exhibit 1 at 1.

The structured data Plaintiffs requested is crucial for their motion for class certification because it is the data that will establish instances where Capital One stole a commission owed to Plaintiffs and class members (i.e., typicality, commonality, predominance, and liability), the identity of those class members (i.e., numerosity and ascertainability), and the amount of commissions Capital One stole (i.e., predominance and damages). Ex. 7 at ¶ 3. Specifically, the data includes (among many other things central to class certification) data showing:



---

adjudicate any remaining disputes. Exhibit 7 (Declaration of E. Michelle Drake in Support of Plaintiffs' Reply in Support of Plaintiffs' Motion to Modify the Scheduling Order) at ¶ 14.

*Id.* Upon receipt of Capital One's structured data on June 10, Plaintiffs and their experts immediately began attempting to analyze it but they could not do so without first performing multiple tasks spanning several weeks just to get the data into a format that could be meaningfully reviewed. *See* Mot. at 4-6 (citing Shafiq Decl., ECF No. 234-5, at ¶¶ 6-11).

Since commencing that process—and since filing their Motion—Plaintiffs have continued to promptly raise various questions about Capital One's data production, most importantly that the information Capital One provided about the meaning of the data fields was not sufficient to render it useable. *See generally* Ex. 1. To date, Capital One has continued to refuse to provide definitions and values needed to interpret the data. *See generally* Exhibit 2; Exhibit 6 at 1-6. These definitions and values are irrefutably within Capital One's possession, are responsive to Plaintiffs' structured data discovery requests,³ and could be provided by Capital One with ease. Ex. 7 at ¶ 5; Ex. 6 at 5.

To date, Capital One has *never* provided any definitions for the values in those fields. *See* Ex. 1 at 1-2; Ex. 6 at 1-6. For example, just *one* of the data fields Capital One produced—that relates to perhaps the most important issue in this case: events triggering attribution of commissions—contains the standardized fields listed below, the meaning of which are not self-evident; yet, Capital One has (so far) refused to provide more information, despite Plaintiffs' repeated requests that they do so:



---

³ *See* Exhibit 3 at 18-20 (Plaintiffs' requests for production number 21 requesting Capital One's structured data and request for production number 22 requesting "Documents sufficient to describe the contents and searchability of all data responsive to Request 21"); Exhibit at 4-6 (Plaintiffs' interrogatory number 6 requesting Capital One's description of its structured data, and interrogatory number 7 requesting that Capital One "Describe in detail the contents and searchability of all Data responsive to Interrogatory 6.").



███████████████████████████████████████████████████████████████

███████████████████ [4]

Plaintiffs have also flagged for Capital One numerous instances where the explanations it did provide are insufficient or appear to be inaccurate. For instance, Capital One's descriptions themselves contain undefined terms that are subject to various interpretations. *See id.* at 2-3. Similarly, Plaintiffs have discovered that ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ *See id.* at 3. In other instances, Plaintiffs raised that ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ These are just two examples, but Plaintiffs have raised numerous additional questions and potential issues with Capital One's structured data. *See generally id.* at 1-3; *see also* Ex. 6 at 1-6.

---

[4] Because the data fields and values are anything but self-explanatory—and the limited explanations that Capital One did provide are seemingly inaccurate—Plaintiffs have requested that Capital One provide sufficient explanations for all outstanding questions. *See id.* at 2. However, as recently as June 30, 2025, Capital One flatly refused to do so and again insisted that it would only provide those answers in a deposition. *See* Ex. 2 at 1-2.

7

During the parties' conferrals over the structured data, Capital One refused to provide a data dictionary providing explanations for the fields and values in its structured data. Ex. 7 at ¶ 4.[5] Indeed, until as recently as June 30, Capital One took the position that all of Plaintiffs' questions should be answered during a deposition. *See, e.g.*, Ex. 2 at 2 ("The proper way to get answers to your questions is via a deposition."). However, as the parties discussed with Magistrate Porter during the parties' discovery conference on July 1, Capital One's position that this information should be conveyed via a deposition ignores the impracticality of Plaintiffs obtaining detailed database information via oral questioning, ignores Plaintiffs' outstanding interrogatory asking for descriptions of the data, and also ignores the existence of documents in Capital One's possession, namely the source code that created the data in the first instance, that can provide guidance on these issues, but that has not yet been produced. Exhibit 5 at 6-9, 27-33, 42-44.[6] Capital One's

---

[5] During the parties' conferral yesterday, Plaintiffs requested that Capital One provide a data dictionary for these fields, as it has done with respect to tables and other aspects of the structured data. Ex. 7Ex. 7Ex. 7 at ¶ 6. The parties also discussed the prospect of Capital One producing additional source code related to the browser extension, which Plaintiffs would then have to use to manually determine the explanations/definitions of all the fields contained therein. *Id*. Should Capital One refuse to produce easily usable information and require Plaintiffs to review source code to understand the data, the approach will impose yet additional delays, as Plaintiffs will have to review voluminous code to even understand the voluminous data Capital One has produced. *Id*. Plaintiffs have requested this information via interrogatory and, should Capital One refuse to produce it in a usable format, Plaintiffs may be required to seek assistance from Magistrate Porter. *Id*. at ¶¶ 6, 14. Plaintiffs anxiously await Capital One's decision and remain unable to analyze the structured data until Capital One provides that guidance. *Id*. at ¶ 6.

[6] Indeed, Judge Porter agreed with Plaintiffs and aptly explained during the July 1 hearing as follows:
> I fully appreciate your point that at some point a deposition needs to be taken. But I think what Ms. Drake is trying to prevent and I think the Court on some level would not want to see happen is a deposition that, say, takes eight hours to figure out what in the world's going on versus digging into what the actual issues in this case are. And it causes me to wonder if there's some middle ground that we might be able to find… between the two of you where maybe the plaintiff identifies a list of information that they're looking for. [Capital One] goes back and you get it. And [Capital One] ha[s] -- either provide it to [Plaintiffs] or have a discussion about it, because I think a -- a deposition that is more trying to figure out what the discovery is versus a deposition

8

insistence that Plaintiffs cancellation of a deposition about the structured data reflects a lack of diligence is wrong. *See* Capital One's Opposition to Plaintiffs' Motion to Modify Scheduling Order, ECF No. 241 ("Opposition" or "Opp."), at 11. Plaintiffs' insistence on receiving basic foundational information necessary to conduct a meaningful deposition (which the Court endorsed on July 1, *see supra* n.6) *evidences* Plaintiffs' diligence, not the lack of it.

In addition to requiring additional information about the structured data, Plaintiffs also continue to not have access to the source code they need to analyze the operation of Capital One's browser extension. Ex. 7 at ¶ 7; Ex. 6 at 6-8. Plaintiffs requested some additional source code files on June 13, only three days after the source code was first made available. *See* Mot. at 10-11. As explained in Plaintiffs' Motion, this source code was referenced in (but omitted from) the source code Capital One initially made available and appears to be crucial to class certification because it shows how the Capital One Shopping browser extension is implemented and the manner in which it operates with respect to affiliate links. Mot. at 10-11, 13. Capital One has agreed to produce this code and only today (July 3) relayed that they will do so on July 7. Ex. 7 at ¶ 7; *See also* Ex. 6 at 7-8.

Plaintiffs have continued to identify missing files in Capital One's source code. *See* Ex. 6 at 6-8. ███████████████████████████████████████████████████████████████████ Plaintiffs

---

that's getting to the merits of the case is going to slow the process down and at the same time may cause [Plaintiffs] to come back and say, Hey, we need more time, and this is why we need more time. And depending on how the deposition goes and the merits of it, that may be something that might be appropriate. So it strikes me that that's an issue that you-all might be able to work out and without overburdening your client, getting to a place where while the answers may make -- may not be entirely comprehensive, they're at least enough that provide the plaintiff an opportunity to ask intelligent deposition questions.

*Id*.

9

have yet to receive a formal response to this request, but based on the parties' conferral on July 2, are hopeful that Capital One will provide the requested additional information. Ex. 7 at ¶ 8; Ex. 6 at 7-8.

To date, however, Capital One's process for producing source code has created an endless game of cat and mouse with Capital One, wherein (1) Plaintiffs specify the code functionality they wish to review; (2) Capital One produces something partially responsive from a single point in time; (3) Plaintiffs' review the source code, which reveals other code that was not produced; (4) Plaintiffs ask for additional code and are told the request is not sufficiently specific, and (5) Plaintiffs ask to review other versions of the code in effect during the class period and are instead provided with incomplete files with comments removed, which reference yet more code that has not been produced. During the parties' conferral yesterday, Capital One's attorneys acknowledged the shortfalls in that process and said they would "take it back" to Capital One to discuss a potential alternative but were unable to provide a definitive timeline on when they would be able to provide their position. Ex. 7 at ¶ 9; Ex. 6 at 7-8.

There are numerous other issues Plaintiffs raised in their June 27 letter that directly impact their review of Capital One's source code, about which Plaintiffs expect Capital One to provide its position on July 7. Ex. 6 at 6-8; Ex. 7 at ¶ 10. Ultimately, the parties' conferral yesterday ended with Capital One's counsel stating that they do not know when they will produce the additional source code Plaintiffs requested on June 27, and they are not presently able to commit to the process changes the parties discussed regarding future reviews. Ex. 6 at 6-8; Ex. 7 at ¶ 11. While Plaintiffs are hopeful that Capital One will provide what is required, Plaintiffs continue to wait for information from Capital One as to when they will be able to access and review this important information. Ex. 6 at 6-8; Ex. 7 at ¶ 11.

Adding to the complexity of Plaintiffs' task is the reality that Capital One's source code has changed over the class period. So, each produced source code file needs to be provided not merely in a static format, but in a format that allows Plaintiffs to understand how it has changed over time, and whether those changes might impact the certifiability of the proposed classes. *See* Ex. 6 at 7. However, the scope of these changes is near impossible to discern using the information Capital One has provided to date. *See id.* In its brief, Capital One touts the "diff" files it produced as "show[ing] the changes over time to the source code files it had previously produced, consistent with Plaintiffs' request to review changes to those files." Opp. at 10. However, those "diff" files are incomplete and lack critical information that would allow Plaintiffs to comprehend how the code has changed over time. Ex. 6 at 7-8. During the parties' meet and confer on July 2, Capital One's counsel acknowledged the shortcomings in the "diff" files as produced, and the parties conferred about alternative methodologies for showing changes it made to its source code. Ex. 6 at 6-8; Ex. 7 at ¶¶ 8-9. Again, Plaintiffs are hopeful that Capital One will produce usable information on this issue, but the present reality requires an extension, as the information provided to date is insufficient. Ex. 6 at 6-8; Ex. 7 at ¶ 8.

In short, Capital One has tacitly conceded that it has not yet provided Plaintiffs with the information they need to analyze the browser extension or the structured data. Plaintiffs are waiting for Capital One to advise next week if and when it will make this additional information available. Ex. 6 at 6-8. However, Capital One's deficient productions to date have prevented Plaintiffs from analyzing the data and source code has also rendered Plaintiffs unable to proceed with depositions. Ex. 7 at ¶ 12.

The information sought is core to the case—it goes to the heart of how the browser extension operated during the class period and to the establishment of a methodology that can identify class members and prove their claims on a class-wide basis.

**B. Capital One Grossly Misrepresents and Oversimplifies How Time Consuming and Onerous Plaintiffs' Review of the Source Code and Structured Data Will Be**

In its opposition, Capital One remarkably claims that in *only five business days*—from the June 25 date it made its structured data designee available for a deposition, and the July 2 class certification deadline—Plaintiffs should have been able to analyze over *54 terabytes* of structured data (using information they would have learned for the first time during a deposition on June 25) to formulate data-based methodologies for identifying (1) transactions where Capital One stole commissions from Plaintiffs and class members, (2) the identities of those class members, and (3) the dollar amounts of those commissions Capital One wrongfully stole from those class members. Opp. at 19. That suggestion is so unrealistic that it undercuts Capital One's credibility before this tribunal.

Again, as set forth in Plaintiffs' Motion—which Capital One's opposition wholly fails to refute—the structured data totals 54.5 terabytes and contains over 375 billion records. Mot. at 3 (citing Shafiq Decl. at ¶ 5). Capital One's position is simply not realistic or possible: Plaintiffs cannot instantaneously review source code, process the explanations Capital One shares about the structured data, immediately implement those explanations in analysis of the data, and generate expert reports necessary to support a motion for class certification; the Court credited the flaws in that approach. Ex. 5 at 42-44. Instead, the structured data is not only incredibly voluminous but is also from a bespoke database that requires expert analysis and time to decipher. Ex. 7 at ¶ 13.

As set forth in great detail in both Plaintiffs' Motion and the Declaration of Professor Shafiq filed contemporaneously therewith, the process of analyzing the source code and structured

data is time consuming and complex. *See* Mot. at 4-6 (explaining complex process for analyzing Capital One's structured data, citing Shafiq Decl. at ¶¶ 6-11); *see id*. at 11 (same for source code, citing Shafiq Decl. at ¶¶ 6, 13-21). To review the 375 million records in the structured data, Plaintiffs' experts must (1) first parse the data, (2) develop custom code to do so, (3) resolve all scheme inconsistencies, (4) programmatically join the various event types to reconstruct the consumer journey, and (5) actually analyze the enormous data. *See* Mot. at 4-6 (explaining complex process for analyzing Capital One's structured data, citing Shafiq Decl. at ¶¶ 6-11). Likewise, to analyze Capital One's source code, Plaintiffs' expert must (1) use developer tools to understand how certain segments of the code operate, (2) identify any related portions of source code, (3) request same from Capital One, (4) travel to Capital One's counsel's office to review those additional portions if/when Capital One makes them available, (5) wait to receive printouts of source code from Capital One, and (6) conduct a detailed programmatic analysis of the source code using standard development tools employed by software engineers to write, navigate, and test codebases. *See* Mot. at 11 (explaining complex process for analyzing Capital One's source code, citing Shafiq Decl. at ¶¶ 6, 13-21).

    **C.**    **Plaintiffs Need Information from the Affiliate Networks to Identify Transactions in Capital One's Structured Data Where Capital One Stole Commissions from Plaintiffs and Class Members**

Plaintiffs' subpoenas to the affiliate networks seek "Data related to Plaintiffs, including but not limited to Data sufficient to identify Plaintiffs' Affiliate IDs, Affiliate Links, and Merchants." ECF No. 241-3 at 11 (Ex. C to Capital One's Opp., at Request No. 4). Plaintiffs have also requested information sufficient to identify each affiliate networks Affiliate Links in the structured data. *See id*. (Request Nos. 7, 9). Likewise, Request No. 7 seeks "Data, including Affiliate Links and Affiliate IDs, sufficient to Identify all instances involving Affiliate Marketer Links in which any Affiliate Links, Affiliate IDs, Tracking Tags, URL, Cookies, or other codes or

13

tags associated with, or attributing transactions to, Affiliate Marketers were replaced, modified, or removed through operation of the Capital One Shopping Browser Extension." ECF No. 241-3 at 11 (Ex. C to Capital One's Opp., at Request No. 7). This requested information (and other requested in Plaintiffs' subpoenas) is necessary for Plaintiffs to identify transactions in Capital One's structured data where Capital One stole commissions from Plaintiffs and class members (i.e., relevant to commonality, typicality, and predominance), and is therefore crucial for their expert's effort to craft classwide methodologies for establishing liability and damages. Therefore, Capital One is incorrect that Plaintiffs' subpoenas do not seek information relevant to class certification, and Plaintiffs' Motion adequately explains how Capital One misled Plaintiffs (and this Court) by explicitly stating it would subpoena all of the affiliate networks, which does not bear repeating here. Mot. at 7-8.

      Capital One also makes a string of puzzling arguments about the scope of Plaintiffs' subpoenas to the affiliate networks—and emphasizes that some of those affiliate networks do not contract with Capital One. Capital One's claim that Capital One "does not partner" with those affiliate networks (Opp. at 21) is beside the point. Despite not partnering with those affiliate networks, it appears Capital One still replaces links generated by those networks, meaning that those affiliate networks possess critical information related to Plaintiffs and the class.

      Capital One's remaining arguments are equally unavailing. First, Capital One's argument that it would have "pass[ed] along" requests from Plaintiffs to the limited affiliate networks it subpoenaed suggests that Plaintiffs would have had to run all negotiations with the affiliate networks through Capital One, which is improper and unworkable. Further, Capital One did not subpoena all the affiliate networks Plaintiffs have utilized, and once Capital One stated that it would not subpoena the others, Plaintiffs needed to protect their discovery interests under Rule 45

and serve subpoenas documenting and preserving their requests. Second, Capital One's argument that "[m]oving Plaintiffs' class certification deadline to the close of fact discovery would inappropriately shift the burdens of discovery onto [the affiliate networks]" is nothing more than a futile strawman argument because Plaintiffs can obviously confer with the affiliate networks to sequence their response to initially produce only the information Plaintiffs need for class certification now, while Plaintiffs reserve their rights to seek the remaining requests at a later time (if necessary).

In short, none of Capital One's arguments undercut the reality that Plaintiffs need information from the affiliate networks to both analyze the structured data and formulate methodologies for class certification. *See* Opp. at 21-22. Plaintiffs are dependent on third parties to obtain information that can help them identify impacted transactions in the data. Plaintiffs have diligently sought this information, and are continuing to do so, but have not yet received it. Plaintiffs' ongoing need for this information provides a further basis for the requested extension.

## **CONCLUSION**

For the foregoing reasons, good cause exists for modifying the current schedule consistent with Exhibit A to Plaintiffs' Motion. As discussed above, because the parties are currently waiting for Capital One to revert with various updates and proposals on both its structured data productions and source code, Plaintiffs respectfully request that the Court enter an order granting Plaintiffs' Motion, extending the deadline for Plaintiffs' class certification motion to September 1 (and extending the other deadlines as listed in Exhibit A to Plaintiffs' Motion), and ordering a deadline of July 10, 2025, by which Capital One must provide all final positions on all of Plaintiffs' outstanding questions and requests with respect to source code and structure data so that, if the parties are unable to resolve all outstanding disputes, Plaintiffs can promptly seek the Court's

adjudication of all remaining disputes thereafter.

Dated: July 3, 2025                                  Respectfully submitted,

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728
Alexandria, Virginia 22201
Telephone: (888) 987-9991
swebster@websterbook.com

*Plaintiffs' Local Counsel*

*/s/Norman E. Siegel*
Norman E. Siegel (admitted *pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

*/s/E. Michelle Drake*
E. Michelle Drake (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: 612.594.5999
emdrake@bm.net

*/s/Douglas J. McNamara*
Douglas J. McNamara (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
dmcnamara@cohenmilstein.com

*/s/James J. Pizzirusso*
James J. Pizzirusso (admitted *pro hac vice*)
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com

16

*Plaintiffs' Co-Lead Counsel*

17

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**